**FILED & ENTERED**

**SEP 26 2023**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY penning   DEPUTY CLERK

<u>NOT FOR PUBLICATION</u>

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>PEOPLE WHO CARE YOUTH CENTER, INC.,<br><br>Debtor. | Case No. 2:18-bk-10290-RK<br><br>Chapter 11<br><br>Adv. No. 2:18-ap-01139-RK |
| PEOPLE WHO CARE YOUTH CENTER, INC.,<br><br>Plaintiff.<br><br>v.<br><br>AMMEC, INC., and GRETA CURTIS,<br><br>Defendants. | **BANKRUPTCY COURT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF FACT AFTER TRIAL OF PLAINTIFF'S AMENDED COMPLAINT**<br><br><u>Trial Dates</u><br>January 28 and February 18 and 19, 2021, June 29 and 30, 2022, and June 16, 2023 |

TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, AND THE PARTIES TO THIS ADVERSARY PROCEEDING,

PLAINTIFF PEOPLE WHO CARE YOUTH CENTER, INC., DEFENDANTS AMMEC,

INC, AND GRETA CURTIS, AND THEIR COUNSEL OF RECORD.

      Pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9033, the

undersigned United States Bankruptcy Judge on behalf of the United States Bankruptcy

1  Court for the Central District of California after the trial of Plaintiff's First Cause of Action

2  for Slander of Title in this adversary proceeding hereby issues the following proposed

3  findings of fact and conclusions of law regarding Plaintiff's Amended Complaint

4  containing its First, Second, Third and Fourth Causes of Action for consideration by the

5  United States District Court for the Central District of California.

6      Plaintiff's First Cause of Action for Slander of Title is a claim that arises under

7  nonbankruptcy California state law, and the Bankruptcy Court lacks authority to enter a

8  final judgment on such claim absent the consent of all parties, which has not been given.

9  *See Stern v. Marshall,* 564 U.S. 462 (2011).

10     When the trial of adversary proceeding was commenced, Plaintiff's First Cause of

11  Action for Slander of Title was the sole remaining claim in this adversary proceeding

12  which has not been adjudicated by the Bankruptcy Court.  Previously, the Bankruptcy

13  Court adjudicated the other claims in this adversary proceeding on Plaintiff's motion for

14  summary adjudication, determining that those other claims arose under bankruptcy law,

15  and the Bankruptcy Court had authority to enter a final judgment on such claims.

16  However, in light of subsequent, intervening Ninth Circuit case law, the Bankruptcy Court

17  on its own motion reconsidered and modified its order on partial summary adjudication,

18  vacating its judgments in favor of Plaintiff on its third cause of action for lien avoidance

19  and its fourth cause of action for declaratory relief regarding lien avoidance.  The

20  Bankruptcy Court's prior ruling granting partial summary adjudication on Plaintiff's second

21  cause of action for claim disallowance and on its fourth cause of action for declaratory

22  relief regarding claim disallowance remains in effect.

23     The Bankruptcy Court previously determined that Plaintiff's Second Cause of

24  Action for Disallowance of Claim, its Third Cause of Action for Avoidance of Lien and its

25  Fourth Cause of Action regarding Disallowance of Claim and Avoidance of Lien are

26  claims that arise under the Bankruptcy Code, and the Bankruptcy Court has authority to

27  enter a final judgment on such claims absent the consent of the parties.   Since the

28  Bankruptcy Court's prior ruling on Plaintiff's Second Cause of Action for Disallowance of

1   Claim and Fourth Cause of Action as to Disallowance of Claim still stands, the

2   Bankruptcy Court having jurisdiction to enter a final judgment on these claims will enter a

3   final judgment as to these claims by a separate order and judgment.  However, since the

4   Bankruptcy Court has reconsidered and vacated its grant of partial summary adjudication

5   on Plaintiff's Third Cause of Action for Avoidance of Lien and Fourth Cause of Action as

6   to Avoidance of Lien, the Bankruptcy Court has instead finds that the resolution of these

7   two claims depends on the same factual determinations as the First Cause of Action for

8   Slander of Title and concludes that the resolution of these two claims along with the First

9   Cause of Action should be determined by the District Court upon the following proposed

10  findings of fact and conclusions of law.

11  **I.    INTRODUCTION**

12      1.    On January 28, 2021, February 18 and 19, 2021, on June 29 and 30, 2022,

13  and June 16, 2023, the Bankruptcy Court conducted a trial on the Amended Complaint

14  [Adversary Proceeding Docket No. 44] in this adversary proceeding[1] filed by Plaintiff

15  People Who Care Youth Center, Inc. ("Plaintiff" or "Debtor") against Ammec, Inc.

16  ("Ammec" or "<u>Defendant</u>") and Greta Curtis ("Curtis" or "Defendant") (Ammec and Curtis,

17  collectively, "Defendants").  The trial focused on the First Cause of Action of the

18  Amended Complaint for Slander of Title.  However, the trial addresses the remaining

19  unadjudicated causes of action after the Bankruptcy Court's modification of its order

20  granting partial summary adjudication in favor of Plaintiff, which set aside the granting of

21  partial summary adjudication in favor of Plaintiff on the Third Cause of Action for Lien

22  Avoidance and the Fourth Cause of Action for Declaratory Relief as to Lien Avoidance.

23  _____

24  [1] On May 8, 2018, Plaintiff People Who Care Youth Center, Inc. filed an adversary
    complaint against Defendants Greta Curtis and Ammec, Inc. for: (1) Slander of Title; (2)
    Disallowance of Claim [11 U.S.C. § 502(b)]; (3) Avoidance of Lien; [FRBP 7001]; (4)

25  Declaratory relief; (5) Punitive Damages; and (6) Attorneys' Fees and Costs. Adversary
    Proceeding Docket No. 1.  On October 26, 2018, Plaintiff filed its Amended Complaint

26  with the same headings, but omitted certain material attached to the original complaint
    which had been stricken by order of the bankruptcy Code.  Adversary Proceeding Docket

27  No. 44.  The proposed findings of fact and conclusions of law herein only relate to the first
    claim for relief of Slander of Title in the Amended Complaint.

28

The court's granting of partial summary adjudication in favor of Plaintiff on the Second Cause of Action for Claim Disallowance and the Fourth Cause of Action for Declaratory Relief remains in effect.

2.    The Bankruptcy Court received into evidence the trial declaration of witness Eric Radley [Adversary Proceeding Docket No. 171], subject to the Bankruptcy Court's rulings on evidentiary objections [Adversary Proceeding Docket No. 173], and heard his testimony on cross-examination and re-direct examination at trial.

3.    The Bankruptcy Court received into evidence the trial declaration of witness Barrington Radley, also known as "Ronnie" [Adversary Proceeding Docket No. 170], subject to the Bankruptcy Court's rulings on evidentiary objections [Adversary Proceeding Docket No. 174], and heard his testimony on cross-examination and re-direct examination at trial.

4.    The Bankruptcy Court received into evidence the trial declaration of witness Michelle McArn (McArn) [Adversary Proceeding Docket No. 172], subject to the Bankruptcy Court's rulings on evidentiary objections [Adversary Proceeding Docket No. 175], and heard her testimony on cross-examination and re-direct examination at trial.

5.    The Bankruptcy Court received into evidence the trial declaration of witness Greta Curtis (Curtis) [Adversary Proceeding Docket No. 204], subject to the Bankruptcy Court's rulings on evidentiary objections [Adversary Proceeding Docket No. 205], and heard her testimony on cross-examination and re-direct examination at trial.

6.    The Bankruptcy Court received into evidence the trial declaration of witness Sherman Lee (Lee) [Adversary Proceeding Docket No. 167], subject to the Bankruptcy Court's rulings on evidentiary objections [Adversary Proceeding Docket No. 195], and heard his testimony on cross-examination and re-direct examination at trial.

7.    The Bankruptcy Court heard direct testimony of the subpoenaed third-party witness Rudy Trabanino at trial, and Defendants did not cross-examine him.

8.    The following exhibits from the *Amended Joint Pre-trial Stipulation as Modified at the Hearing on Joint Pre-trial Conference; Order thereon* (JPTS)[Adversary

Proceeding Docket No. 162]  were admitted into evidence, 2/19/21 Trial Transcript at

205:10-12:[2]

| Exhibit | JPTS ¶ No. | Plaintiff's Exhibit No. | Defendants' Exhibit No. |
|---|---|---|---|
| Recorded notice of Disputed Mechanic's Lien. | 74, 81, 87 | P-1 | D-1 |
| Email from Habitat for Humanity with attached Habitat for Humanity Monthly Total Sales Receipts for September, October, November 2017 | 75 | P-2 | N/A |
| One photograph of Habitat Restore pink "pull tag receipt" ticket | 76, 83, 89 | P-3 | D-3 |
| Two photographs of lumber purportedly at Habitat for Humanity | 77 | P-4 | N/A |
| Nine photographs of lumber purportedly at Debtor's Property | 78, 84, 90 | P-5 | D-4 |
| Text Messages from Michelle McArn | 79 | P-7 | D-6 |
| Text Messages from Eric Radley | 80 | P-6 | D-7 |
| Appraisal of the 1500 W. Slauson Avenue, Los Angeles, CA building | 82, 88 | N/A | D-2 |
| Habitat Restore "pink" pull tag hold ticket | 83 | P-3 | D-3 |
| Two photographs of Curtis's lumber inside 1500 W. Slauson Avenue, L.A., CA building before being affixed to the second story of the building | 84, 91 | *See* P-4 | D-5 |
| Pleading filed by Sherman Lee in the involuntary bankruptcy case of *In re Ammec, Inc.*, case number 1:16-bk-10598-MB (Bankr. C.D. Cal.) [Docket No. 142] | N/A | P-8 | N/A |

---

[2] Citation to the trial transcripts in this adversary proceeding are in the format of "[Month/Day/Year] Trial Transcript at [Page:Line-Line]" or, if the citation continues onto a different page "[Page:Line- Page:Line]."  Pages cited are the page numbers of the transcripts, not the court's docket entry bates stamp page numbers.  The parties in their papers refer to the Trial Transcripts as "Hr Tr" (Hearing Transcript).  The Bankruptcy Court prefers not to use this abbreviation for the sake of clarity.

| | | | |
|---|---|---|---|
| Deposition Transcript of Greta Curtis on March 25, 2019 | N/A | P-10 | N/A |

9.      The Bankruptcy Court also heard the trial testimony of John-Patrick M. Fritz regarding Plaintiff's claim of attorneys' fees and litigation costs as pecuniary damages on its slander of title cause of action and received into evidence his declarations in support of Plaintiff's first and second motions for attorneys' fees and costs and the reply to Defendants' opposition to Plaintiff's second motion for attorneys' fees and costs and the exhibits attached thereto which set forth the billing entries for the claimed fees and the breakdown of costs, and the reformatted records of attorneys' fees [Adversary Proceeding Docket Nos. 146, 221, 273 and 275].

10.      Upon consideration of all evidence and argument presented at trial, and upon those matters that the Bankruptcy Court may take judicial notice[3] pursuant to Federal Rule of Evidence 201, and upon those findings of facts and conclusions of law established in the JPTS, and after due deliberation and good cause appearing therefor, and pursuant to Rule 52 of the Federal Rules of Civil Procedure, as incorporated by Rules 7052 and 9033 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Court issues the following proposed findings of fact and conclusions of law.

## II.     JURISDICTION

11.      The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The claims of the adversary proceeding are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(O), except for Plaintiff's first cause of action for slander of title which is a noncore proceeding arising under nonbankruptcy California state law, absent the consent of all parties, which has not been given.  *See*

---

[3] Plaintiff separately and concurrently filed its request for judicial notice ("RJN") with the proposed findings and conclusions.  Declaration of John-Patrick M. Fritz in Support of Request for Judicial Notice in Support of Plaintiff's Proposed Findings of Fact and Conclusions of Law After Trial [Adversary Proceeding Docket No. 219].

Defendants Greta Curtis and Ammec, Inc.'s Proposed Findings of Fact and Conclusion[s] of Law in Support of First Cause of Action for Slander of Title in the Amended Complaint Following Trial (Defendants' Proposed Findings) at 2 [Adversary Proceeding Docket No. 269] ("Defendants do not dispute the court[']s jurisdiction over the adversary proceeding but they do take issue with the Bankruptcy Court entering a judgment in this matter and respectfully requested the Bankruptcy Court to refer the matter to the District Court for a final judgment.").

12.   On December 22, 2022, the Bankruptcy Court issued an Order Requesting Statements Regarding Scope of Referral to United States District Court Pursuant to Federal Rule of Bankruptcy Procedure 9033 [Adversary Proceeding Docket No. 314] in order for the parties to address the Bankruptcy Court's ability to enter a final judgment in this adversary proceeding.  In response to the Bankruptcy Court's order, Plaintiff and Defendants filed responses [Adversary Proceeding Docket Nos. 316 and 317], on January 6, 2023.  Having considered the responses, the Bankruptcy Court rules as follows.

13.   Defendants expressly declined to consent to the Bankruptcy Court entering final judgment in this adversary proceeding as indicated in the joint status report filed on January 15, 2019 [Adversary Proceeding Docket No. 63] and in their proposed findings of fact and conclusions of law after trial [Adversary Proceeding Docket No. 269].  Based on Defendants' responses, they still do not consent to the Bankruptcy Court entering a final judgment in this adversary proceeding.  Since the slander of title claim is a noncore claim arising under state law (that is, a claim being noncore does not involve a substantive right arising under federal bankruptcy law), and subject to the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), holding that an Article III tribunal (that is, the United States District Court) is required to enter final judgment on a noncore claim, such as Plaintiff's slander of title claim, the Bankruptcy Court as an Article I tribunal lacks authority to enter final judgment on such a claim. The Bankruptcy Court may try such a claim, but must submit proposed findings of fact and conclusions of law to the United States District Court for de novo review pursuant to Federal Rule of Bankruptcy

Procedure 9033. 28 U.S.C. § 157(c)(1) and (2).  *Seee also*, *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25 (2014).  Accordingly, the Bankruptcy Court is issuing these proposed findings of fact and conclusions of law on Plaintiff's first cause of action for slander of title for de novo review by the United States District Court pursuant to Federal Rule of Bankruptcy Procedure 9033.

14.  Plaintiff asserts that it largely agrees with the Bankruptcy Court's stated position, but argues that Defendants have consented to the Bankruptcy Court's authority to enter a final judgment on all causes of action based on their conduct after the filing of the January 15, 2019 joint status report indicating their lack of consent to Bankruptcy Court authority.  Plaintiff contends that Defendants filed a motion for summary judgment [Adversary Proceeding Docket No. 69] where they asked for final judgment, and therefore, Defendants consented to the jurisdiction of the bankruptcy court to adjudicate non-core, related proceedings despite self-serving and one-sided assertions of non-consent.  *See Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665, 682-683 (2015).  In the conclusion portion of Defendants' motion for summary judgment, they argued that the Bankruptcy Court lacked jurisdiction to disallow their lien claim because they did not file a proof of claim in the underlying bankruptcy case.  Adversary Proceeding Docket No. 69, 8:26-27.  This was not an affirmative indication that Defendants were consenting to Bankruptcy Court jurisdiction in this adversary proceeding, though as previously discussed, while Defendants sought a favorable ruling from the Bankruptcy Court on their summary judgment motion in asking that the Bankruptcy Court grant summary judgment in their favor, technically speaking, they should have requested that the Bankruptcy Court issue a report and recommendation to the District Court that their summary judgment motion be granted and that the District Court enter a final judgment on their motion.  While this oversight is probably explained by Defendants' lack of understanding of Bankruptcy Court jurisdiction, it does not definitively indicate that they consented to Bankruptcy Court jurisdiction to enter a final judgment.

15. Regarding the other claims in Plaintiff's adversary complaint, although the

Bankruptcy Court previously granted partial summary adjudication on those claims, the Bankruptcy Court did not enter a final judgment on those claims pursuant to Federal Rule of Bankruptcy Procedure 7054, making Federal Rule of Civil Procedure 54(b) applicable. A final judgment can be entered only when all the claims in the adversary proceeding are adjudicated, including the first cause of action for slander of title to be finally adjudicated by the United States District Court pursuant to Federal Rule of Bankruptcy Procedure 9033. Subsequently, after trial, the Bankruptcy Court modified its ruling on Plaintiff's motion for partial summary adjudication and vacated the granting of partial summary adjudication in favor of Plaintiff on the Third Cause of Action for Lien Avoidance and the Fourth Cause of Action for Declaratory Relief as to Lien Avoidance.

16.  The Bankruptcy Court determines that Plaintiff's second cause of action for disallowance of claim pursuant to 11 U.S.C. § 502(b) is a constitutionally core claim for which the Bankruptcy Court may enter final judgment as claim allowance is a core bankruptcy function, and likewise, the same is true as to the fourth cause of action for declaratory relief as to claim disallowance.

17.  The Bankruptcy Court also determines that the third cause of action for lien avoidance pursuant to Federal Rule of Bankruptcy Procedure 7001 is also a constitutionally core claim for which the bankruptcy court may enter final judgment as held by the Bankruptcy Appellate Panel of the Ninth Circuit in *In re Washington Coast I, L.L.C.*, 485 B.R. 393 (9th Cir. BAP 2012), because lien avoidance relates to claim allowance, and likewise, the same is true as to the fourth cause of action for declaratory relief as to lien avoidance. However, because lien avoidance is dependent on same factual findings as the slander of title claim, the Bankruptcy Court determines that the lien avoidance claims should be determined by the District Court.

18.  Accordingly, while the Bankruptcy Court may hear Plaintiff's tort claim for slander of title under nonbankruptcy law, it lacks authority to enter a final judgment on such claim, and must issue and submit proposed findings of fact and conclusions of law for de novo review by the United States District Court pursuant to 28 U.S.C. §157(c)(1) and Federal Rule of Bankruptcy Procedure 9033.

19. As stated earlier, the Bankruptcy Court determines that it may enter a final judgment on Plaintiff's Second, Third and Fourth Causes of Action, and the Bankruptcy Court has granted Plaintiff partial summary adjudication in its favor on the Second Cause of Action for Claim Disallowance and the Fourth Cause of Action as to Claim Disallowance. Although the Bankruptcy Court has authority to enter a final judgment on the Plaintiff's Third Cause of Action as to Lien Avoidance and Fourth Cause of Action for Declaratory Relief as to Lien Avoidance, the Bankruptcy Court only issues proposed findings of fact and conclusions of law on these claims because its factual findings are dependent on the proposed factual findings on the slander of title claim which is subject to de novo review by the District Court.

III.    **FINDINGS OF FACT[4]**

A.    **The Parties**

20. Plaintiff People Who Care Youth Center, Inc., is a non-profit corporation, and its mission is to provide child daycare and afterschool programs to low-income working parents in South Central Los Angeles. JPTS at 2, Admitted/Adjudicated Fact No. 2 [Adversary Proceeding Docket No. 162]. [5]

21. Plaintiff's primary asset is real property consisting of two commercial buildings located at 1502 and 1512 West Slauson Avenue, Los Angeles, California 90047 (the 1502 Property and 1512 Property, respectively, and, collectively, the Property). JPTS at 2, Admitted/Adjudicated Fact No. 3 [Adversary Proceeding Docket No. 162].

22. Michelle McArn (McArn) is the president of the board of directors for Plaintiff. Declaration of Michelle McArn (McArn Declaration), ¶ 2 [Adversary Proceeding Docket No. 172].

23. Michelle McArn is married to Eric Radley. McArn Declaration, ¶ 5 [Adversary

---

[4] To the extent any proposed findings of fact are recommended conclusions of law, the Bankruptcy Court adopts them as such.

[5] The Joint Pretrial Stipulation listed admitted facts and facts adjudicated on Plaintiff's motion for summary adjudication together. JPTS at 2-5 [Adversary Proceeding Docket No. 162],

Proceeding Docket No. 172].

24.    According to McArn, her husband, Eric Radley, has helped her and the Plaintiff with extensive renovation and repair of the Plaintiff's Property, and McArn considers Eric to be an agent of the Plaintiff in many respects, including the repair and renovation of the Property. McArn Declaration, ¶ 6 [Adversary Proceeding Docket No. 172]; *see also* 2/18/21 Trial Transcript at 237:1-23 (McArn testimony).

25.    Eric Radley's cousin, Barrington Radley, has also helped the Plaintiff in its renovations on the Property since 2017.  McArn Declaration, ¶ 7 [Adversary Proceeding Docket No. 172]; Declaration of Barrington Radley (Barrington Radley Declaration), ¶¶ 3, 7-9 [Adversary Proceeding Docket No. 170].

26.    Eric Radley testified that he has approximately 30 years of handyman work repairing buildings with his cousin, Barrington Radley.  Eric Radley Declaration, ¶ 22 [Adversary Proceeding Docket No. 171].

27.    Barrington Radley is a retired building inspector, and he is a builder of commercial and residential properties with over 40 years of experience in building and construction.  Barrington Radley Declaration, ¶ 4 [Adversary Proceeding Docket No. 170].

28.    Barrington Radley testified that he has extensive background, experience, and expertise as a contractor, builder, and building inspector.  Barrington Radley Declaration, ¶¶ 4-6 [Adversary Proceeding Docket No. 170].

29. Greta Curtis (Curtis) is the president of Ammec, Inc. (Ammec).  JPTS at 4, Admitted Fact No. 22 [Adversary Proceeding Docket No. 162].

30. Greta Curtis was formerly a practicing attorney for 20 years before she was disbarred on December 20, 2014.  Curtis Declaration, ¶ 33 [Adversary Proceeding Docket No. 204]; McArn Declaration, ¶¶ 14-18 [Adversary Proceeding Docket No. 172] (McArn testimony that she allowed Curtis to store at Plaintiff's Property files from the closing of Curtis's law office after Curtis lost her law license); License Status, Disciplinary and Administrative History for Greta Sedeal Curtis, California Bar No. 175248 (State Bar

1    of California website accessed on March 22, 2023 at

2    https://apps.calbar.ca.gov/attorney/Licensee/Detail/175248); 2/18/21 Trial Transcript at

3    44:20-23 (court noting on the record at trial that Curtis is a disbarred attorney); *see also,*

4    Federal Rule of Evidence 201 (judicial notice of a fact that is not subject to reasonable

5    dispute, such as Curtis's disbarment by order of the California Supreme Court in 2014 as

6    reflected on the State Bar of California's website at

7    https://apps.calbar.ca.gov/attorney/Licensee/Detail/175248 and the California Appellate

8    Courts Case Information website at

9    https://appellatecases.courtinfo.ca.gov/search/case/dockets. [6]

10            31.    Eric Radley and Greta Curtis were acquaintances who met in fall or winter of

11    2016 in the Clerk's Office at the courthouse in Torrance, California, where Eric Radley

12

---

13    [6] The docket notes for the disposition of Curtis's discipline case by the California Supreme
        Court on the California Appellate Court Case Information website stated *inter alia*

14        as follows:  "The court orders that Greta Sedeal Curtis, State Bar Number 175248,
        is disbarred from the practice of law in California and that her name is stricken from

15        the roll of attorneys.

16    Greta Sedeal Curtis must make restitution to the following payees:

      (1) Anna and Larry Troup in the amount of $18,461.38 plus 10 percent interest per year
17        from September 1, 2010; and

18    (2) Kathryn Carr in the amount of $209,410.38 plus 10 percent interest per year from
        February 18, 2010.

19    Any restitution owed to the Client Security Fund is enforceable as provided in Business
        and Professions Code section 6140.5, subdivisions (c) and (d)."

20    As reflected in these docket notes, the California Supreme Court adopted the
21        recommendations of the State Bar Court that Curtis be disbarred and ordered to pay
        restitution to her clients, the Troups and Ms. Carr, as stated in the State Bar Court
22        opinion filed on June 12, 2014 posted on the State Bar's website at
        https://apps.calbar.ca.gov/courtDocs/10-O-07369-2.pdf.  The State Bar Court in its
23        opinion stated:  "Here, respondent [Curtis] misappropriated a total of $249,926.53
        ($18,461.38 + 231,465.15). Respondent's misappropriation in the Carr matter is
24        particularly disturbing because she took her client's money on the pretense that she
        was going to safeguard it from the IRS. Respondent used fear to manipulate Carr
25        into putting her life savings into respondent's care, and then immediately began
        using those funds for respondent's own benefit. Respondent demonstrated no
26        recognition of her duty to protect and account for her clients' funds and has made
        little effort to make her clients whole. Accordingly, the court finds that the interests
27        of public protection mandate a recommendation of disbarment." *Id.* at 25.

28

was having difficulty looking up court records and Curtis approached him and offered to

help, telling him that she was an attorney; later, they exchanged contact information, and

Curtis told Eric Radley that if he ever needed legal help to give her a call.  Eric Radley

Declaration, ¶¶ 5-7 [Adversary Proceeding Docket No. 171]; Trial Declaration of Greta

Curtis (Curtis Declaration) at 2, ¶2 [Adversary Proceeding Docket No. 204] ("I met

Plaintiff's agent, Eric Radley, in the Torrance courthouse.").  At the time Curtis told Eric

Radley that she was a lawyer in 2016, she was no longer a lawyer, having been

disbarred about two years earlier in 2014, and there is no evidence that Curtis disclosed

her disbarment to Eric Radley at the time.

32.   Eric Radley did not call Curtis, but a few months later, Curtis called him up,

and he told Curtis about McArn's work with Plaintiff, that is, McArn having taking over

management of Plaintiff a month earlier, and telling Curtis about all of Plaintiff's problems,

including its debt problems with Acon Development, Inc., and Curtis told him that she

could help.  Eric Radley Declaration, ¶¶ 8-10 [Adversary Proceeding Docket No. 171].

33.   In the spring of 2017, Eric Radley introduced McArn to Curtis.  McArn

Declaration, ¶ 8 [Adversary Proceeding Docket No. 172]; Eric Radley Declaration, ¶¶ 9-

11 [Adversary Proceeding Docket No. 171].  Curtis said to McArn that she was a lawyer

and that she could help Plaintiff with its financial problems, management, and refinancing

Plaintiff's debts with Acon Development, Inc. ("Acon").  McArn Declaration, ¶ 9

[Adversary Proceeding Docket No. 172].  At the time Curtis told McArn that she was a

lawyer in 2017, she was no longer a lawyer, having been disbarred over two years earlier

in 2014, and there is no evidence that Curtis disclosed her disbarment to McArn at the

time.

34.   McArn gave Curtis Plaintiff's files, books, and records, so that Curtis could

help with Plaintiff's financial and legal issues and refinancing.  McArn Declaration, ¶ 10

[Adversary Proceeding Docket No. 172]; Eric Radley Declaration, ¶¶ 9-11 [Adversary

Proceeding Docket No. 171].

**B.    Procedural Background**

35.   Plaintiff filed for bankruptcy protection on January 10, 2018 (the "Petition Date") by filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C.  JPTS at 2, Admitted/Adjudicated Fact No. 1 [Adversary Proceeding Docket No. 162].

36.   When Plaintiff was attempting to refinance the Property, Plaintiff learned for the first time that, on October 19, 2017 (the "Recording Date"), Curtis, either on behalf of herself or on behalf of Ammec, recorded a "Claim of Lien" (Doc. No. 20171200769) (the Lien) on the Property for $40,000 allegedly related to construction work at the Property (the "Alleged Obligation").  JPTS at 2, Admitted/Adjudicated Fact No. 4 [Adversary Proceeding Docket No. 162].

37.   On May 8, 2018, Plaintiff filed this adversary proceeding (Adversary Proceeding), bearing case number 2:18-ap-01139-RK, objecting to the claims of Ammec and Curtis and seeking to void any lien that Defendants may have.  JPTS at 5, Admitted/Adjudicated Fact No. 26 [Adversary Proceeding Docket No. 162].

38.   On November 14, 2019, the Bankruptcy Court entered its *Order Granting Motion for Partial Summary Adjudication of Plaintiff's Amended Complaint [Adversary Proceeding Docket No. 120]* ("Partial Summary Adjudication Order"), granting in favor of Plaintiff and against Defendants partial summary adjudication of the Second, Third, Fourth Causes of Action in the Complaint.  Request for Judicial Notice (RJN), Exhibit 1, Partial Summary Adjudication Order [Adversary Proceeding Docket No. 142].

39.   Pursuant to the Partial Summary Adjudication Order, Defendants are not entitled to any allowed claim against Plaintiff or its bankruptcy estate in Plaintiff's bankruptcy case, and any proofs of claim filed by the Defendants are deemed untimely and are disallowed pursuant to 11 U.S.C. § 502(b)(9).  JPTS at 5, Admitted/Adjudicated Fact No. 33 [Adversary Proceeding Docket No. 162].

40.   Based on the Partial Summary Adjudication Order, the Joint Pretrial Stipulation stated that any and all liens asserted by the Defendants against the Property

are void and unenforceable.  JPTS at 5, Admitted/Adjudicated Fact No. 34 [Adversary Proceeding Docket No. 162].  However, in light of the partial modification and vacation of the Partial Summary Adjudication Order, this statement is no longer a fact established by the Partial Summary Adjudication Order.

41.  As a result of the Partial Summary Adjudication Order, the first cause of action in the Complaint for slander of title was the only cause of action remaining for trial. *See generally*, RJN, Exhibit 1, Partial Summary Adjudication Order [Adversary Proceeding Docket No. 142].  However, in light of the Bankruptcy Court's reconsideration of the Partial Summary Adjudication Order, Plaintiff's third cause of action for lien avoidance and its fourth cause of action as to lien avoidance also remained for adjudication at trial.

**C.    The Purchase of the Lumber**

42.  Eric and Barrington Radley devoted several months in 2017 and 2018 to repairing the Plaintiff's Property.  Eric Radley Declaration, ¶ 23 [Adversary Proceeding Docket No. 171]; Barrington Radley Declaration, ¶¶ 7-10 [Adversary Proceeding Docket No. 170].

43.  Eric Radley testified that Greta Curtis had told him that she wanted to build a house for herself, and that he told Curtis that his cousin Barrington Radley had a lot of building experience.  Eric Radley Declaration, ¶ 13 [Adversary Proceeding Docket No. 171].

44.  Eric Radley took several trips to Habitat for Humanity Restore (Habitat) to get materials for renovating the Property, including carpet, linoleum, and many miscellaneous items.  Eric Radley Declaration, ¶ 24 [Adversary Proceeding Docket No. 171].

45.  Eric Radley testified that on one trip to Habitat, he saw a large cache of lumber in the parking lot for sale for $4,000 and that over the course of ten days or so, he negotiated down the price on the lumber to $1,000.  Eric Radley Declaration, ¶ 25 [Adversary Proceeding Docket No. 171].

46.  According to Eric Radley, the large cache of lumber was approximately 50

panels of 12-foot, 14-foot, and 16-foot prefabricated lumber walls in a pile, in addition to approximately ten small, short (8-foot or less) prefabricated lumber walls.  Eric Radley Declaration, ¶ 26 [Adversary Proceeding Docket No. 171]; Barrington Radley Declaration, ¶ 19 [Adversary Proceeding Docket No. 170].

47.   Eric Radley testified that he told Greta Curtis about this deal on the lumber, and Eric Radley suggested to Greta Curtis that they could both buy the lumber, $500 each, and split it so that she could build a new house and so that Plaintiff could renovate the 1502 Property.  Eric Radley Declaration, ¶ 27 [Adversary Proceeding Docket No. 171].

48.   On September 6, 2017, Greta Curtis, Eric Radley, and Barrington Radley, all met at Habitat to buy the lumber.  Eric Radley Declaration, ¶¶ 25-32 [Adversary Proceeding Docket No. 171]; Curtis Declaration at 8, ¶¶23-24 [Adversary Proceeding Docket No. 204].

49.   According to Eric Radley in his trial testimony, on September 6, 2017, he made an agreement on behalf of himself with Greta Curtis to purchase a large pile of lumber.  2/18/21 Trial Transcript at 145:3-10; Trial Exhibit P-3 (pull tag receipt for lumber dated 9/6/2017).

50.   According to Eric Radley, as he testified at trial, he intended to split the lumber "50/50" with Greta Curtis, and he made an agreement with her to do so.  2/18/21 Trial Transcript at 117:15-20 (Eric Radley testimony); Eric Radley Declaration, ¶ 27 [Adversary Proceeding Docket No. 171].  This testimony of Eric Radley is corroborated by his cousin, Barrington Radley, who testified that he heard the conversation between his cousin Eric Radley and Greta Curtis in the Habitat parking lot about the lumber in which Eric and Greta Curtis agreed to buy the lumber jointly.  Barrington Radley Declaration, ¶ 21 [Adversary Proceeding Docket No. 170].

51.   According to Eric Radley, Greta Curtis told him that she did not have $500 cash on hand for her 50-percent share of the lumber, so they made an agreement that Eric would pay the full $1,000 in cash to buy the lumber, but that Curtis would arrange for

and take care of the transportation of the lumber for the total $1,000 that Eric was contributing.  Eric Radley Declaration, ¶ 31 [Adversary Proceeding Docket No. 171]; 2/18/21 Trial Transcript at 172:2-25 (Eric Radley testimony).  Eric Radley's testimony on this point is corroborated by the testimony of his cousin Barrington, who heard the conversation between Eric and Curtis at Habitat. Barrington Radley Declaration, ¶¶ 22-24 [Adversary Proceeding Docket No. 170].

52.    According to Eric and Barrington Radley, Greta Curtis stated that she would arrange for the transportation of the lumber.  2/18/21 Trial Transcript at 196:1-4 (Barrington Radley testimony); Barrington Radley Declaration, ¶ 25 [Adversary Proceeding Docket No. 170]; 2/18/21 Trial Transcript at 119:1-17 (Eric Radley testimony).

53.    Eric Radley testified in his trial declaration that he gave Greta Curtis $1,000 in cash to buy the lumber.  Eric Radley Declaration, ¶ 32 [Adversary Proceeding Docket No. 171].  Eric Radley's testimony on this point is corroborated by the testimony of his cousin Barrington, who heard the conversation between Eric and Curtis at Habitat. 2/18/21 Trial Transcript at 194:14 and 195:12-24 (Barrington Radley testimony).  At trial, Curtis asked the following questions, and Barrington gave testimony in response as follows:

Q:    Did you see Eric Radley give me $500?

A.    No.  I saw him give you a thousand dollars.

***

Q.    Did you, did you see who paid for the lumber that day?

A.    I saw Eric give you the money, and then you turned around and gave the lady your credit card.  And you guys spoke.  I was right behind you, but you guys were speaking at the time you were paying.

*Id.*  The Bankruptcy Court finds this testimony of Eric and Barrington Radley to be credible.

54.    Greta Curtis in her trial testimony disputed the version of Habitat lumber purchase transaction given by Eric and Barrington Radley in their trial testimony.  Curtis Declaration [Adversary Proceeding Docket No. 204].  According to Curtis, while she

admits that Eric Radley was the one who told her about the lumber, she purchased the

lumber on her own for herself, and not jointly with Eric Radley.  Curtis Declaration at 8-9,

¶¶ 23-26 [Adversary Proceeding Docket No. 204].  Curtis testified that when Eric Radley

told her about the lumber, she agreed that she would buy it because she wanted to use it

to do some new construction on a lot she owned, but that she never agreed that she

would give half of the lumber to Plaintiff as a donation.  Curtis Declaration at 8-9, ¶¶23-26

[Adversary Proceeding Docket No. 204]. Curtis denied that there was any agreement or

"alleged partnership" between her and Plaintiff for the purchase of the lumber.  Curtis

Declaration at 8, ¶24 [Adversary Proceeding Docket No. 204].  As Curtis stated in her

trial declaration, "I did not become aware of the alleged partnership PWC [People Who

Care] and I entered until I read Eric Radley's trial declaration." *Id.*  Curtis testified that

she made the purchase of the lumber with her bank debit card for $1,000 and that Eric

Radley did not give her $1,000 in cash, or he or Plaintiff did not give her any amount,

towards the purchase of the lumber.  Curtis Declaration at 8, ¶24 [Adversary Proceeding

Docket No. 204].  Defendants argue that testimony of McArn who went to Habitat with her

husband Eric Radley to buy the lumber that "he had money in his pocket, thousand dollar

check . . . ." indicates that there was no cash exchanged since Eric Radley had brought a

check to Habitat.   Defendants Greta Curtis and Ammec, Inc's Objections to Plaintiff's

Proposed Findings of Fact and Conclusions of Law in Support of the First Cause of

Action for Slander of Title in the Amended Complaint Following Trial (Defendants'

Objections to Plaintiff's Proposed Findings) at 17-18 [Adversary Proceeding Docket No.

270], referring to McArn Testimony, 2/19/21 Trial Transcript at 26:20-24.

     55.   Although the testimony of the witnesses about the Habitat lumber purchase

transaction is conflicting in a number of respects, the following facts are undisputed by

the parties:

          a.   On September 6, 2017, there was a purchase of approximately 50

               prefabricated wooden walls of lumber for the total purchase price of

               $1,000 from Habitat for Humanity Restore.  2/18/21 Trial Transcript at

1     64:11-16 (Greta Curtis testimony); 2/18/21 Trial Transcript at 119:1-13

2     (Eric Radley testimony).

3     b.  The total amount of lumber purchased was approximately 50

4     prefabricated wood wall panels.  2/18/21 Trial Transcript at 195:1-2

5     (Barrington Radley testimony); Eric Radley Declaration, ¶ 26 [Adversary

6     Proceeding Docket No. 171]; Curtis Declaration at 8-10, ¶ 23-32

7     [Adversary Proceeding Docket No. 204] (contending that Plaintiff by Eric

8     and Barrington Radley took 30 panels, half of the lumber).

9     c.  Greta Curtis paid $1,000 to Habitat for purchase of the wood using her

10    credit or debit card.  2/18/21 Trial Transcript at 195:21-22 (Barrington

11    Radley testimony); Curtis Declaration, ¶ 24 [Adversary Proceeding

12    Docket No. 204].

13    56.   Having considered the written and oral testimony of the witnesses about the

14 purchase of the lumber, Eric and Barrington Radley, McArn and Curtis, the Bankruptcy

15 Court finds that the testimony of Eric and Barrington Radley and McArn to be more

16 credible than the testimony of Curtis.  Specifically, the Bankruptcy Court finds that the

17 testimony given by Eric and Barrington Radley that Eric Radley and Curtis agreed to

18 purchase the lumber jointly, each to take half, and that Eric Radley gave Curtis $1,000 in

19 cash for the purchase to be credible.  Regarding the existence of the agreement, it is

20 undisputed that Eric Radley found the lumber at Habitat, negotiated the price down to

21 $1,000 and told Curtis about the lumber deal. It is also undisputed that Eric Radley was

22 interested in using some of the lumber to help renovate the Plaintiff's Property and that

23 he knew that Curtis might be interested in some lumber to build on her new property, and

24 telling her would help get the deal of purchasing 50 panels from Habitat for $1,000 down

25 from $4,000.  There is no plausible reason why Eric and Barrington Radley and McArn

26 would have gone to Habitat with Curtis about the lumber unless Eric Radley and/or

27 Plaintiff would benefit from the purchase of the lumber, either as a joint purchase by Eric

28 Radley and a purchase by Curtis with a promise of a donation of some lumber to Plaintiff.

At the time of the purchase in September 2017, Curtis and Eric Radley and McArn were on speaking terms, if not friends.  Thus, when these parties went to Habitat to look at the lumber available for purchase at a bargain price, they had an understanding that some of the lumber would go to Eric Radley and/or Plaintiff, and not just Curtis.

57.  Although it is undisputed that Curtis was the person who used her debit or credit card to make the actual purchase of the lumber from Habitat for $1,000, the Bankruptcy Court having heard the oral testimony of Eric and Barrington Radley at trial and observing their demeanor while testifying, finds their testimony is credible that Eric Radley and Curtis orally agreed that they would buy the lumber jointly "50/50" and that Eric gave Curtis $1,000 in cash for the purchase.  It is true that the testimony of a cash transfer may lack some persuasiveness because there is no written documentation of the transfer, but the Bankruptcy Court, having observed the demeanor of the witnesses, gives credence to the testimony of Eric and Barrington Radley that Eric gave $1,000 in cash to Curtis to be used towards the purchase.  The Bankruptcy Court especially gives credence to the testimony of Barrington Radley, who testified that he overheard Eric Radley and Curtis making the oral agreement for a joint purchase of the lumber and that he saw Eric give Curtis the $1,000 in cash.  While Eric Radley's share of the $1,000 lumber purchase was only $500, he gave Curtis $1,000, and his explanation of his giving her more than $500 is credible, stating that she told him that she did not have any cash with her, so he gave her the $1,000 to cover the purchase transaction, but then she surprised him by taking the cash and pulling out her credit or debit card to pay for the lumber.  Regarding Defendants' argument that based on McArn's testimony about a $1,000 check, Eric Radley did not give Curtis $1,000 in cash, the Bankruptcy Court does not give credence to this argument because although McArn went to Habitat with Eric, she did not go into the store and did not observe the actual purchase of the lumber, and therefore, she is not a percipient witness of the purchase transaction and does not have

personal knowledge of who actually purchased the lumber. [7] Eric and Barrington Radley were percipient witnesses to the purchase transaction, and the Bankruptcy Court finds that their testimony that Eric gave Curtis $1,000 in cash as his contribution for the purchase of the lumber to be based on personal knowledge and credible.

### D.    Moving a Portion of Lumber to Plaintiff's Property and Its Use by Plaintiff

58.    Eric and Barrington Radley testified that on the day of the lumber was purchased, they took five small, prefabricated walls from the purchase and loaded them into a pick-up truck (which is all that the truck could carry) and moved them to Plaintiff's Property.  2/18/21 Trial Transcript at 197:17-21 and 202:6-10 (Barrington Radley testimony); 2/18/21 Trial Transcript at 121:3-7 (Eric Radley testimony) 122:14-24 (same); Eric Radley Declaration, ¶ 33 [Adversary Proceeding Docket No. 171]; Barrington Radley Declaration, ¶ 29 [Adversary Proceeding Docket No. 170].

59.    Barrington Radley testified that in the parking lot at Habitat, Eric Radley told Greta Curtis that he (Eric) and Barrington would take about five of the small prefabricated walls at that time in the pick-up truck, and Curtis did not object.  Barrington Radley Declaration, ¶ 28 [Adversary Proceeding Docket No. 170].

60.    According to Eric Radley, he intended to give his share of the lumber to Plaintiff.  2/18/21 Trial Transcript at 154:1-3 (Eric Radley testimony).

61.    According to McArn, although her husband, Eric Radley, purchased the lumber with his own money, she understood that he intended that his portion of the lumber would be used to help Plaintiff with its renovations at the Property, which was shown as that same day he and Barrington Radley loaded the five short, prefabricated walls into the pick-up truck and drove them to Plaintiff's Property.  2/19/21 Trial Transcript at 58:3-25 (McArn testimony).

---

[7]  To the extent that McArn's testimony on this point is probative, it indicates that Eric Radley took money to Habitat to make a purchase of lumber, and was not looking for a donation from Curtis.

62.  Eric and Barrington Radley testified that they used the lumber from those five small, prefabricated walls to build five doorways for bathrooms at the 1502 Property and that was the extent of their use of the lumber, that is, they used all of this lumber, none of it went to waste, and they did not build any drop-down ceilings, bookcases, or additional walls.  Eric Radley Declaration, ¶ 34 [Adversary Proceeding Docket No. 171]; Barrington Radley Declaration, ¶ 30 [Adversary Proceeding Docket No. 170].

63.  Curtis in her trial testimony disputed the version of move of the purchased Habitat lumber to Plaintiff's Property given by Eric and Barrington Radley in their trial testimony.  Curtis Declaration at 8-9, ¶¶25-27 [Adversary Proceeding Docket No. 204]. Curtis in her trial declaration testified that after she purchased the lumber, she left it at the Habitat for Humanity premises "because of the large volume I needed a semi-tractor trailer with a flat bed trailer to move the lumber panels." *Id.,* ¶25.  Curtis further testified the lumber was not moved until a month later when her brother Gregory Curtis arranged for a semi-tractor to move the lumber to a secured space in a private yard with another individual.  *Id.* In her trial declaration, Curtis absolutely denied that she gave her permission to Eric Radley, Barrington Radley or Plaintiff to take any of the lumber:  "I never gave Eric Radley, Barrington Radley nor Plaintiff permission to take any of my lumber panels from the Habitat parking lot nor from the lot I secured after I moved the lumber from Habitat either on September 6, 2017 or after I made the purchase." *Id.,* ¶27. Curtis also testified that she never agreed to donate any of the lumber to Plaintiff: "I never agreed to give half of my lumber to Plaintiff nor did I agree to store 50% of the lumber Plaintiff is claiming belonged to it in the Eric Radley trial declaration at ¶39." *Id.,* ¶26.

64.  In support of Curtis's testimony and Defendants' position, Sherman Lee was called as a witness who testified in his trial declaration that he was an acquaintance of Curtis and helped her move the lumber from the Habitat premises to a yard in Compton, California, on October 5, 2017.  Trial Declaration of Sherman Lee [Adversary Proceeding Docket No. 167].  Lee testified in his trial declaration that he saw some of the lumber in Plaintiff's building before he helped Curtis move the other lumber from the Habitat

1    parking lot on October 5, 2017.  *Id.,* ¶8.

2         65.  Having considered the written and oral testimony of the witnesses about the

3    move of some of the purchased lumber to Plaintiff's Property on the date of the purchase

4    on September 6, 2017, Eric and Barrington Radley, Curtis and Lee, the Bankruptcy Court

5    finds that the testimony of Eric and Barrington Radley to be more credible than the

6    testimony of Curtis.  Specifically, the Bankruptcy Court finds that the testimony given by

7    Eric and Barrington Radley that Eric Radley told Curtis that they were taking some of the

8    lumber in the pickup truck they drove to Habitat and that she did not object to be credible.

9    It is undisputed that Eric Radley had negotiated the deal with Habitat for the lumber and

10   told Curtis about it, that is, Eric Radley and Curtis were still on good terms, and that they

11   and Barrington Radley all met at Habitat and were together when the lumber was

12   eventually purchased there.  As stated previously, the Bankruptcy Court finds that the

13   purchase of the lumber was jointly by Eric Radley and Curtis.  Plaintiff's version of the

14   facts that after the joint purchase of the lumber from Habitat, Eric Radley took some of

15   the lumber he purchased with Curtis after telling her that he was taking some of it is more

16   consistent with the evidence than Curtis's version of the facts.  Curtis's version of the

17   facts is essentially that Eric Radley induced Curtis to buy the lumber from Habitat, so that

18   he and Barrington Radley could lie in wait until she left the Habitat premises after the

19   purchase and steal some lumber for Plaintiff without her knowledge and consent.

20   Curtis's version of the facts is not credible in light of the state of the parties' relationship

21   at the time that they were on speaking, if not good, terms.  The parties all knew that they

22   were going to Habitat together for the purchase of lumber, also together, and Eric Radley

23   brought $1,000.00 for the purchase of the lumber and was prepared to take some of his

24   share of the lumber right after purchase, and Curtis was not as prepared to take her

25   share of the lumber after their purchase from the Habitat premises.

26        66.  The Bankruptcy Court having heard the oral testimony of Eric and Barrington

27   Radley at trial and observing their demeanor while testifying, finds their testimony is

28   credible that Eric Radley told Curtis that he was taking some of the lumber and that she

did not object.  That the portion of the lumber that Eric Radley took with Barrington

Radley's assistance, that is, the 5 wood panels that fit in the pickup truck they drove to

Habitat, was only a small portion of the purchased lumber, is consistent with their

testimony that Eric Radley and Curtis agreed to make a joint purchase.  Moreover, the

testimony of Eric and Barrington Radley is credible also because the amount of lumber

that Eric Radley claimed and took on the date of the purchase was certainly less than half

of the lumber that Eric Radley was entitled to in the joint purchase.

**E.    Moving Lumber to the Compton Storage Lot**

67.    According to Barrington Radley, on a later date, the remaining portion of Eric

Radley's share of the lumber was loaded with a forklift onto a flatbed truck and moved to

a lot in Compton, California.  2/18/21 Trial Transcript at 202:21-204:11 (Barrington

Radley testimony).

68.    According to Eric and Barrington Radley, they assisted Greta Curtis and a few

other men to load approximately half of the remaining lumber which Eric considered as

his, using a forklift onto the flatbed truck to be transported to the lot in Compton and

unloaded it there.  Eric Radley Declaration, ¶¶ 35-38 [Adversary Proceeding Docket No.

171]; Barrington Radley Declaration, ¶¶ 31-34 [Adversary Proceeding Docket No. 170].

69.    The witnesses in their trial testimony either could not remember when the

lumber was moved to the Compton lot or disagreed as to whether the lumber was moved

there in September or October 2017.  2/19/21 Trial Transcript at 170:19-171:9 (Sherman

Lee testimony); Eric Radley Declaration, ¶ 35 [Adversary Proceeding Docket No. 171]

(testifying the move was approximately a week after purchase).

70.    Eric Radley testified that he considered the first half of the lumber that he and

Barrington Radley had just helped to move to the Compton lot to be his or Plaintiff's half

of the lumber, and so he and Barrington were done with the moving process as far as his

or Plaintiff's half of the lumber was concerned, particularly as Barrington had already

showed Greta Curtis and her brother how to load the lumber with the forklift.  Eric Radley

Declaration, ¶ 39 [Adversary Proceeding Docket No. 171].

71.  Eric Radley testified that he chose to store his remaining half of the lumber at the Compton lot because the lumber could not all be stored at Plaintiff's Property because of risk of theft and vandalism, in addition to the impracticability of vehicles having to move in and out of Plaintiff's parking lot.  2/18/21 Trial Transcript at 173:5-23 (Eric Radley testimony).

72.  Eric and Barrington Radley testified that neither Plaintiff nor its agents took any wood other than the five small, prefabricated wood walls that had been originally taken in the pick-up truck on the date of purchase.  2/18/21 Trial Transcript at 213:15-214:19 (Barrington Radley testimony); Barrington Radley Declaration, ¶ 39 [Adversary Proceeding Docket No. 170].

73.  Curtis in her trial testimony disputed the version of the lumber being moved from Habitat to Compton was owned in part by Eric Radley, and not wholly owned by her, given by Eric and Barrington Radley in their trial testimony.  Trial Declaration of Greta Curtis (Curtis Declaration) [Adversary Proceeding Docket No. 204].   Curtis testified in her trial declaration that she purchased the lumber from Habitat by and for herself, and not jointly with Eric Radley, and that she left the lumber at Habitat after the purchase on September 6, 2017 because the lumber was too voluminous to move without a tractor trailer.  *Id.,* ¶ 25.  Curtis further testified that her brother Gregory Curtis arranged for a semi tractor trailer with a flat bed trailer to move the lumber a month later to a private yard after she and her brother secured space in that yard.  *Id.*   In her trial declaration, Curtis testified that she "counted the lumber panels with my driver before the move day on September 8, 2017."  *Id.,* ¶31.  This statement by Curtis about September 8, 2017 is unclear whether she was referring to the day she counted the lumber panels or the day the lumber was moved.  Curtis also testified about her count of the lumber panels: "When we did move the lumber panels we were short by approximately 30."  *Id.,* ¶30.  Regarding these allegedly missing 30 panels, Curtis stated in her trial declaration: "I filed the mechanic's lien against Plaintiff's real property because its' [sic] agents, Eric Radley and Barrington Radley, stole over 30 lumber panels from me in the course of a month."  *Id.,*

¶30.

74.    Defendants' witness, Sherman Lee, testified in his trial declaration that on October 5, 2017, he assisted Curtis in moving lumber from Habitat to a yard in Compton, California, and that Eric and Barrington Radley were with her at the Compton vacant yard and that they also assisted in moving the lumber from Habitat to the Compton lot.  Lee Trial Declaration at 2, ¶6.  Lee further testified that both Eric and Barrington Radley helped him and several other men in removing the lumber from a 40 foot flatbed truck that she and her brother Gregory Curtis rented to move the lumber and that they made two trips on October 5, 2017 and unloaded the flatbed truck twice. *Id.,* at 3 ¶9.  Lee also testified that on October 6, 2017, he reported to the Habitat store to complete the move of the lumber to the vacant lot in Compton, but Eric and Barrington Radley did not appear to help with moving the remaining lumber.  *Id.* At 3, ¶ 10.

75.    Having considered the written and oral testimony of the witnesses about the move of the purchased lumber remaining at Habitat to a private yard in Compton, California, secured by Curtis on October 5 and 6, 2017, Eric and Barrington Radley, Curtis and Lee, the Bankruptcy Court finds that the testimony of Eric and Barrington Radley to be more credible than the testimony of Curtis.  Specifically, the Bankruptcy Court finds that the testimony given by Eric and Barrington Radley that they worked with Lee and the other men that were helping Curtis move the lumber from Habitat to Compton, which included the remaining lumber in Eric Radley's one-half share, and that they were concerned about the security of the lumber if stored at the Plaintiff's Property.  As stated previously, the Bankruptcy Court finds that the purchase of the lumber was joint by Eric Radley and Curtis.

76.    Plaintiff's version of the facts that after the joint purchase of the lumber from Habitat, Eric Radley with his cousin Barrington Radley moved his remaining lumber to the Compton lot with Curtis's one-half share with the assistance of Curtis's helpers is more consistent with the evidence than Curtis's version of the facts.  Curtis's version of the facts is essentially that Eric and Barrington Radley stole 30 wood panels from her, though

admittedly, they helped move the lumber, which she contends was all hers to the Compton lot which she had arranged for.  Curtis's version of the facts is not credible in light of the state of the parties' relationship at the time that they were on speaking, if not good, terms, and they were helping each other move the lumber from Habitat after they made the joint purchase.  The parties all knew that after they made the purchase from Habitat, they had to move the lumber before they could use it, and they worked together to move the lumber from Habitat.  If Curtis had counted the lumber panels with her driver on September 8, 2017 and found that there were 30 missing lumber panels as she testified, it would seem that she would have confronted Eric and Barrington Radley about her suspicions that they took her lumber as soon as she had her suspicions rather than letting them, the alleged thieves, help move the lumber to the Compton lot a month later on October 5, 2017.  It is undisputed that Eric and Barrington Radley and Curtis were at the Compton lot for moving lumber there from Habitat on October 5, 2017, and there is no testimony or evidence that Curtis shared her current suspicions with them that they stole lumber from her or demanded return of the lumber to her or some sort of accounting.  Lee's testimony that Eric and Barrington Radley only showed up to move the lumber on only one of the two days of moving the lumber on October 5 and 6, 2017 is consistent with their testimony that they were only helping to move the remaining part of Eric's one-half share of the lumber and were not participating in the move of the lumber after Eric's share had been moved to the lot.  Moreover, the testimony of Curtis and Lee and Defendants' physical evidence of photographs do not substantiate Curtis's claim that Eric and Barrington Radley took 30 lumber panels, theft or not.  Defendants' position on the nature of the move of the lumber from Habitat to Compton is less credible than Plaintiff's position.

### F.     Moving and Storing the Other Half of the Lumber

77.   Eric Radley testified that about a week or so after the purchase of the lumber, he and Barrington Radley went back to Habitat for other renovation materials for the 1502 Property, and they discovered that all of the lumber was now gone, and there were only a

few of the small, short wall panels left.  Eric Radley Declaration, ¶ 40 [Adversary Proceeding Docket No. 171].

78.   Eric and Barrington Radley testified that they found the lumber at the Compton vacant lot, left out in the open, but surrounded by a fence and locked.  Eric Radley Declaration, ¶ 41 [Adversary Proceeding Docket No. 171]; Barrington Radley Declaration, ¶ 36 [Adversary Proceeding Docket No. 170].

79.   Barrington and Eric Radley testified that they went to the vacant lot in Compton several times trying to get the Plaintiff's half of the lumber, but the gate was always locked, and they could not get Greta Curtis to have someone unlock it for them. Eric Radley Declaration, ¶ 42 [Adversary Proceeding Docket No. 171]; Barrington Radley Declaration, ¶ 37 [Adversary Proceeding Docket No. 170].

80.   Barrington and Eric Radley testified that a year later, they went back to the lot in Compton, and the lumber was still there, damaged beyond repair by being left out in the weather.  Eric Radley Declaration, ¶ 43 [Adversary Proceeding Docket No. 171]; Barrington Radley Declaration, ¶ 38 [Adversary Proceeding Docket No. 170].

81.   In her trial declaration, Greta Curtis disputed the testimony of Eric and Barrington Radley that she denied them or Plaintiff access to the Compton lot.  Curtis Declaration at 10, ¶ 29.  Curtis testified in her trial declaration:  "I never received a request from Eric Radley nor Michelle Mcarn to access the Oak Street lot where I stored my lumber panels.  Barrington Radley asked me after I moved the lumber there who had a key and I told him my brother and I."  *Id.*

82. Having considered the written and oral testimony of the witnesses about the Curtis's denial of access of Eric and Barrington Radley to the Compton lot for retrieval of the remaining lumber in Eric's one-half share of the lumber, Eric and Barrington Radley and Curtis, the Bankruptcy Court finds that the testimony of Eric and Barrington Radley to be more credible than the testimony of Curtis.  Curtis in her trial testimony admitted that Barrington Radley asked her who had the key to the lock at the lot and that she told him that she and her brother were the ones who had the key.  From this admission, the

Bankruptcy Court infers that Barrington Radley had asked Curtis for access to the lot and that she refused.  The Bankruptcy Court also finds credible the testimony of Eric and Barrington Radley that Curtis refused them access to the lot when they sought to retrieve the remaining lumber in Eric's one-half share of the lumber.

83.   The significance of Curtis's denial of access of Eric and Barrington Radley to the Compton lot to retrieve lumber is that it corroborates the evidence that Eric Radley purchased the lumber with Curtis and believed that he purchased the lumber and was requesting Curtis to give his access to the locked Compton lot to retrieve his share. Curtis's position is that Eric and Barrington Radley stole the purchased lumber which was all hers, but she admitted that at least, Barrington Radley had inquired about access to the Compton lot and she told him that she had the key to the lot, which indicates that he asked her for access to the lot.  Based on Curtis's testimony, Defendants' position is that the Radley cousins were asking her to unlock the Compton lot so they can steal more lumber from her, which does not make any sense as it begs the question why would they need to ask her for access to the lot if they were stealing more lumber from her. Defendants' position on the reason for denial of access is simply not credible.

### G.    Defendants' Filing of the Lien

84.   On October 19, 2017, Greta Curtis, either on behalf of herself or on behalf of Ammec, recorded the Lien on the Property.  Lien, Trial Exhibit P-1 (showing recording date of October 19, 2017); JPTS at 2, Admitted/Adjudicated Fact No. 4 [Adversary Proceeding Docket No. 162].

85.  The Lien expressly asserted: "In accordance with an agreement to provide labor and/or material, I did furnish the following labor and/or materials: 20 Prefabricated Wood Wall Panels @ a cost of $2,000 a piece… of a total value of $40,000."  Lien, Trial Exhibit P-1 at 2.

86.  The Lien asserted that the labor and/or material described therein was furnished on the property commonly known as 1500 W. Slauson Avenue, Los Angeles, CA  90047, owned by People Who Care Youth Center, Inc., with a copy of the property's

legal description attached, and that Greta Curtis, as President of Ammec, Inc., thereby

claimed a lien under the laws of the State of California for the allegedly unpaid amount of

$40,000 for labor and/or material allegedly furnished on the property owned by People

Who Care Youth Center, Inc., starting on September 16, 2017 and ending on October 13,

2017.  Lien, Trial Exhibit P-1.

87.  The Lien was signed under a declaration of penalty of perjury under the laws

of the State of California by Greta Curtis, as President of Ammec, Inc., listing Ammec as

the person claiming the Lien.  Lien, Trial Exhibit P-1 at 3.

88.  The Certificate of Service that a copy of the Lien was mailed to People Who Care

Youth Center, Inc., on October 17, 2017, was completed and signed by Greta

Curtis.   Lien, Trial Exhibit P-1 at 3.

**H.    Defendants Refuse to Remove the Lien**

89.  McArn testified that Plaintiff, through her and Eric Radley's efforts, was trying

to refinance the Property, and Eric and McArn learned of the Lien for the first time in late

2017 when they received a phone call from Lending Xpress, the Plaintiff's refinancing

broker, about the Lien.  McArn Declaration, ¶ 22 [Adversary Proceeding Docket No. 172];

Eric Radley Declaration ¶ 53 [Adversary Proceeding Docket No. 171].

90.   McArn and Eric Radley called Greta Curtis and left a voicemail saying to

remove the Lien by noon or that they would file a police report at the 77th Division police

station, which is the station nearest to the Property. McArn Declaration, ¶ 23 [Adversary

Proceeding Docket No. 172].

91.  The Lien was notarized.  Lien, Trial Exhibit P-1 at 5-6.

92.  McArn and Eric Radley went to the notary's office and told the notary that if

the Lien was not removed that they would file a police report on account of the Lien being

false.  2/18/21 Trial Transcript at 162:14-20 and165:11-17 (Eric Radley Testimony).

93.   McArn testified that while she and Eric Radley were going to the police

station, Curtis had gone to the sheriff station, each side attempting to file reports against

each other for alleged theft of each other's share of the lumber and, in Plaintiff's case,

1   removal of the Lien, as well.  2/19/21 Trial Transcript at 37:13-18 (McArn testimony).

2        94.  McArn and Eric Radley testified that they went to the police station; when they

3   were at the police station, they received a return telephone call from Curtis, who said that

4   she was at the sheriff's station filing her own report; neither the police nor the sheriff

5   accepted the reports of either parties, saying that it was a civil matter.  McArn

6   Declaration, ¶¶ 24-27 [Adversary Proceeding Docket No. 172]; Eric Radley Declaration

7   ¶¶ 55-58 [Adversary Proceeding Docket No. 171]; 2/18/21 Trial Transcript at 165:19-25

8   (Eric Radley Testimony); 2/19/21 Trial Transcript at 37:13-18, 40:7- 42:19 (McArn

9   Testimony).

10        95.  Eric Radley testified that in October or November 2017, on behalf of Plaintiff,

11   and as Plaintiff's agent, he sent a text message to Curtis demanding that she remove the

12   Lien, but she refused to do so.  Eric Radley Declaration, ¶ 60 [Adversary Proceeding

13   Docket No. 171]; Text Messages from Eric Radley, Trial Exhibit P-6 at 14.

14        96.  Although Plaintiff made several demands on the Defendants to remove the

15   Disputed Lien from the Property, Defendants refused to comply with such demands.

16   JPTS at 5. Admitted/Adjudicated Fact No. 31 [Adversary Proceeding Docket No. 162];

17   *see also,* McArn Declaration, ¶¶ 22-27 [Adversary Proceeding Docket No. 172]; Eric

18   Radley Declaration ¶¶ 53, 55-58, 60 [Adversary Proceeding Docket No. 171]; 2/18/21

19   Trial Transcript at 165:19-25 (Eric Radley Testimony); 2/19/21 Trial Transcript at 40:7-

20   42:19 (McArn Testimony).

21        **I.      Defendants' Malice and Ill Will in Filing the Lien**

22        97.  Greta Curtis knew about Plaintiff's financial and legal problems with Acon

23   because Eric Radley had told her about them when she called him up in early 2017.  Eric

24   Radley Declaration, ¶ 10 [Adversary Proceeding Docket No. 171].  Curtis gained Eric

25   Radley's confidence after they first met in fall or winter of 2016 at the Torrance

26   Courthouse and when she told him that she was an attorney and offered to help him with

27   his search of court record. *Id.,* ¶¶5-7.  Curtis's representation to Eric Radley that she was

28   an attorney was misleading and deceptive in order to gain his confidence because while

it was true that she was an attorney in the past, she was no longer an attorney at the time she told him she was an attorney, having been disbarred two years prior.

98.   Curtis gained access to Plaintiff's financial information when McArn gave Greta Curtis the Plaintiff's files, books, and records because Curtis told McArn that she (Curtis) could help with the Plaintiff's financial and legal issues and refinancing.  McArn Declaration, ¶¶ 9-10 [Adversary Proceeding Docket No. 172].   Curtis gained McArn's confidence because Curtis said to McArn that she (Curtis) was a lawyer and that she could help her and Eric Radley with the Plaintiff's financial problems, management, and refinancing Plaintiff's debts with Acon.  McArn Declaration,  ¶¶ 8-10 [Adversary Proceeding Docket No. 172].  Curtis's representation to McArn that she was an attorney was deceptive and gained his confidence because while it was true that she was an attorney in the past, she was no longer an attorney at the time she told McArn she was an attorney, having been disbarred two years prior.  It is unlikely that McArn would have given Curtis access to Plaintiff's financial information if she (McArn) had known that Curtis had been disbarred. Later, McArn found out that Curtis had been disciplined and disbarred when another lawyer told McArn about Curtis's state bar record.  *Id.,* ¶14.

99. Greta Curtis testified that she researched the California law, legal treatises, and subject matter of mechanic's liens before filing the Lien.  2/19/21 Trial Transcript at 137:1- 138:11 (Curtis testimony).

100.   Greta Curtis filed the Lien asserting: "In accordance with an ***agreement*** to provide labor and/or material, I did furnish the following labor and/or materials: ***20*** Prefabricated Wood Wall Panels @ a cost of ***$2,000*** a piece… of a total value of ***$40,000.***"  Lien, Trial Exhibit P-1 at 2.  (emphasis added).

101.   Aside from the incidents surrounding the lumber, other incidents transpired between the parties leading up to the filing of the Lien, as discussed below:

102.   As Eric Radley testified, in the summer of 2017, he discussed doing a real estate deal with Greta Curtis in Gardena, California (the Gardena Deal), but when Curtis could not come up with her half of the money for the deal, he told her that he would need

to move forward with another investor, and in response, Curtis told him that she would sue him for breach of contract.  Eric Radley Declaration, ¶¶ 14-21 [Adversary Proceeding Docket No. 171].

103.    As McArn testified, during spring and summer of 2017, while Greta Curtis was helping the Plaintiff with its legal and financial problems, she (Curtis) tried to get McArn to have the Plaintiff employ Curtis and pay Curtis compensation for helping with Plaintiff's affairs, but McArn refused.  McArn Declaration, ¶ 12 [Adversary Proceeding Docket No. 172].

104.    McArn further testified that Curtis also asked McArn to put her (Curtis) on Plaintiff's board.  McArn Declaration, ¶ 13 [Adversary Proceeding Docket No. 172].

105.    McArn testified that she had considered putting Curtis on the Plaintiff's board before she (McArn) learned that Curtis was a disbarred attorney when another attorney informed McArn about Curtis's state bar record and that Curtis had been disciplined and disbarred, and consequently, McArn decided not to put Curtis on the board. McArn Declaration, ¶ 14 [Adversary Proceeding Docket No. 172].

106.    McArn also testified that Curtis had asked McArn to allow her (Curtis) to move many of Curtis's personal property items in storage from the closing of Curtis's law office into a small warehouse at Plaintiff's Property for storage.  McArn Declaration, ¶¶ 15-21 [Adversary Proceeding Docket No. 172].  McArn agreed to allow Curtis to move her files from her law office into Plaintiff's Property, but refused to allow Curtis's many other personal property items to be moved to Plaintiff's Property for storage because Plaintiff was preparing to use the property for child care, and this made Curtis angry.  *Id.*

107.    McArn testified that it is her belief that the culmination of Eric Radley not doing the Gardena Deal with Curtis, in addition to McArn refusing to put Curtis on Plaintiff's board, refusing to give Curtis an employment contract, and refusing to allow Curtis to store Curtis's personal property at Plaintiff's Property, ultimately made Curtis so angry that Curtis filed the Lien as a way of trying to get something out of Plaintiff or otherwise getting back at McArn and Eric Radley.  McArn Declaration, ¶ 21 [Adversary

1    Proceeding Docket No. 172].

2        108.    During the period from the Recording Date through January 17, 2018, or

3    ninety (90) days after the Recording Date, the Lien Enforcement Deadline, neither of the

4    Defendants commenced a court or other legal proceeding to enforce, maintain, or

5    continue the Lien.  JPTS at 2, Admitted/Adjudicated Fact No. 5 [Adversary Proceeding

6    Docket No. 162]; [8] *see also,* California Civil Code § 8460(a) ("The claimant shall

7    commence an action to enforce a lien within 90 days after recordation of the claim of lien.

8    If the claimant does not commence an action to enforce the lien within that time, the claim

9    of lien expires and is unenforceable.").  However, the 90-day period under state law for

10   enforcing Defendants' purported mechanic's lien was tolled by 11 U.S.C. § 108(c) as

11   filing of such action was an act to enforce a lien that is otherwise stayed by the automatic

12   stay in Plaintiff's bankruptcy case under 11 U.S.C. § 362(a) and filing a notice of intent to

13   enforce the lien pursuant to 11 U.S.C. § 546(b) would not have been required to continue

14   or maintain perfection of the lien.  *Philmont Management, Inc. v. In re 450 S. Western*

15   *Ave., LLC (In re 450 S. Western Ave., LLC),* No. 21-60060, 2023 WL 2851378 (9th Cir.

16   _____

17   [8] The case docket sheet for Curtis's state court lawsuit to enforce the Lien, *Curtis v. People
         Who Care Youth Center, Inc.,* No. BC 690787 (Superior Court of California,
18       County of Los Angeles), and the file-stamped copy of the complaint conclusively
         established the dates of recording of the Lien on October 19, 2017 and the filing of
19       the lawsuit on January 18, 2018, 91 days after the date of lien recordation.  These
         documents were unobjected-to Exhibits 1 and 2 to Declaration of John-Patrick M.
20       Fritz in support of Plaintiff's Motion for Summary Judgment [Adversary
         Proceeding Docket No. 122].  Curtis improperly tried to manufacture a genuine
21       issue of material fact to deny Plaintiff summary adjudication by giving untruthful
         testimony in her declaration opposing summary adjudication by testifying that she
22       "did file a complaint exactly 89 days after recordation of the mechanics' lien.
         There are approximately 89 calendar days from October 20, 2017 to January 17,
23       2018." Declaration of Greta Curtis in Defendants' Opposition to Plaintiff's Motion
         for Partial Summary Adjudication at 17 [Adversary Proceeding Docket No. 129].
24       Curtis's declaration was made in bad faith because it misstated the date of lien
         recordation as October 20, 2017 and the date of filing of her state court lawsuit as
25       January 17, 2018 to support her false claim that her lawsuit to enforce the lien was
         filed 89 days after lien recordation. Curtis's testimony in her declaration was
26       objectionable as not the best evidence of the filing dates of her lien and her lawsuit,
         and the best evidence of the facts were copies of the recorded lien and file-stamped
27       complaint.  However, the Bankruptcy Court now considers Curtis's factual
         misstatement as not material as the grant of partial summary adjudication on the
28       lien avoidance claims has been vacated.

1   Apr. 10, 2023), *following In re Hunters Run Limited Partnership,* 875 F.2d 1425 (9th Cir.

2   1989); *but see, In re Baldwin Builders,* 232 B.R. 406, 410-416 (9th Cir. BAP 1999).

3       109.    After Plaintiff filed for bankruptcy, Curtis filed her state court complaint (the

4   State Court Complaint) on January 18, 2018, one day after the Lien Enforcement

5   Deadline, which commenced her state court lawsuit (the "State Court Lawsuit") bearing

6   case number BC690787, with case title "*Greta Curtis vs. People Who Care Youth Center*

7   *Inc.*," in an attempt to enforce the Lien against the Plaintiff.  JPTS at 2-3,

8   Admitted/Adjudicated Fact No. 5 [Adversary Proceeding Docket No. 162].

9       110.    Defendants were aware of Plaintiff's bankruptcy case and retention of

10  bankruptcy counsel by at least January 26, 2018 when Plaintiff's counsel sent Curtis a

11  letter informing her of the bankruptcy filing and that filing the State Court Lawsuit violated

12  the automatic stay and was void.  JPTS at 3, Admitted/Adjudicated Facts Nos. 7-9

13  [Adversary Proceeding Docket No. 162].

14      111.    While Plaintiff's bankruptcy case was pending, Curtis continued to litigate

15  the State Court Lawsuit by amending it to add as defendants McArn, Eric Radley,

16  Barrington Radley, and McArn's four children, even though they never received service of

17  any of these papers against them personally.  McArn Declaration, ¶ 40 [Adversary

18  Proceeding Docket No. 172]; JPTS, Admitted/Adjudicated Facts Nos. 10-17 [Adversary

19  Proceeding Docket No. 162].

20      112.    At trial, Curtis also admitted to violating the automatic stay by making a

21  claim against Plaintiff with the California Labor Commission Board in or about November

22  or December 2018.  6/29/22 Trial Transcript at 127:13-128:13.

23      113.    On November 5, 2018, the state court held a hearing on its order to show

24  cause, no appearances were made on the record, and the state court entered a minute

25  order dismissing the State Court Complaint.  JPTS 4, Admitted/Adjudicated Fact No. 19

26  [Adversary Proceeding Docket No. 162].

27

28

35

**J.  Plaintiff's Claim for Damages from Defendants' Filing the Lien Interfering with Its Loan Refinancing**

114.    Plaintiff was facing a foreclosure or sheriff's sale at the hands of a large, secured creditor, Acon Development, Inc. ("<u>Acon</u>").  Declaration of John-Patrick M. Fritz in Support of Request for Judicial Notice in Support of Plaintiff's Proposed Findings of Fact and Conclusions of Law After Trial [Adversary Proceeding Docket No. 219].(RJN), Exhibit 3, Acon Development, Inc.'s Notice of Motion and Motion to Dismiss Case under 11 U.S.C. § 1112(b); Memorandum of Points and Authorities (Acon's Motion to Dismiss Bankruptcy Case) [Bankruptcy Case Docket No. 123 at 12 and Bankruptcy Case Docket No. 123-1 at 4]; 2/19/21 Trial Transcript at 45:8- 46:1 (McArn Testimony).

115.    McArn testified that Plaintiff was working with a loan broker, Lending Xpress, to refinance the existing loan on the Property, where the refinancing loan proceedings would be used to pay off certain liens, such as for Acon, and Lending Xpress was prepared to provide Plaintiff a loan to pay off Acon, property taxes, and the other liens until Defendants' Lien for $40,000 appeared on the preliminary title report for the property.  2/19/21 Trial Transcript at 79:1-7 (McArn testimony).

116.    McArn testified that Defendants' Lien caused damage to Plaintiff because the lien prevented Plaintiff from refinancing.  2/18/21 Trial Transcript at 259:23-25 (McArn testimony); 2/19/21 Trial Transcript at 53:10-25 (McArn testimony).

117.    McArn testified that Plaintiff had arranged for $950,000 of refinancing from Lending Xpress.  2/19/21 Trial Transcript at 65:1-14 (McArn testimony).  McArn also testified that the Lending Xpress refinancing was to be junior to the existing lien of the City of Los Angeles.  2/19/21 Trial Transcript at 82:4-16 (McArn testimony).  McArn testified that Lending Xpress cancelled the refinancing in 2017 because of the mechanic's lien before the bankruptcy case was filed in 2018.  2/19/21 Trial Transcript at 81:11-25 (McArn testimony).  McArn testified that Lending Xpress would not fund a loan to Plaintiff because the existence of a mechanic's lien created a cloud on title due to borrower irresponsibility.  2/19/21 Trial Transcript at 88:3-10 (McArn testimony).

118.    McArn testified that Plaintiff was damaged by Defendants' Lien because it delayed Plaintiff from being able to do a lot of things with the refinancing money.  2/19/21 Trial Transcript at 63:7-25 (McArn testimony).

119.    Plaintiff was eventually able to successfully refinance the Property by the end of 2020 with another lender Danco Inc. 2/19/21 Trial Transcript at 80:22-25 (McArn testimony).

120.    From the time of the bankruptcy filing date in January 2018 until the refinancing at the end of 2020, interest and attorneys' fees on the secured claim of Acon Development Inc. increased.  2/19/21 Trial Transcript at 81:1-4 (McArn testimony).

121.    As indicated by Acon's proof of claim, the per diem interest accrued on its lien at the rate of $82.94.  RJN [Adversary Proceeding Docket No. 219], Exhibit 6, Acon Development, Inc.'s Proof of Claim No. 9, at 4.

122.    Also, as indicated on Acon's proof of claim, its claim for attorneys' fees increased by $121,629.85 from the date of filing of Plaintiff's bankruptcy petition on January 10, 2018 to March 3, 2020.  RJN [Adversary Proceeding Docket No. 219], Exhibit 6, Acon Development, Inc.'s Proof of Claim No. 9, at 4.

123.    After successfully refinancing, on December 17, 2020, Plaintiff paid Acon's secured claim, with interest, in the total amount of $550,000, plus attorneys' fees in the amount of $116,865.16.  RJN [Adversary Proceeding Docket No. 219], Exhibit 5, Plaintiff's Notice of Motion and Motion for Order Authorizing Release of Financing Proceeds to Reorganized Debtor; Memorandum of Points and Authorities; Declaration of Michelle McArn in Support (Plaintiff's Motion for Order Authorizing Release of Financing Proceeds) [Bankruptcy Case Docket No. 273 at 8, 15, 16].

**K.  Plaintiff's Claim for Attorneys' Fees and Costs as Damages in Removing Defendants' Lien**

124.    As a result of the Defendants' refusal to voluntarily remove the Disputed Lien from the Property and litigation related thereto, the Plaintiff was forced to incur legal fees and costs to remove the disputed Lien from the Property.  JPTS at 5,

Admitted/Adjudicated Fact No. 32 [Adversary Proceeding Docket No. 162].

125.    McArn testified that Plaintiff incurred damages by having to hire an attorney to remove Defendants' purported mechanic's lien.  2/19/21 Trial Transcript at 62:9-16 (McArn testimony).

126.    The amount of attorneys' fees and costs incurred by the Plaintiff were the subject of hearings set for May 27, 2021, but, due to repeated requests by Defendants for continuance, serially rescheduled for over twelve months and eventually heard at trial on June 29 and 30, 2022.

127.    Plaintiff requests the Bankruptcy Court to take judicial notice of the motion and reply brief in support of Plaintiff's attorneys' fees and costs filed as Adversary Proceeding Docket Nos. 146 and 153, asserting $189,569.50 in fees and $6,351.05 in costs. Plaintiff's Notice of Motion and Motion for Attorneys' Fees and Costs; Memorandum of Points and Authorities in Support Thereof; Declaration of John-Patrick M. Fritz, Esq. (Plaintiff's First Motion for Attorneys' Fees) [Adversary Proceeding Docket No. 146]; RJN [Adversary Proceeding Docket No. 219], Exhibit 2, Reply to Defendants' Opposition to Debtor's Motion for Attorneys' Fees and Costs [Adversary Proceeding Docket No. 153 at 28:16-19].  Plaintiff's motion and reply brief in support of its attorneys' fees and costs are not proper subjects for judicial notice under Federal Rule of Evidence 201 as they consist of legal argument and evidence disputed by Defendants.  The motion and reply brief contain evidence in support of Plaintiff's claim for attorneys' fees and costs, which the court may consider in determining the facts relating to such claim, the billing statements of Plaintiff's counsel in particular, which Defendants have had opportunities to review and cross-examine Plaintiff's counsel about.

128.    Plaintiff requests the Bankruptcy Court to take judicial notice of the motion and reply brief in support of Plaintiff's attorneys' fees and costs filed as Adversary Proceeding Docket Nos. 221 and 273.  Plaintiff's motion and reply brief in support of its attorneys' fees and costs are not proper subjects for judicial notice under Federal Rule of Evidence 201 as they consist of legal argument and evidence disputed by Defendants.

The motion and reply brief contain evidence in support of Plaintiff's claim for attorneys' fees and costs, which the court may consider in determining the facts relating to such claim, the billing statements of Plaintiff's counsel in particular, which Defendants have had opportunities to review Plaintiff' counsel's billing entries before trial and cross-examine Plaintiff's counsel during trial.

129.    Plaintiff requests the Bankruptcy Court to take judicial notice of the summary of all fees filed by Plaintiff, summarizing three periods with detailed time entries attached as Exhibits A, B, and C thereto: (A) $189,569.50;[9]  (B) $95,913.00; (C) $36,737.50.  Adversary Proceeding Docket No. 275.  Plaintiff's summary of its attorneys' fees and costs is not a proper subject for judicial notice under Federal Rule of Evidence 201 as it consists of evidence disputed by Defendants.  The summary of fees with detailed time entries constitute evidence in support of Plaintiff's claim for attorneys' fees and costs incurred to remove Defendants' lien, which the court may consider in determining the facts relating to such claim, the time entries of Plaintiff's counsel in particular which Defendants have had opportunities to review and cross-examine Plaintiff's counsel about.

130.    At the trial on June 29, 2022, Plaintiff agreed to limit attorney fee damages to only those billing entries by one attorney, John-Patrick M. Fritz (billing initials "JPF"). 6/29/22 Trial Transcript at 11:3- 12:24 and 19:20- 20-6.

131.    At trial on June 29 and 30, 2022, the Bankruptcy Court made oral preliminary rulings on the fees charged, as reflected in **Exhibit 1** attached hereto.

132.    As set forth in Plaintiff's First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 146], Plaintiff asserts that Defendants were unnecessarily combative and added unnecessary procedural expense to the litigation from the start:

    a.  Instead of answering the complaint, Curtis filed a motion to dismiss the

---

[9] This figure was later voluntarily reduced by Plaintiff to $189,757.50 in recognition that some entries were not related to this matter.

adversary proceeding for lack of personal jurisdiction, alleging a failure

to serve her or Ammec.  Curtis also opposed the entry of default

judgment and immediately sought sanctions against Plaintiff's counsel

for $2,500.  After a series of briefing in opposition and replies, entry of

default was withdrawn, and the Plaintiff again served Curtis with another

summons on or about July 19, 2018, by which time more than 60 days

had passed since the complaint was filed.  This was the start of

Defendants' unending efforts to cause delay and increase the cost of

litigation through various procedural objections and avoid the

substantive merits of the suit.

b.  Curtis's next move was to file a motion to dismiss the complaint for

failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Although Curtis filed her motion on August 20, 2018, and the local rules

require only 21 days' notice, Curtis scheduled the hearing for October

16, 2018, nearly 60 days out, causing more than a month of

unnecessary delay.  Although the Bankruptcy Court denied Curtis's

motion to dismiss the complaint, Plaintiff's counsel was nonetheless

required to analyze the motion, prepare an opposition, attend the

hearing, and prepare and lodge the order.  It was not until November 2,

2018, that Curtis ultimately filed an answer to Plaintiff's amended

Complaint, by which time nearly six months had passed since the start

of the adversary proceeding.

c.  Curtis also filed a counterclaim against Plaintiff, six months after the

Claims Bar Date had passed, causing Plaintiff's counsel to prepare and

file a motion to dismiss the cross-complaint and for violation of the

automatic stay.  Curtis did not respond on the merits but (like with her

initial pleadings in the adversary proceeding) opposed based on

technical grounds regarding insufficient service and seeking to have the

1           motion rescheduled from December 11, 2018, until after the New Year,

2           based on her alleged vacation schedule spanning 24 days and

3           (coincidentally) beginning December 12, 2018 (the day after the then-

4           scheduled hearing) up to January 3, 2019.  This would have caused

5           more undue delay, and Plaintiff's counsel was forced to prepare a reply

6           (which Plaintiff's counsel did and filed within one day to avoid such

7           further delay) and explain why Curtis was wrong in her calculation of

8           insufficient service days under the Local Bankruptcy Rules.  As a result

9           of Plaintiff's counsel's diligent and speedy response, Curtis voluntarily

10          stipulated to dismiss her cross-complaint with prejudice the next week.

11          Although Plaintiff was making steady progress in challenging the

12          Disputed Mechanic's Lien in furtherance of its crucial refinancing efforts,

13          Curtis's litigation strategy of increasing cost and delay had forced

14          Plaintiff's counsel to go through at least four rounds of motion practice

15          over the course of six months just to get through the answer phase of

16          the lawsuit.

17     d. Plaintiff's counsel also soon learned that Curtis had further violated the

18          automatic stay by filing a complaint against Plaintiff with the California

19          Labor Commission Board in or about November or December 2018.

20          Because of the close temporal proximity to the other stay violation in

21          connection with the cross-complaint in the adversary proceeding,

22          Plaintiff's counsel was forced to prepare a stay letter and making phone

23          calls to the Labor Board informing them of the automatic stay and

24          pending bankruptcy case to ensure that Curtis was not carrying the

25          litigation asserting the claim underlying the mechanic's lien over into

26          other forums.

27     e. In an effort to avoid further delay by another round of contested motion

28          practice about whether service had been effectuated, Plaintiff's counsel

1 had Plaintiff's discovery personally served on Curtis by a process server

2 to ensure receipt.  Nonetheless, Curtis opposed the discovery on other

3 grounds in what would become an expensive, unpleasant, and ongoing

4 series of discovery disputes for most of March, all of April, and

5 continuing into mid-May 2019.

6 f. Shortly after the Bankruptcy Court signed the order setting the discovery

7 deadlines, Plaintiff's counsel propounded discovery on Curtis and

8 Ammec on or about February 19, 2019, so that the defendants would

9 have 30 days to respond, and then there would be adequate time to

10 bring a discovery motion if needed.  Depositions of Curtis and Ammec's

11 person most knowledgeable were set for March 27, 2019, and then

12 rescheduled to March 25, 2019, at the defendants' request.  However,

13 as soon as Plaintiff's counsel had agreed to reschedule the depositions

14 (at defendants' request), Curtis then freshly raised additional objections

15 in an attempt to not produce documents and not appear at deposition.

16 g. Plaintiff's counsel was forced to render additional legal services to

17 Plaintiff by engaging in telephone calls with Curtis to "meet and confer,"

18 analyze Curtis's various letters and emails objecting to discovery, and

19 preparing response correspondence to hold Curtis to discovery

20 production and attendance of depositions.  Because written decisions on

21 discovery disputes very rarely rise to the level of binding authority from

22 the Ninth Circuit or the Supreme Court, most discovery disputes must be

23 resolved based on common practice, reasonability, and whatever non-

24 binding federal discovery case decisions may be available.  Despite

25 Plaintiff's counsel crafting its discovery in consultation with respected

26 treatises and practice guides on federal discovery, and Plaintiff's

27 counsel preparing several correspondence with citation to treatise and

28 case law to compel discovery, Curtis would invariably object on the

1    grounds that this was not binding authority while occasionally citing a

2    non-binding case of her own.  These correspondence exchanges were

3    extremely time consuming in research, reference, and preparation, and

4    mostly done on short notice leading up to the impending discovery

5    deadline or deposition date.  Nonetheless, it was imperative that

6    Plaintiff's counsel conduct the discovery and take the additional steps to

7    ensure that Curtis attended depositions so as to properly and

8    adequately prepare for trial.

9    h.  Ultimately, Curtis sat for deposition – both personally and as the person

10    most knowledgeable for Ammec – but was highly uncooperative and

11    disruptive during the deposition.  At several points during the

12    depositions, Curtis would object and refuse to answer lines of

13    questioning for various reasons that were without merit, and insist that

14    not her, but Ammec's other officer, Carlos Montenegro, would be the

15    person to question regarding these topics.  Because of Curtis's

16    persistent obstruction, Plaintiff's counsel was forced to notice a second

17    set of depositions of Ammec's person most knowledgeable and Carlos

18    Montenegro.  Once again, this led to meritless written objection

19    correspondence from Curtis, followed by Plaintiff's counsel having to

20    prepare replies with researched case law and treatise citation to compel

21    production and attendance at the deposition.  Most shocking in this

22    particular exchange was the written statement from Curtis and

23    Montenegro that Montenegro was not an officer of Ammec, even

24    though: (i) he was the signed listed officer on the Secretary of State

25    corporate records; (ii) Curtis repeatedly stated that Montenegro was an

26    officer of Ammec; and (iii) a few weeks later Montenegro would attend a

27    third-party deposition and state on the record that he is an officer of

28    Ammec.  At the second deposition of Ammec's person most

43

knowledgeable, Montenegro did not appear, and Curtis appeared a

second time to act as the "person most knowledgeable" on the issues

that she previously stated she had no knowledge, and, once again

refused to answer while making baseless objections to the lines of

questioning.  Thus, what should have been (and could have been) one

simple day of depositions with Curtis became a labored process of two

days of depositions and hours of additional disputed letters and

telephone exchanges simply to compel attendance at deposition.

i.   These depositions and discovery were necessary because Curtis is a

key witness in the dispute.  To keep costs down, based upon concerns

about credibility, bias, cost, and the amount at issue in the dispute,

Debtor made the specific litigation discovery decision to notice only the

deposition of Curtis (personally and as Ammec's person most

knowledgeable) despite Defendants' listing several other potential

witnesses that were Curtis' family members and acquaintances.

Without these discovery efforts, the Debtor would be left completely

unprepared and exposed for whatever Curtis might attempt to do at trial.

Unfortunately, the Curtis deposition fight was only the first stage of the

discovery disputes.

j.   Curtis listed certain employees at Habitat for Humanity as witnesses in

her initial Federal Rule of Civil Procedure 26 disclosures, and, after

Curtis gave further details on who these persons were and what they

might know during the course of her deposition on March 25, 2019,

Plaintiff's counsel diligently began setting up a deposition of these

employees and a document production to Habitat for Humanity.

Plaintiff's counsel exchanged telephone calls and emails with a Habitat

for Humanity vice president to set up a convenient time and place for

depositions.  Plaintiff's counsel also prepared subpoenas as third-party

44

1    witnesses.  By the time that all the logistics were arranged with Habitat

2    for Humanity for the depositions, the parties were nearing the discovery

3    cutoff of April 30, 2019.  Curtis objected to the scheduling and attempted

4    to interfere with the depositions going forward, causing Plaintiff's

5    counsel to render additional legal services to keep the depositions on

6    track.

7    k.  The depositions of the Habitat for Humanity employees were necessary

8    because Curtis had listed them as key witnesses in the dispute.  While

9    many of Defendants' potential witnesses in their Federal Rule of Civil

10    Procedure 26 disclosures were family members or associates that might

11    be subject to bias impeachment, the Habitat for Humanity employees

12    presented a different situation with true third-party witnesses who may

13    have been neutral and percipient witnesses to key facts in the dispute.

14    Plaintiff had to get on record what these witnesses knew or did not know

15    in preparation for trial if Curtis intended to call them.  Plaintiff's counsel

16    conducted and completed these depositions in one morning to keep

17    costs down.

18    l.  The discovery disputes between Curtis and the Debtor entered a third

19    (and highly litigious and expensive) stage because Curtis waited too late

20    to propound discovery on the Plaintiff.  All of the discovery demands that

21    Plaintiff's counsel received from Curtis were served on or after April 11,

22    2019, which did not provide the requisite 30-day notice period to answer

23    under the Federal Rules of Civil Procedure.  One exception to the 30-

24    day rule is that depositions can be set on "reasonable notice" and

25    documents can be produced at or before a deposition in less than 30

26    days if reasonable (though some courts view this as an impermissible

27    run-around of the 30-day rule).  Nonetheless, one type of discovery

28    demand where this "30-day run-around" exception absolutely will not

1    work is a demand for inspection of real property under Federal Rule of

2    Civil Procedure 34.  Curtis was determined to gain access to Plaintiff's

3    Property, but being beyond the 30-day notice requirement of Federal

4    Rule of Civil Procedure 34(b)(2), she had no way of doing so.  Thus,

5    Curtis insisted on noticing a deposition of the Debtor's board members

6    at the Property on less than 30 days' notice.  It absurd that one party

7    could unilaterally insist on setting a deposition anywhere it pleased,

8    even in an adversary's place of business.  In order to protect the Debtor

9    from this harassment and discovery abuse, on instruction from the

10    client, Plaintiff's counsel prepared objections to Curtis's discovery but

11    offered to host the depositions at Plaintiff's counsel's offices.

12    m. Curtis was adamant about conducting the deposition at Plaintiff's

13    Property, refused to alter her position despite telephone and

14    correspondence exchanges with Plaintiff's counsel, and filed a motion to

15    force the deposition at Plaintiff's Property and (for the second time in the

16    case) seek monetary sanctions against Plaintiff's counsel.

17    Consequently, Plaintiff's counsel was required to render legal services

18    to Plaintiff by analyzing Curtis's 100 pages of motion and exhibits,

19    prepare an opposition complete with evidentiary objections,

20    declarations, and exhibits, totaling nearly 500 pages.  The Bankruptcy

21    Court entered an order denying Curtis's discovery motion without oral

22    argument a week before the scheduled hearings based on the papers

23    alone.

24    n. In the meantime, while the discovery disputes were ongoing, Curtis filed

25    a motion for summary judgment against Plaintiff on March 4, 2019, and

26    set it for hearing on April 30, 2019.  Many of Curtis's legal arguments

27    were confused and nonsensical, but, nonetheless Plaintiff was forced to

28    incur legal fees and respond or risk losing the case on summary

judgment.  Plaintiff's counsel was forced to analyze Curtis's motion and
prepared a 30-page opposition, which was as much opposition to
Curtis's position as explanation of legal theories and doctrines that
Defendants had misconstrued in their motion.  Responding to a motion
for summary judgment is not a light task, and Plaintiff's counsel was
required to prepare not only the opposing memorandum of points and
authorities, but separate declarations in opposition, evidentiary
objections, and a separate statement of disputed facts.  Next, Curtis
would file her replies, subsequent declarations, and evidentiary
objections of her own. Plaintiff's counsel was forced to review these
replies and prepare for and attend the hearing on the motion, which the
Bankruptcy Court ultimately denied, except for using the opportunity to
establish certain undisputed facts between the parties.

o.  On September 16, 2019, Plaintiff's counsel filed Plaintiff's motion for
partial summary adjudication ("Motion for Partial Summary
Adjudication") on voiding the mechanic's lien based on application of a
number of bankruptcy code sections, setting it for hearing on November
5, 2019.  The preparation of the motion also required a separate
statement of facts and conclusions of law, and declarations and exhibits
in support.

p.  Curtis and Ammec opposed Plaintiff's Motion for Partial Summary
Adjudication, but their opposition failed to provide a substantive
response on the issues; instead, the opposition proffered misguided
procedural arguments about the federal rules and meandered into
irrelevant arguments on discovery disputes.  Thus, Plaintiff's counsel
was forced to respond to Defendants' opposition papers by first
untangling a series of nonsensical objections that barely touched on the
substance of the Motion for Partial Summary Adjudication and then

1   (after making some sense of them) completely refuting them.  Plaintiff's

2   refutation of Defendants' arguments covered both facts and law.

3   Factually, Defendants had contradicted their previous testimony

4   regarding lien assignment, blatantly misrepresented the counting of

5   days in the 90-day requisite period for filing suit to enforce a mechanic's

6   lien, attempted to re-characterize the dismissal of Curtis's counterclaim

7   that was wholly at odds with the record in the case, and

8   mischaracterized oral argument from a previous hearing as an

9   "evidentiary" one.  Legally, Defendants proffered an incorrect

10  interpretation of 11 U.S.C. § 362 in relation to 11 U.S.C. § 546(b) and

11  insisted on a reading of Federal Rule of Civil Procedure 56 in an

12  irrational manner that would render FRBP 7056 a nullity.  Plaintiff was

13  forced to incur attorneys' fees to respond and prevailed on all of these

14  issues in Plaintiff's reply and at the hearing on the Motion for Partial

15  Summary Adjudication.

16  q.  Plaintiff's counsel's fees were reasonable and necessary because when

17  the Plaintiff prevailed on the Motion for Partial Summary Adjudication, it

18  significantly reduced the number of issues and amount of evidence

19  necessary for trial, and it invalidated the Defendants' Lien and

20  disallowed all claims that the Defendants had against Plaintiff, the

21  Property, and the bankruptcy estate.

22  r.  Plaintiff's counsel's attorneys' fees were also reasonable and necessary to

23  prepare the mandatory joint pretrial stipulation with Curtis and Ammec, and

24  to prepare for and attended the pretrial conference on October 1, 2019,

25  which has been continued to December 17, 2019, on account of the Motion

26  for Partial Summary Adjudication.

27  133.  As set forth in Plaintiff's Second Motion for Attorneys' Fees [Adversary

28

48

Proceeding Docket No. 221], Plaintiff again asserts that Defendants were unnecessarily combative and added unnecessary procedural expense to the litigation:

    s.  Plaintiff's counsel prepared a joint pretrial stipulation and exchanged emails with Defendants regarding the stipulation.  The parties continued to have disputes regarding the pretrial stipulation, and Plaintiff's counsel had to prepare a notice of dispute for hearing, prepare for and attended the status conference on December 17, 2019, and prevailed on Plaintiff's version of the joint pretrial stipulation. See Plaintiff's Notice of Motion and Second Motion for Attorneys Fees and Costs; Memorandum of Points and Authorities in Support Thereof; Declaration of John-Patrick M. Fritz, Esq.

    t.  Plaintiff's counsel prepared and timely filed Plaintiff's direct testimony declarations on February 7, 2020, in advance of the trial scheduled for April 23 and 24, 2020.  However, due to the complications of Covid 19, on March 16, 2020, Plaintiff filed motions and applications to reschedule the in-person trial, and on March 17, 2020, the Bankruptcy Court vacated the trial dates and set a status conference for April 28, 2020. For the remainder of 2020, Plaintiff's counsel would attend continued status conferences and report to the Bankruptcy Court on availability of remote trial procedures for Plaintiff, witnesses, and parties to conduct the trial, which the Bankruptcy Court ultimately set as a remote trial scheduled for January 28 and 29, 2021.

    u.  Defendants at first objected to remote trial and remote trial procedures, and Plaintiff's counsel had to prepare briefing and status report on proposed procedures for remote trial [Adversary Proceeding Docket No. 186], which Defendants opposed for, among other reasons, the assertion that Curtis did not own a computer and insisted on an in-person trial with only the witness Barrington Radley being allowed to

1    appear remotely [Adversary Proceeding Docket No. 187].  Plaintiff's

2    counsel was required to analyze such objections, prepare for, and

3    attend status conferences to move the matter along to remote trial.

4    v.  In preparation for trial, Plaintiff's counsel prepared and served a third-

5    party witness subpoena on Habitat for Humanity to appear at trial for

6    examination.

7    w.  In January 2021, Plaintiff's counsel prepared and filed evidentiary

8    objections to Defendants' three direct witness trial declarations, and

9    Plaintiff's counsel had to expend significant time preparing for a two-day

10    trial scheduled for January 28 and 29, 2021.

11    x.  At the first day of trial, January 28, 2021, neither Curtis nor counsel for

12    Ammec appeared for trial at 9:00 a.m.  The Bankruptcy Court waited,

13    then took a recess to allow more time for Defendants to appear, but at

14    9:30 a.m., Defendants were still not present, and the Bankruptcy Court

15    took a default against Defendants.  1/28/21 Trial Transcript at 3:7- 4:25.

16    y.  The Bankruptcy Court permitted trial to continue with Plaintiff's counsel

17    taking the live direct testimony of Mr. Rudy Trabanino, store manager for

18    Habitat for Humanity.  Just after direct testimony concluded, Ammec's

19    counsel, Mr. Barriage, appeared at the trial at approximately 9:50 a.m.

20    1/28/21 Trial Transcript at 10:1- 11:9. At the court's request, Plaintiff's

21    counsel summarized and repeated Mr. Trabanino's testimony for Mr.

22    Barriage, and Mr. Barriage did not wish to cross-examine, so the

23    witness was excused.  1/28/21 Trial Transcript at 18:1-7.  Just then

24    Curtis appeared by telephone (not video) at the trial, and after another

25    recess of ten minutes, trial commenced again 10:21 a.m. with Curtis

26    present by video, and the Bankruptcy Court reversed its previous

27    decision for a default.  1/28/21 Trial Transcript at 23:20-16.

28    z.  Instead of getting on with the actual trial though, the Bankruptcy Court

1       was forced to address Defendants' failure to file Curtis's trial declaration.

2       1/28/21 Trial Transcript at 24:24- 25:12.  Curtis's trial declaration was

3       due by no later than February 21, 2020.  JPTS,  ¶¶ 107, 115 [Adversary

4       Proceeding Docket No. 162]; Adversary Proceeding Docket No. 163, ¶4.

5   aa. On the first day of trial, after almost 90 minutes of delay for Defendants'

6       failure to timely appear, Curtis tried to sandbag Plaintiff by attempting to

7       testify live without having filed her trial declaration, as required in the

8       Joint Pretrial Stipulation [Adversary Proceeding Docket No. 162].  *See*,

9       1/28/21 Trial Transcript at 24:23- 32:14.  Curtis first argued why she

10      should be allowed to ambush the Plaintiff with live testimony, and, when

11      that failed, attempted to explain her lapse, and the Bankruptcy Court

12      graciously continued the trial in the interest of justice so that Curtis could

13      file her late trial declaration, and the trial was rescheduled for February

14      18 and 19, 2021.  In such a manner, practically an entire morning of trial

15      was wasted by Defendants' inability to competently appear at trial or

16      otherwise file the most important one of all their trial declarations.

17      Defendants appeared to have been unprepared on a substantive level,

18      as well, because near the end of the hearing, Curtis asked: "At the risk

19      of sounding stupid, what is the claim that we're litigating?"  1/28/21 Trial

20      Transcript at 40:25- 41:1.  Of course, all of these actions by Defendants

21      unnecessarily increased the cost of the litigation, forcing Plaintiff's

22      counsel to incur attorneys' fees to prepare for trial and attend a half-day

23      of trial only to have the matter rescheduled by three weeks.

24  bb. On February 4, 2021, Curtis filed her late trial declaration [Adversary

25      Proceeding Docket No. 204].  The trial declaration contained an

26      explanation that Curtis had contracted Covid-19 during January 2020

27      and had been incapacitated for five weeks while her breathing was

28      extremely laborious, particularly due to being extremely ill with COPD.

1   Adversary Proceeding Docket No. 204 ¶ 49.  Somewhat incongruously,

2   despite this battle with Covid-19 in January/February 2020, in July 2020

3   (a time when no vaccine had been developed at all) Curtis made no

4   mention of the matter but insisted on in-person trial hearings because

5   she had no computer, mentioning no health concerns at all, even while

6   the country hit progressively worse waves of Covid infection and

7   hospitalization in July 2020.  *See*, Adversary Proceeding Docket No.

8   187.

9   cc. Plaintiff's counsel was required to analyze Curtis's late trial declaration,

10   prepare and file evidentiary objections, and prepare for trial a second

11   time due to the delay.

12   dd. To keep costs down, Plaintiff's counsel had only one attorney appear for

13   the two-day trial encompassing oral arguments on evidentiary

14   objections, cross-examination, re-direct, and rehabilitation testimony.

15   See Plaintiff's Second Motion for Attorneys' Fees [Adversary Proceeding

16   Docket No. 221].

17   ee. On the original first day of trial, January 28, 2021, Debtor's counsel

18   expressed a view that the trial could be done in one day.  1/28/21 Trial

19   Transcript at 36:1-2.  Indeed, earlier that day, evidence had been

20   admitted that all the lumber sold by the Habitat for Humanity Store for

21   the entire month of September 2017 was less than $3,000.  1/28/21 Trial

22   Transcript at 9:1-19.  From that point forward, the trial primarily

23   concerned Defendants' failed attempts to justify an indefensible

24   "mechanic's" lien, and it would seem unfathomable that such a defense

25   could take two full days, particularly because (as of February 3, 2021,

26   when Curtis filed her late trial declaration) it was undisputed that the

27   total purchase price of 50 prefabricated walls of lumber was only $1,000,

28   which was so obviously out of proportion with Defendants' mechanic's

Lien asserting a claim of $40,000.

ff. Based on the undisputed facts, Defendants' Lien was so indefensible
that at the outset of trial the Court stated the obvious: "… I have to know
what exactly… what the thinking was to go into the lien is, or what was
the reason for the lien.  Because it's a little unclear to me, you know,
where the $40,000 comes form, and, you know, what makes this a
mechanics lien." 2/18/21 Trial Transcript at 16:14-18.  Very early on in
the trial, the Bankruptcy Court continued to question Curtis under oath
trying to understand how these facts (alleged tort of conversion) could
possibly justify a mechanic's lien.  2/18/21 Trial Transcript at 67:15-
75:3. Very early on in the trial, the Bankruptcy Court also questioned
Curtis directly on how $1,000 purchase of lumber could justify a $40,000
lien.  2/18/21 Trial Transcript at 64:7-21.  Thus, within the first two hours
of trial (2/18/21 Trial Transcript at 56:6 [Bankruptcy Court resumes after
morning recess]), the Banrkuptcy Court had already addressed the main
problem with Defendants' claimed "mechanic's" Lien for $40,000.  The
rest of the trial was largely Curtis attempting to defend her indefensible
actions over the course of two days, which only further proved
Defendants' malice in filing the lien.  Nonetheless, Plaintiff's counsel
was forced to provide services and incur additional service fees for a
two-day trial where the vast majority of the time was spent by Ms. Curtis
arguing with the Bankruptcy Court and attempting to justify a $40,000
lien for a dispute over $1,000 of lumber.

gg. At trial Defendants engaged in extensive arguments on evidentiary
objections.  2/18/21 Trial Transcript at 108:10-19 (THE COURT: …
there's been extensive argument on objections, I don't think we're going
to get to the defense witnesses today… I think the actual testimony itself
is not going to be that long, but we've had very extensive argument on

1   these objections…).  Even after actual testimony was under way,

2   though, the Bankruptcy Court noted that the trial was still taking a lot

3   longer than expected.  2/18/21 Trial Transcript at 109:11-14 and 245:20-

4   21.  As a result, what could have been a much shorter trial was

5   extended unnecessarily by Defendants' constant arguments, adding to

6   Plaintiff's attorneys' fees.

7   hh. Defendants caused the trial to be longer than necessary with a series of

8   inane legal arguments (all of which failed). For example, on January 28,

9   2021, Curtis argued that Amec could call her as an adverse witness for

10   direct testimony, and, thus, Curtis was not required to file a trial

11   declaration.  1/28/21 Trial Transcript at 26:25- 27:7.  On February 18,

12   2021, Curtis argued that she (a disbarred attorney) could testify as an

13   expert witness on the subject matter of bankruptcy law (of all things) to a

14   presiding bankruptcy judge.  2/18/21 Trial Transcript at 42:20- 45:6. In

15   the middle of trial Curtis attempted to make a motion for directed verdict

16   based upon a case that she had not presented to the Court previously

17   and without having the citation.  2/19/21 Trial Transcript at 95:2-21.  Mr.

18   Barriage provided the cite to the Bankruptcy Court, and the Bankruptcy

19   Court reserved ruling until the end of evidence.  2/19/21 Trial Transcript

20   at 96:6-16.  At the close of evidence, the Bankruptcy Court allowed

21   Defendants the opportunity to make their motion for directed verdict, but

22   Defendants did not even know what legal authority or federal rule

23   governed such motion.  2/19/21 Trial Transcript at 205:22- 208:25.

24   ii.  Extensive arguments about evidentiary objections and baseless legal

25   arguments aside, trial took more than two days in large part because

26   from a factual standpoint Curtis was completely unable to justify her

27   filing a "mechanic's" Lien for $40,000 relevant to less than $1,000 of

28   lumber where there was no agreement for the lumber between the

1    parties.

2        jj.    After trial concluded on February 19, 2021, Plaintiff's counsel had to

3            expend significant time reviewing over 550 pages of hearing transcripts

4            across the three-day trial to prepare proposed Findings of Facts and

5            Conclusions of Law (originally and timely filed by Plaintiff at Adversary

6            Proceeding Docket No. 217 on April 19, 2021.

7    **IV.    CONCLUSIONS OF LAW[10]**

8        **A.    Plaintiff's First Cause of Action for Slander of Title - Elements**

9        134.    The elements of a claim of slander of title are: (1) a publication, (2) which is

10   without privilege or justification and thus with malice, express or implied, and (3) is false,

11   either knowingly so or made without regard to its truthfulness, and (4) causes direct and

12   immediate pecuniary loss.  *Howard v. Shaniel*, 113 Cal.App.3d 256, 263-264 (1980);

13   *accord, Manhattan Loft, LLC v. Mercury Liquors, Inc*., 173 Cal.App.4th 1040, 1051

14   (2009).  These four elements will be discussed out of order below, addressing first

15   publication, then falsity, before turning to privilege and malice, and, finally, pecuniary

16   loss.

17       **B.    Slander of Title Legal Element Number 1: Publication**

18       135.    The first element of publication for slander of title is met by the evidence of

19   Defendants' filing of the Lien in the Los Angeles County Recorder's Office, which is a

20   publication.  JPTS at 2, Admitted/Adjudicated Fact No. 4 [Adversary Proceeding Docket

21   No. 162]; Trial Exhibit P-1 (Lien); 2/18/21 Trial Transcript at 15:10-13 (no dispute as to

22   publication element number 1).  The uncontroverted evidence shows that Defendants

23   "published" the Lien by recording it in the County Recorder's Office.

24

25

26

27   ---
[10] To the extent any proposed conclusions of law are findings of fact, the Bankruptcy
Court adopts them as such.

28

**C.    Slander of Title Legal Element Number 3: Defendants' Statement in the Lien Was False**

### i.    The Statement in the Lien that the Parties Had an Agreement Was False Because There Was No Agreement

136.    The second element of false statement in a publication knowingly so or without regard to its truthfulness is met by the evidence that Defendants knowingly made a false statement in the Lien in which Defendants expressly asserted: "In accordance with an ***agreement*** to provide labor and/or material, I did furnish the following labor and/or materials: **20** Prefabricated Wood Wall Panels @ a cost of ***$2,000*** a piece… of a total value of ***$40,000***."  Trial Exhibit P-1 at 2 (emphasis added).

137.    The evidence indicates that this statement was false because: (1) there was no agreement between the parties for Defendants to supply Plaintiff with any lumber; (2) Defendants did not supply 20 wood panels to Plaintiff, that is, at most, there were 5 panels at issue; (3) the panels did not cost $2,000 a piece; and (4) whether there were 5 panels or 20 panels involved, the total value was not $40,000.

138.    As set forth in the above proposed findings of fact, the parties did not have any agreement for Defendants to supply lumber to Plaintiff or its agents, including Eric Radley.  The lumber at issue in this case was purchased from Habitat for Humanity jointly by Eric Radley and Defendant Greta Curtis "50/50" for a total purchase price of $1,000.00.  Eric Radley gave $1,000 in cash to Curtis to purchase the lumber, and she used her credit card to buy the lumber, keeping Eric Radley's cash.  Eric Radley was entitled to 50 percent of the lumber consisting of 50 prefabricated wood panels, and on the day of the purchase, he took 5 of the 25 wood panels (half of the 50 wood panels purchased by him and Curtis) that he was entitled to take after telling Curtis that he was taking these panels and she did not object.  Because Eric Radley took from his share of the lumber, there was no need for any agreement for  Defendant Curtis to "supply" him with the lumber.

139.    In any event, based on the admissions of Defendant Curtis in her trial

testimony, the statement in the Lien that Defendants had an agreement to supply Plaintiff

with lumber was false because she testified that Eric and Barrington Radley stole her

lumber, or in other words, they took the lumber which she says was entirely hers without

her knowledge or permission.  If the Radleys "stole" Curtis's lumber, there was no

agreement for her to supply it to them.   Thus, it was false for Defendants to state in the

Lien that there was an "agreement" between them and Plaintiff.

140.    Regarding this purported "agreement," Curtis testified at trial that she

intended to "donate" some of her lumber to Plaintiff.  2/19/21 Trial Transcript at 121:1-11

(Curtis testimony).  But this concept of a "donation" does not fit with the rest of the

evidence. Barrington Radley testified that he heard Curtis say to Eric Radley, "take what

you need," from the lumber on the day of purchase.  2/18/21 Trial Transcript at 211:25

(Barrington Radley testimony).  But Barrington Radley testified at trial in response to a

question asked by Curtis that he thought it strange for Curtis to call it a "donation"

because Eric Radley had purchased half of the lumber: "I don't know if you were donating

them or what the arrangement was.  I do know this.  That you were buying that wood --  I

don't see why you would donate them and half the wood was – you guys were buying

that wood in conjunction."  2/18/21 Trial Transcript at 212:3-7 (Barrington Radley

testimony).

141.    Even if assuming *arguendo* that Curtis had an intention to donate some of

her lumber to Plaintiff, that purported intention did not rise to the level of an agreement as

Curtis testified at trial that she later changed her mind after Eric and Barrington Radley

had already taken five prefabricated wood walls to Plaintiff's Property.  2/19/21 Trial

Transcript at 119:11-17 (Curtis testimony).  After Curtis purportedly changed her mind (at

which time Eric and Barrington Radley had already taken the five prefabricated walls to

Plaintiff's Property), Curtis alleged that Plaintiff had stolen the lumber from her and that

there was no agreement between the parties and that this was a tort of conversion.

2/19/21 Trial Transcript at 122:13-123:12 (Curtis testimony).  Curtis testified that she had

made no commitment as to when or how much lumber to donate to Plaintiff, and thus Eric

Case 2:18-ap-01139-RK    Doc 344    Filed 09/26/23    Entered 09/26/23 10:05:29    Desc
Main Document    Page 58 of 220

and Barrington Radley had taken the lumber without her knowledge or consent, and, therefore, without any agreement between the parties.  2/19/21 Trial Transcript at 127:3-128:4 (Curtis testimony); *see also*, 2/18/21 Trial Transcript at 68:5- 70:24 (Curtis testimony):

> THE COURT: … So there was no agreement that they could take the panels, right?
>
> CURTIS: Right, your Honor.
>
> THE COURT: And so… you're saying this is theft, right?
>
> CURTIS:  I don't see it as being anything else.

2/18/21 Trial Transcript at 70:17-24 (Curtis testimony).

142.    Defendants knew the statement about an agreement in the Lien was false because Curtis knew that there was no agreement: "I did not become aware of the alleged partnership PWC and I entered into until I read Eric Radley's trial declaration." Curtis Trial Declaration [Adversary Proceeding Docket No. 204 ¶ 24].  Eric Radley and Barrington Radley testified that the only agreement ever had been for Eric and Curtis to split the cost of the lumber and transportation – not that Curtis would supply Plaintiff with any lumber.  2/18/21 Trial Transcript at 117:15-20 (Eric Radley testimony); 2/18/21 Trial Transcript at 192:12-17 and 195:21-196:4 (Barrington Radley testimony).

143.    Defendants, that Curtis personally and as Ammec's principal, knew that the statement in the Lien that there was an "agreement" for Curtis to supply lumber to Plaintiff was false because Curtis repeatedly testified that the Lien was based not on an agreement, but on a tort of conversion for theft of the lumber.  Curtis Declaration [Adversary Proceeding Docket No. 204 ¶ 30] ("I filed the mechanic's lien against Plaintiff's real property because its' agents, Eric Radley and Barrington Radley, *stole* over 30 lumber panels from me in the course of a month.") (emphasis added); 2/18/21 Trial Transcript at 74:24-75:3 (Curtis testimony) (Mechanic's Lien based on several acts that Curtis did not agree to); Trial Exhibit P-6 at 14 (text message from Curtis to Eric Radley on 11/3/2017 stating "I will gladly remove my mechanic's lien when you pay my

money for the lumber you and Ronnie *stole* from me.  Now that is a felony that can put your wife and kids away also.") (emphasis added); Defendants' Trial Exhibit 7 at 12 (same text message).

144.    Accordingly, the second element of slander of title in a false published statement is met based on the evidence of Defendants' statement in the Lien about the existence of an "agreement" between the parties was false, and the evidence showing that Defendants knew it was false.

**ii.    The Statement in the Lien that Defendants Provided Plaintiff with 20 Walls Was False Because the Walls Given to Plaintiff Were At Most 5 Walls which Belonged to Eric Radley**

145.    Defendants made a false statement in the Lien by asserting that Defendant Curtis had provided Plaintiff with "20 Prefabricated Wood Wall Panels" because the evidence showed that Plaintiff had only five of the total 50 walls; in particular, photographic evidence showed three walls of lumber inside the Plaintiff's building and the other two walls cut up and stacked in Plaintiff's parking lot.

146.    As discussed in the proposed findings of fact above, Curtis did not supply Plaintiff with any materials; rather, the five wood walls obtained by Plaintiff were supplied by Eric Radley from his half of the lumber.  As Eric and Barrington Radley credibly testified, they took only five of the prefabricated walls from Habitat for Humanity, and they denied taking any more than the five walls.  2/18/21 Trial Transcript at 124:14-25 & 124:12-126:19-25 (Eric Radley testimony); 2/18/21 Trial Transcript at 213:20- 214:19 (Barrington Radley testimony).

147.    The trial exhibits from both sides showing the lumber at Plaintiff's Property show nothing more than three prefabricated wood wall panels inside at Plaintiff's Property and some small piles of cut-up lumber stacked in the parking lot outside at Plaintiff's Property, which altogether appear to sum up to the five small, prefabricated walls taken by Eric and Barrington.  *See*, Lumber Photographs, Trial Exhibit P-5; *see also*, Trial Exhibit P-10 (Curtis Deposition Transcript at 37:12-22-25, 77:11-78 and Exhibit 4, 8-15

thereto); *see also*, Lumber Photographs, Trial Exhibit D-5; *see also*, 2/18/21 Trial

Transcript at 136:7, 138:1-7 (Eric Radley testimony).

148.    The lumber jointly purchased by Eric Radley and Curtis and moved to

Plaintiff's Property was only a small portion of the total 50 panels of lumber located at

Habitat for Humanity, which is easily discernible from comparing the photograph of all 50

walls at Habitat compared to the photographs of the lumber at Plaintiff's Property.   *See*,

Lumber Photographs, Trial Exhibit P-4, *cf.* Lumber Photographs, Trial Exhibit P-5.

149.    Most of the lumber – all of it other than the five walls that Eric and

Barrington Radley took on the day of purchase – ended up in Defendants' possession at

a lot in Compton.  2/18/21 Trial Transcript at 126:12 (Eric Radley testimony); 2/18/21 Trial

Transcript at 214:3-215:9 (Barrington Radley testimony).

150.    Therefore, the Bankruptcy Court finds and concludes that it was false for

Defendants to have asserted in the Lien that Plaintiff had obtained 20 of the prefabricated

walls.

151.    At trial, Curtis attempted to make it appear as if Plaintiff had taken more

lumber than just the five walls by testifying that she had taken all the photographs inside

Plaintiff's building and outside in Plaintiff's parking lot of the lumber at Plaintiff's Property

on the same day.  2/19/21 Trial Transcript at 186:12-14 (Curtis testimony).  However, the

Bankruptcy Court finds Curtis's testimony unreliable and contradicted by her prior sworn

deposition testimony, discussed in greater detail immediately below.

152.    During trial, Plaintiff introduced into evidence the transcript of the deposition

of Greta Curtis, taken on March 25, 2019.  2/18/21 Trial Transcript at 58:14-16

(introducing Curtis Deposition Transcript, Trial Exhibit P-10).  The Bankruptcy Court

notes that the lumber photographs in Plaintiff's Trial Exhibit P-5 matches Curtis's

Deposition Exhibits 4 and 8-15, all showing lumber at Plaintiff's Property.

153.    During her deposition, Curtis checked her phone to verify the date that she

took the photographs and stated that the photo of lumber inside Plaintiff's property

(Deposition Exhibit 4) (Trial Exhibit P-4 at page 1) was taken between September 15 and

20, 2017.  Trial Exhibit P-10, 3/25/2019 Curtis Deposition Transcript at 37:12-38:12.

154.    During the deposition, Curtis checked her phone to verify the date that she took the photos and testified that the photos of lumber cut up and stacked outside in Plaintiff's parking lot were taken on October 12, 2017.  3/25/2019 Curtis Deposition Transcript at 78:21-79:15 & Exhibit 8-15 thereto.

155.    During her deposition, Curtis further testified that the wood shown in Deposition Exhibit 4 as being inside Plaintiff's Property was the same wood that was cut up and stacked in Plaintiff's parking lot in Deposition Exhibit 8 at 15 because Curtis testified that she saw Eric and Barrington Radley cutting up the wood back on September 16, 2017, when she took the photograph of the wood inside.  3/25/2019 Curtis Deposition Transcript at 79:16-80:6.

156.    The inconsistent statements between Curtis's deposition testimony and trial testimony calls into question the trustworthiness of the statements, and the Bankruptcy Court finds that the deposition testimony is more trustworthy than the trial testimony regarding the dates of the photographs because it was closer in time to the actual events, and Curtis stated that she checked her phone for the dates of the photographs, whereas during trial Curtis made her self-serving statement off the cuff to bolster her version of events as Plaintiff argues.

157.    Eric Radley testified that some of the photographs of the wood in the parking lot was from the same five prefabricated walls taken from Habitat for Humanity, and that only three walls were shown standing in the picture inside the Plaintiff's Property, and that the wood cut up in the parking lot was from the other two walls. 2/19/21 Trial Transcript at 193:12-194:22 (Eric Radley testimony); Trial Exhibit P-5 (pictures of lumber at Plaintiff's Property).

158.    Eric Radley also testified that some of the photographs of the wood cut up in the parking lot was not even the same wood that was taken from Habitat for Humanity, but different wood purchased from a different lot.  2/19/21 Trial Transcript at 191:6-192:25 (Eric Radley testimony), Exhibit P-5 at 5 of 8 (photograph of lumber).

159.    Thus, the preponderance of the evidence shows that Plaintiff had no more than five of the total 50 prefabricated wood walls purchased from the Habitat for Humanity Restore store, that Defendants' statement in the Lien that Plaintiff had taken 20 walls was false, and that Defendants knew it was false, or at the very least, they had no reasonable grounds to believe the statement that Plaintiff had taken 20 walls was true.

### iii.    Lien Was False Because of the Assertion of a $40,000 Claim

160.    The Bankruptcy Court finds and concludes that Defendants made a false statement in the Lien by asserting a cost at $2,000 per wall, for a total claim of $40,000.

161.    Defendants knew that the Lien was a false statement – or at the very least made the statement without regard to its truthfulness – when Defendants asserted "a cost of $2,000 a piece… of a total value of *$40,000*" because Curtis admitted at her deposition that she had no basis to value the lumber allegedly taken by Plaintiff: "… I'm not a contractor.  I'm not a construction person so I – I can't really give you a value."  Trial Exhibit P-10 (3/25/2019 Curtis Deposition Transcript at 55:23-56:3).  At trial, Curtis reiterated her testimony that she is not a contractor and did not know about lumber. 2/19/21 Trial Transcript at 120:15-25 (Curtis testimony).

162.    Moreover, Curtis knew, or should have known, that the statement of value of $40,000 for five walls (or even 20 walls) of lumber in the Lien was false, and Curtis made that statement with reckless disregard for its truthfulness because the purchase price of all 50 walls of the lumber from Habitat was only $1,000.  Curtis Declaration at 8, ¶ 24 [Adversary Proceeding Docket No. 204].  *Appel v. Burman*, 159 Cal.App.3d 1209, 1214 (1984) (malice where publisher "knows that the statement is false *or* acts in reckless disregard of its truth or falsity") (emphasis added) (quoting Rest. 2d Torts § 623A).

163.    The Bankruptcy Court finds and concludes that the value of lumber in question was not anywhere near $40,000 based on cost, and, therefore, the Lien was false in its assertion of its claim of value for the lumber was $40,000 asserted to be based on cost.  The falsities of Defendants' statements in the Lien as to the $40,000 value – as

well as the existence of an agreement and amount of lumber – are discussed in greater

detail immediately below in connection with malice and lack of privilege.

**C.      Slander of Title Legal Element Number 2: Without Privilege or**

**Justification and Thus with Malice, Express or Implied**

**i.      No Privilege for Mechanic's Lien and Falsity Regarding**

**"Agreement"**

164.    Defendants contend as a defense that the filing of the Lien was privileged.

Defendants' Answer, Affirmative Defense No. 17 [Adversary Proceeding Docket No. 51].

165.    The Bankruptcy Court finds and concludes that Defendants affirmative

defense fails and that Defendants did not have any such privilege to file a mechanic's

lien.

166.    In California, the right to file a mechanic's lien is statutory, and the

applicable statute states: "A person that provides work authorized for a work

improvement, including [a material supplier] … has a lien right under this chapter

[Chapter 4, Mechanics Lien]."  California Civil Code § 8400(c).

167.    Curtis asserted in her trial testimony that she is a material supplier of

lumber.  2/18/21 Trial Transcript at 71:4-6 (Curtis testimony).

168.    The Bankruptcy Court finds and concludes that Curtis did not supply

Plaintiff with any materials because the five wood walls obtained by Plaintiff were

supplied by Eric Radley from his half of the lumber jointly purchased by him and Curtis.

169.    However, even assuming *arguendo* if Curtis did "supply" the lumber to

Plaintiff (and regardless of whether it was 5 or 20 prefabricated walls), Defendants still

would have no privilege to file a mechanics lien because there was no "work authorized

for a work improvement."

170.    The statute specifies that "work is authorized for a work improvement" only

if it meets either one of two criteria: (a) "It is provided at the request of or agreed to by the

owner," or (b) "It is provided or authorized by a direct contractor, subcontractor, architect,

project manager, or other person having charge of all or part of the work of improvement

or site improvement."  California Civil Code § 8404.

171.    The evidence in this case shows that there was no request of, or agreement between, the parties for Curtis to supply lumber, and therefore, California Civil Code § 8404(a) does not apply.

172.    The evidence in this case also shows there was no direct contractor, subcontractor, architect, project manager or other person having charge of all or part of the work of improvement or site improvement because Curtis does not meet the definition of any of these enumerated parties for California Civil Code § 8404(b) to apply.  Curtis was not Plaintiff's contractor, subcontractor, architect or project manager regarding the installation of the lumber and she was not an "other person," having charge or all or part of the work of improvement or site improvement of Plaintiff's Property.  As previously stated, Curtis considered herself as having the lumber taken from her without her knowledge or agreement, that is, stolen from her without her agreement, which if true, would constitute a tortious conversion of her property, not her contractual improvement of Plaintiff's Property.  *See, Lee v. Hanley,* 61 Cal.4th 1225, 1240 (2015)("Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. . . .")(internal quotation marks and citation omitted).

173.    The evidence of this case indicates that the Lien was Defendants' improper self-help remedy not supported in the law to address a purported tort claim of conversion against the Plaintiff as Curtis testified that she filed the Lien because "Debtor's employee took my wood without my permission," 2/18/21 Trial Transcript at 67:18-21 (Curtis testimony).  In order for Defendants to have a lien on real property based on a purported tort claim of conversion, they needed to institute a lawsuit on the claim and obtain a money judgment as a prerequisite for a judgment lien on Plaintiff's real property.  *See* California Code of Civil Procedure §697.310(a); *see also, e.g., Meyer v. Sheh,* 74 Cal.App.5th 830, 837 (2022); Ahart, *Rutter Group Practice Guide: Enforcing Judgments*

64

*and Debts,* ¶¶ 6:11.20 and 6.173 (online edition, June 2023 update).  Defendants simply recorded the Lien against Plaintiff's Property without filing suit and obtaining a money judgment as required by California law, and basically filed the Lien without any legal authority.

174.    In an attempt to justify the Lien in response to the Bankruptcy Court's comment that an agreement is necessary for a mechanic's lien, Curtis immediately changed her position and testified that there was an agreement for her to donate lumber. 2/18/21 Trial Transcript at 68:2-9 (Curtis testimony).  Upon further questioning by the Bankruptcy Court, Curtis admitted that there was no agreement and that this was a claim for conversion based on theft:

> THE COURT: Well, there was no agreement – right.  So, there was no agreement that they could take the panels, right?
>
> THE WITNESS [CURTIS] Right, your Honor.
>
> THE COURT: And so – well, isn't that – you're saying this is theft, right?
>
> THE WITNESS [CURTIS]: I don't see it as being anything else.

2/18/21 Trial Transcript at 70:17-24 (Curtis testimony).

175.    Curtis repeatedly testified that the lumber was "stolen."  Curtis Declaration at 10, ¶30 [Adversary Proceeding Docket No. 204] ("I filed the mechanic's lien against Plaintiff's real property because its' agents, Eric Radley and Barrington Radley, stole over 30 lumber panels from me in the course of a month.").

176.    Curtis sent a text message to Eric Radley on November 3, 2017, stating: "I got your message and I will gladly remove my mechanics lien when you pay my money for the lumber you and Ronny stole from me.  Now that is a felony.  They can put your wife and kids away, also.  You have 24 hours to pay." 2/18/21 Trial Transcript at 79:15-20; Trial Exhibit P-6 at 13-14 (text message).

177.    Curtis testified at trial that she filed the Lien as way of getting a quick prejudgment remedy for payment because a lawsuit for conversion would take too long:

> MR BARRIAGE: Ms.  Curtis, why did you not file a lawsuit for conversion?

1    CURTIS: Well, I didn't want to --  I didn't want things to linger on for a long time.  I

2    knew the mechanic's lien had specific requirements.  I only had so much time to

3    try to build something and get something, you know …

4  2/19/21 Trial Transcript at 130:25-131:5 (Curtis testimony); *see also*, 2/19/21 Trial

5  Transcript at 135:12-20 (Curtis testimony) ("I just wanted my money for what they took

6  from me without my permission … and I didn't want to go through any protracted litigation

7  with them …").

8        178.    Defendants argue that their publication of their purported mechanic's lien

9  was privileged under the litigation privilege of California Civil Code §47 and thus, not

10  actionable for the tort of slander of title.  Defendants' Proposed Findings) at 3 [Adversary

11  Proceeding Docket No. 269]; Defendants Greta Curtis and Ammec, Inc's Objections to

12  Plaintiff's Proposed Findings of Fact and Conclusions of Law in Support of the First

13  Cause of Action for Slander of Title in the Amended Complaint Following Trial

14  (Defendants' Objections to Plaintiff's Proposed Findings) at 2-5 [Adversary Proceeding

15  Docket No. 270].  Defendants in support of their argument cite the case of *RGC*

16  *Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.,* 56 Cal.App.5th 413 (2020) for the

17  proposition that "the filing of a mechanic's lien constitutes protected activity, ***even if the***

18  ***lien was invalid or otherwise improper***" and the case of *Frank Pisano & Associates v.*

19  *Taggart,* 29 Cal.App.3d 1 (1972) for the proposition that ***"it's a privileged act to file a***

20  ***mechanic's lien, that privilege is not lost if it turns out that the mechanic's lien was***

21  ***not something that was ultimately valid or appropriate to do so."*** [11]  Defendants'

22  Proposed Findings at 3 and 11 [Adversary Proceeding Docket No. 269] (emphasis in

23

---

24  [11] In their papers, Defendants repeatedly assert the statement purportedly quoted from the
opinion in *Frank Pisano & Associates v. Taggart* that "it's a privileged act to file a
mechanic's lien, that privilege is not lost if it turns out that the mechanic's lien was
25  not something that was ultimately valid or appropriate to do so." Defendants'
Objections to Plaintiff's Proposed Findings) at *passim* [Adversary Proceeding
26  Docket No. 270], *citing Frank Pisano & Associates v. Taggart* (1972) 29
Cal.App.3d 1.  Defendants did not in their papers provide a pinpoint page citation to
27  this purported quote, and the Bankruptcy Court was unable to locate the purported
quotation in the *Frank Pisano & Associates v. Taggart* opinion.

28

original).

179.    The Bankruptcy Court overrules and rejects Defendants' argument based on the *RGC Gaslamp* case as distinguishable because in *RGC Gaslamp* and *Frank Pisano Associates* in those cases, there were colorable claims by contractors with agreements (a subcontractor doing sheet metal fabrication and installation work for the owner in *RGC Gaslamp*, and a contractor providing engineering services for subdivision purposes to owner's predecessor-in-interest in *Frank Pisano Associates*), but, in this case, Plaintiff and Defendants had no agreement, Defendants' allegation was based on theft – that the lumber was stolen without their consent or agreement – and Defendants bypassed the requirements for a judgment lien based on a tort liability of conversion.  As the court in *RGS Gaslamp* stated, "In general, the privilege applies 'to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.'" 56 Cal.App.5th at 435. Similarly, in *Frank Pisano Associates,* the privilege attached in that case because the filing of the lien was permitted by law by a contractor which had an agreement and the lien had a reasonable relationship to an action to foreclose the lien for unpaid services which had been agreed to.  29 Cal.App.3d at 25.  Defendants' Lien does not meet this standard as stated in *RGC Gaslamp* because they were not "litigants or other participants authorized by law" to file a mechanic's lien because there was no "work authorized for a work improvement" either as (1) "provided at the request of or agreed to by the owner" under California Civil Code §8404(a) (i.e., Curtis did not provide lumber at request of, or agreed to, by the property owner, Plaintiff; the lumber was provided by Eric Radley, and Plaintiff made no request of Curtis for lumber, nor did it make any agreement with Curtis for lumber) or (2) "provided or authorized by a direct contractor, subcontractor, architect, project manager or other person having charge of all or part of the work improvement or site improvement" under California Civil Code §8404(b) (i.e., Curtis who did not supply lumber to Plaintiff does not meet any of these contractor categories), and, thus,

1   Defendants were not "litigants or other persons authorized by law" to file a mechanic's

2   lien as they did, and thus, lacked standing to file the Lien.  Moreover, filing a mechanic's

3   lien by Defendants had no "connection or logical relation" to what at best would be a

4   potential action for conversion, which requires a money judgment and judgment lien to

5   attach to Plaintiff's Property.   *See LiMandri v. Judkins,* 52 Cal.App.4th 326, 345 (1997).

6   Based on Defendants' lack of standing to assert a mechanic's lien and lack of connection

7   or logical relation of a mechanic's lien to their potential conversion claim, the Bankruptcy

8   Court finds and concludes that Defendants' purported mechanic's lien had no legal basis

9   and that there was no applicable litigation privilege for Defendants.  6/29/22 Trial

10  Transcript at 21:22- 22:20. The Bankruptcy Court finds and concludes that Defendants

11  had no basis to argue that they had an absolute privilege in recording their purported

12  mechanic's lien where they did not meet the standard for the litigation privilege as

13  recognized in *RGC Gaslamp.*

14          180.    Accordingly, the Bankruptcy Court finds and concludes that Defendants had

15  neither a privilege nor justification to file a mechanic's lien under California law where

16  there was no request by, or agreement with, Plaintiff, for Defendants to supply materials

17  to Plaintiff, and instead Defendants improperly used the Lien to encumber Plaintiff's

18  Property based on a totally unwarranted interpretation of the California mechanic's lien

19  statute, to enforce a purported claim based on tort of conversion.  Defendants made a

20  patently false statement that they knew to be false when they filed the Lien stating: "In

21  accordance with an ***agreement*** to provide labor and/or material, I did furnish the

22  following labor and/or materials: 20 Prefabricated Wood Wall Panels @ a cost of $2,000

23  a piece… of a total value of ***$40,000***."  Trial Exhibit P-1 at 2 (Lien) (emphasis added).

24          181.    The Bankruptcy Court rejects Defendants' argument that their filing of a

25  mechanic's lien was absolutely privileged under California Civil Code § 47.

26          **ii.       Malice Based Upon No Reasonable Grounds for Believing that**

27          **Defendants' Lien Claim was for $40,000 of Lumber**

28          182.    "Malice" means that the defendant "(1) was motivated by hatred or ill will

68

towards the plaintiff or (2) lacked reasonable grounds for its belief in the truth of the

publication and therefore acted in reckless disregard of the plaintiff's rights."  *Schep v.*

*Capital One, N.A.*, 12 Cal.App.5th 1331, 1337 (2017) (internal citations and quotations

omitted).  The test for malice is in the disjunctive, requiring in the alternative only the first

or the second finding to establish the claim.

183.    The Bankruptcy Court finds and concludes that Defendants lacked

reasonable grounds for believing the truth of the Lien in stating that there was an

"***agreement*** to provide labor and/or material …" for all the reasons discussed above

based on the factual findings herein, and, therefore, Defendants acted with malice in

making that false statement.

184.    The Bankruptcy Court further finds and concludes that Defendants lacked

reasonable grounds for believing the truth of their statement that the Lien could be based

on a claim for lumber that cost $40,000, and, therefore, acted with malice in this regard.

6/29/22 Trial Transcript at 47:17- 48:23 and 124:20- 125:2 and 226:6-12.

185.    The evidence is undisputed that the total purchase price of all 50 walls of

lumber at issue in this case, including the 5 walls obtained by Plaintiff, was only $1,000.

Curtis Declaration at 8, ¶ 24 [Adversary Proceeding Docket No. 204]; *see also*, 2/18/21

Trial Transcript at 64:11-16 (Curtis testimony).

186.    Rudy Trabanino, the store manager for Habitat where the lumber was

purchased testified at trial that according to the store's records, the entire amount of all

lumber sold by the store for the entire month of September 2017 was only $2,861.50.

1/28/21 Trial Transcript at 9:12-19 (Rudy Trabanino testimony); Trial Exhibit P-2 at 2

(Habitat store records).  While Defendants objected to this testimony, which objection

was overruled, the Bankruptcy Court determines that the testimony is only secondary

evidence, which only corroborates Defendants' admission in Curtis's testimony that the

total cost of the lumber was only $1,000.  *See* Defendants' Objections to Plaintiff's

Proposed Findings) at 7-9 [Adversary Proceeding Docket No. 270],

187.    Eric Radley, who has approximately 30 years of experience in handyman

work repairing buildings, testified that the lumber taken by Plaintiff, if purchased new at a retailer such as Home Depot, would cost $200 or $300, in new condition, not weathered. 2/18/21 Trial Transcript at 176:6-9 (Eric Radley testimony).  Eric Radley further testified that if the lumber was assembled into prefabricated wooden walls, the cost would be $100 per wall with the materials and labor.  2/18/21 Trial Transcript at 184:12 (Eric Radley testimony).  According to Eric Radley's testimony, with five prefabricated walls in Plaintiff's possession, the amount of lumber at issue could not be more than $200 of materials, and, even with labor, no more than $700 total (i.e., all the lumber at $200, plus $100 of labor per wall x 5 walls).  While Defendants objected to this testimony, which objection was overruled, the Bankruptcy Court determines that the testimony is only secondary evidence which only corroborates Defendants' admission in Curtis's testimony that the total cost of the lumber was only $1,000.

188.    Plaintiff's witnesses consistently testified that Plaintiff only got 5 of the total 50 prefabricated wood walls purchased from Habitat.  Eric Radley Declaration, ¶¶ 26, 33, 34 [Adversary Proceeding Docket No. 171]; Barrington Radley Declaration, ¶¶ 19, 27, 29, 30 [Adversary Proceeding Docket No. 170]; 2/18/21 Trial Transcript at 124:12-126:19-25 (Eric Radley testimony); 2/18/21 Trial Transcript at 213:20-214:19 (Barrington Radley testimony).  The photographic evidence supports the finding that Plaintiff only got 5 wood walls from the lumber purchased from Habitat. The Bankruptcy Court finds that this evidence that Plaintiff only got 5 of the 50 wood walls purchased from Habitat to be credible.

189.    Defendants' testimony about how much lumber was allegedly stolen from Defendants and used in Plaintiff's Property was not credible because it was inconsistent as noted below:

    a.  In the Lien, Defendants asserted that Plaintiff had taken "20 – Prefabricated Wood Wall Panels @ a cost of $2,000 a piece."  Trial Exhibit P-1 at 2 (Lien).

    b.  In her trial declaration, Curtis testified that the number of wood panels

1       taken by Plaintiff was 30.  Curtis Declaration, ¶ 30 [Adversary

2       Proceeding Docket No. 204] ("… Eric Radley and Barrington Radley,

3       stole over 30 lumber panels from me…").

4           c.  Curtis testified at trial that 30 wood panels being taken by Plaintiff.

5       2/18/21 Trial Transcript at 63:16 (Curtis testimony).

6       190.    Curtis testified that her claim of $40,000 damages as stated in the Lien was

7   "based upon what it would cost me to replace those panels."  2/18/21 Trial Transcript at

8   84:6-7 (Curtis testimony).  The Bankruptcy Court does not find this testimony of Curtis to

9   be credible because its credibility is undermined by her own calculations given in her

10  other testimony.  In her first day of testimony, Curtis testified that the replacement value

11  of the lumber would be $250 to $500 per prefabricated wall.  2/18/21 Trial Transcript at

12  63:9-11 (Curtis testimony).  The basis for this valuation was the inadmissible hearsay

13  from Curtis's conversations with unidentified Home Depot or Lowe's employees.  2/18/21

14  Trial Transcript at 65:13-67:7 (Curtis testimony).  In her second day of testimony, Curtis

15  testified that the replacement value of the lumber would be $200 per prefabricated wall.

16  2/19/21 Trial Transcript at 144:25- 145:5 (Curtis testimony).  Curtis did not establish her

17  knowledge or foundation for her estimation of the value of lumber as she admitted that

18  she cannot value lumber.  2/19/21 Trial Transcript at 120:15, 23-25 (Curtis testimony)

19  ("… I don't know much about this.  I'm not a contractor or anything.")  *See also*, Trial

20  Exhibit P-10 (3/25/2019 Curtis Deposition Transcript at 55:23-56:3) ("… I'm not a

21  contractor.  I'm not a construction person so I – I can't really give you a value.").

22  Nevertheless, even if it were true that Plaintiff had taken 20 or 30 of the prefabricated

23  walls (which is not supported by the preponderance of the evidence that Plaintiff had only

24  obtained five walls), and even if the Bankruptcy Court adopted values of either $200 per

25  wall or $500 per wall, Defendants' claim would still be only in the range of only $4,000 (20

26  walls at $200 per wall) to $15,000 (30 walls at $500 per wall), and this range based on

27  Curtis's estimation testimony falls nowhere near the Lien's claim of $40,000 in damages:

28

| No. Of Walls | Value Per Wall | Total |
|---|---|---|
| 20 | $200.00 | $4,000.00 |
| 20 | $250.00 | $5,000.00 |
| 20 | $500.00 | $10,000.00 |
| 30 | $200.00 | $6,000.00 |
| 30 | $250.00 | $7,500.00 |
| 30 | $500.00 | $15,000.00 |

191.    On the last day of trial, Curtis calculated her claim at 20 prefabricated walls multiplied by $200 per wall.  2/19/21 Trial Transcript at 144:23-145:5 (Curtis testimony).  Thus, even by Curtis's own calculation, the value of the lumber constituting Defendants' damages from Plaintiff's taking as asserted in the Lien would have been only $4,000.  Accordingly, there is no justification for asserting in the Lien $40,000 of damages, which is 10 times the amount computed by Defendant Curtis, Defendant Ammec's principal.  The Bankruptcy Court finds and concludes that Defendants knew – or reasonably should have known – that the claim for $40,000 in the Lien was false, made with malice, and willfully intended to harm Plaintiff.

192.    Defendants' other attempts to justify their $40,000 lien claim also fail. Curtis stated in her trial declaration that her contractor indicated that it would cost approximately $60,000 to replace the lumber to build a new house on her real property, but that testimony is inadmissible hearsay lacking foundation.  Curtis Declaration, ¶ 32 [Adversary Proceeding Docket No. 204]; *see also*, 2/18/21 Trial Transcript at 42:14-19 (Curtis testimony) (sustaining objection for lack of foundation).

193.    At trial, when Curtis could not show that Defendants' purported mechanic's mechanic's lien for $40,000 was based on an agreement, she instead asserted that the $40,000 valuation for the Lien was "what the end product would have been worth *to me*," 2/18/21 Trial Transcript at 65:4 (Curtis testimony), and "… my ability to build my new home …" 2/18/21 Trial Transcript at 84:6-8 (Curtis testimony), and added speculative lost profits at resale: "The $40,000 was based upon what I believe it was worth, not what I paid for it.  I might as well sell, I could sell it retail."  2/18/21 Trial Transcript at 84:6-11

1    (Curtis testimony).  Later, however, Curtis testified that she had had no intention of selling

2    the lumber.  2/19/21 Trial Transcript at 186:23-187:3 (Curtis testimony)).  This testimony

3    is not credible because while an owner of property may give a lay opinion of the value of

4    property he or she owns pursuant to Federal Rule of Evidence 701, Curtis cannot testify

5    as to the value of the property as this Bankruptcy Court has found that the lumber

6    obtained by Plaintiff was owned by Eric Radley from his share of the joint purchase with

7    Curtis.  If Curtis was not the owner of the lumber taken by Plaintiff, then her lay opinion of

8    value is inadmissible.  Moreover, even assuming *arguendo* that Curtis was the owner of

9    all of the lumber, her opinion of value of the lumber obtained by Plaintiff at $40,000 is not

10   based on credible evidence of value because the total purchase price of all the lumber

11   purchased, of which the lumber taken was a small portion (5 out of 50 wood panels), was

12   only $1,000, and thus, the Bankruptcy Court determines that that Curtis's valuation

13   opinion of the lumber she has contended was stolen from her at $40,000 is not supported

14   by the evidence and is not credible.

15        194.    All of the foregoing failed attempts by Defendants to justify the $40,000

16   claim of damages asserted in the Lien shows that Curtis for herself and as representative

17   of Defendant Ammec knew or should have known that Defendants' claim was really one

18   for the tort of conversion and not the basis of a statutory mechanic's lien based on an

19   agreement, which never existed.  As observed by the California Supreme Court, "The

20   differences between contract and tort give rise to distinctions in assessing damages and

21   in evaluating underlying motives for particular courses of conduct. Contract damages

22   seek to approximate the agreed-upon performance . . . and are generally limited to those

23   within the contemplation of the parties when the contract was entered into or at least

24   reasonably foreseeable by them at that time; consequential damages beyond the

25   expectations of the parties are not recoverable." *Applied Equipment Corp. v. Litton Saudi

26   Arabia, Ltd.*, 7 Cal.4th 503, 515 (1994) (internal citations omitted).  Defendants' Lien

27   asserting an inflated claim of damages of $40,000 for alleged theft of lumber by Plaintiff

28   could be only supported by resort to a proper lawsuit asserting the tort of conversion.  As

Plaintiff argues, what Curtis would consequentially do with the lumber, such as building a house or reselling it, had no bearing on contractual damages for a purported mechanic's lien asserted in the amount of $40,000.  Curtis as a former lawyer either knew or reasonably should have known that she could not legitimately assert a mechanic's lien in this manner as she testified that she researched the subject matter of mechanic's liens before filing Defendants' Lien.  2/19/21 Trial Transcript at 137:1-138:11 (Curtis testimony).

195.    The Bankruptcy Court finds and concludes that Defendants acted with malice in filing the Lien as a mechanic's lien because the statutory basis for a mechanic's lien based on a contract or agreement was nonexistent.  Malice exists if Defendants either did not believe the statement to be true *or unreasonably believed the statement to be true*.  *McGrory v. Applied Signal Technology, Inc.*, 212 Cal.App.4th 1510, 1540 (2013) ("The issue is not the truth or falsity of the statements but whether they were made recklessly *without reasonable belief in their truth*.") (emphasis added).

196.    Defendants had no reasonable grounds to believe that the lumber in Plaintiff's possession was worth $40,000 based on cost as asserted in the Lien in light of the evidence before the Bankruptcy Court.  The cost of all 50 walls purchased from Habitat by Curtis either by herself or with Eric Radley, not just the 5 walls obtained by Plaintiff, was only $1,000 – a fact which Curtis knew and has admitted.  The $1,000 cost of the lumber is corroborated by the evidence of the total lumber sales for the Habitat store for the entire month of September 2017 of only $2,861.50. According to Eric Radley based on 30 years of construction experience, the range of value of the 5 wood walls he took for Plaintiff was a $200 to $700 retail replacement cost.  Curtis's own calculations of valuation of the walls allegedly taken by Plaintiff ranged from $4,000 to $15,000 at most. Therefore, the preponderance of the evidence shows that Defendants acted with malice against Plaintiff because they did not have reasonable grounds to believe and assert a mechanic's lien against Plaintiff's Property in the amount of $40,000 for lumber valued at cost.

### iii.    Malice Towards Plaintiff Shown by Curtis's Ill Will

197.    As previously noted, "Malice" means that the defendant "(1) was motivated by hatred or ill will towards the plaintiff or (2) lacked reasonable grounds for its belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." *Schep v. Capital One, N.A.*, 12 Cal.App.5th at 1337 (internal citations and quotations omitted).

198.    The Bankruptcy Court finds and concludes that Defendants through Curtis were motivated by ill will towards Plaintiff in filing their illegitimate Lien.

199.    Curtis knew that Plaintiff was facing the loss of the Property to Acon Development Inc. ("Acon") with a potential foreclosure or sheriff's sale.  Curtis Declaration at 5, ¶ 14 (knowledge of Acon's judgment), ¶ 16 (knowledge of Plaintiff's "financial and administrative problems") [Adversary Proceeding Docket No. 204].

200.    Curtis knew that Plaintiff needed to refinance the Property to save it from foreclosure or sheriff's sale.  McArn Declaration, ¶¶ 9, 10, 12 [Adversary Proceeding Docket No. 172]; Curtis Declaration at 4, ¶¶ 10, 11 [Adversary Proceeding Docket No. 204].

201.    Curtis researched mechanic's liens and knew she could obtain payment by putting the Lien, a purported mechanic's lien, on Plaintiff's Property or otherwise force Plaintiff to incur substantial attorneys' fees to remove the lien – a prospect that Curtis knew that Plaintiff could not afford because Curtis knew that Plaintiff lacked cash resources. Curtis Declaration at 4, ¶ 11 [Adversary Proceeding Docket No. 204]; 2/19/21 Trial Transcript at 137:1- 138:11 (Curtis testimony); 2/19/21 Trial Transcript at 130:25-131:5 (Curtis testimony); *see also*, 2/19/21 Trial Transcript at 135:12-20 (Curtis testimony).

202.    Curtis as a former attorney had 20 years of experience and knowledge about using the legal system to seek advantage against Plaintiff.  2/18/21 Trial Transcript at 44:22 (judicial notice); Curtis Declaration at 11, ¶ 33 [Adversary Proceeding Docket No. 204].

203.    Defendants' misuse of a mechanic's lien to claim $40,000 from Plaintiff where the lumber in question had a value of less than $1,000 was an abuse of legal process which demonstrates their ill will towards Plaintiff and intent to prejudice Plaintiff.

204.    Defendants' ill will towards Plaintiff was further demonstrated by Curtis's actions against Plaintiff's agents and their family members after the date that Plaintiff filed its bankruptcy petition on January 10, 2018.  After Plaintiff filed for bankruptcy, Curtis filed a state court complaint to attempt to enforce the Lien, and rather than proceed against Plaintiff in its corporate capacity where Plaintiff was represented and protected by attorneys, Curtis amended her state court complaint to name Eric Radley, Michelle McArn, their four children, and Barrington Radley personally on the Lien which was recorded only against the corporate Plaintiff and its real property and attempted to obtain judgments against them personally for several months until the state court ultimately dismissed Curtis's complaint on November 5, 2018.  JPTS at 2-4, Admitted/Adjudicated Facts Nos. 6-19.  Not only did this demonstrate a personal vendetta by Curtis against Plaintiff and people affiliated with its management, but it also perpetuated in the state court action Defendants' false statements published in the Lien: (i) falsely stating that there was an agreement between Defendants and Plaintiff, (ii) falsely stating that Plaintiff had taken 20 walls, and (iii) falsely asserting that the lumber had a value of $40,000 based on cost.

205.    Defendant Curtis continued to demonstrate her ill will towards Plaintiff during the pendency of its bankruptcy case by opposing Plaintiff's motion for authorization to refinance and demanding that $40,000 and more for attorneys' fees be set aside to pay the Lien to Defendants, thereby continuing to perpetuate the false statements in the Lien and attempt to extract $40,000 from the Plaintiff's bankruptcy case through the Lien.  RJN [Adversary Proceeding Docket No. 219], Exhibit 7, Greta Curtis's Notice of Opposition and Request for a Hearing re: Plaintiff's Motion for Order Authorizing Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code, etc., Bankruptcy Case Docket No. 84 at 9.

**D. Slander of Title Element Number 4: Damages - Direct and Immediate Pecuniary Loss**

206.    Plaintiff contends that Defendants' Lien caused direct and immediate pecuniary loss to Plaintiff.

   **i. Plaintiff's Claim for Damages from Accrual of Acon's Attorneys' Fees and Interest on Acon's Senior Lien**

207.    Plaintiff contends that it suffered damages from Defendants' slander of title from accrual of additional interest and attorneys' fees on the senior lien of Acon Development, Inc. (Acon).  In support of this claim for damages, Plaintiff largely relies upon the testimony of McArn and the payoff of Acon's secured claim, including additional interest and attorneys' fees accruing after its unsuccessful refinancing attempt in 2017 allegedly thwarted by Defendants' Lien.

208.    McArn testified that Plaintiff had arranged a refinancing loan with Lending Xpress in the fall of 2017.  2/19/21 Trial Transcript at 79:1-7 (McArn testimony).  McArn further testified that when Lending Xpress did a final preliminary title report and discovered Defendants' Lien, Lending Xpress would not do the refinancing. 2/18/21 Trial Transcript at 259:23-25 (McArn testimony); 2/19/21 Trial Transcript at 53:10-25 (McArn testimony); 2/19/21 Trial Transcript at 88:3-10 (McArn testimony).

209.    Much later, Plaintiff eventually was able to successfully close a refinancing of its existing loans on December 16, 2020.  RJN [Adversary Proceeding Docket No. 219], Exhibit 4, Plaintiff's Notice of: (I) Plan Effective Date; (II) Deadline for Filing Contract and Lease Rejection Claims; (III) Deadline for Filing Administrative Claims; and (IV) Deadline for Filing Final Fee Applications for Estate Professionals, Bankruptcy Case Docket No. 269.  As part of the successful December 2020 refinancing, Plaintiff paid to Acon on its secured claim the amount of $550,000, of which at least $88,911.68 was comprised of interest that had accrued since the date on which Plaintiff filed for bankruptcy on January 10, 2018.  RJN [Adversary Proceeding Docket No. 219], Exhibit 5, Plaintiff's Motion for Order Authorizing Release of Financing Proceeds [Bankruptcy Case

Docket No. 273]; RJN [Adversary Proceeding Docket No. 219], Exhibit 6, Acon

Development, Inc.'s Proof of Claim No. 9 (per diem interest rate of $82.94; 1,072 days

between Petition Date and refinancing date).  Plaintiff contends that this accrual of

interest was a direct and immediate pecuniary loss to Plaintiff because if the Lien had not

derailed the refinancing with Lending Xpress in fall of 2017, all of that interest of

$88,911.68 to Acon would not have accrued.

210.    Also, as part of its successful December 2020 refinancing, Plaintiff paid

Acon's attorneys' fees as part of Acon's secured claim in the amount of $116,865.16, all

of which was comprised of attorneys' fees accrued since the date Plaintiff filed for

bankruptcy on January 10, 2018.  RJN [Adversary Proceeding Docket No. 219], Exhibit 5,

Plaintiff's Motion for Order Authorizing Release of Financing Proceeds [Bankruptcy Case

Docket No. 273]; RJN [Adversary Proceeding Docket No. 219], Exhibit 6, Acon

Development, Inc.'s Proof of Claim No. 9.  Plaintiff contends that the accrual of Acon's

additional attorneys' fees was a direct and immediate pecuniary loss to Plaintiff because

if the Lien had not derailed the refinancing with Lending Xpress in fall of 2017, none of

those attorneys' fees of $116,865.16 would have accrued.

211.    Defendants dispute Plaintiff's contentions and argues that its damages

consisting of additional attorneys' fees and interest paid to Acon on its successful

refinancing were not caused by their filing the Lien, asserting: (1) Plaintiff had been facing

foreclosure for over a year as a result of not paying its secured creditor Acon, which had

nothing to do with Defendants' Lien; (2) the Lending Xpress loan was aborted by McArn

because Plaintiff would have had money left over from its refinancing and she made a

business decision not to pay Defendants on the Lien; (3) Plaintiff's contentions that failure

of the Lending Xpress loan was caused by Defendants' Lien is based on McArn's

hearsay statements not supported by any documents, such as a preliminary title report

showing the Lien or a letter of declination from Lending Xpress; (3) Plaintiff already had a

reputation for fiscal irresponsibility for failure to pay its creditors generally as shown in its

bankruptcy schedules, and not just because of Defendants' Lien; (4) Defendants' Lien

had terminated by operation of law well before Plaintiff filed its adversary proceeding

against Defendants in May 2018, and a lender could have refinanced because the Lien

had not been foreclosed upon and was no longer an impediment to refinancing; (5)

Plaintiff's reorganization efforts were delayed anyway because Plaintiff had to work out a

subordination agreement between the City of Los Angeles and a new lender as reflected

in its monthly operating reports and Plaintiff's opposition to Acon's dismissal motion; and

(6) the publication of the Lien was privileged under California law.  Defendants'

Objections to Plaintiff's Proposed Findings) at 25-30 [Adversary Proceeding Docket No.

270].

212.   Having considered the arguments of the parties and the relevant evidence

on the issue of whether Defendants' Lien caused Plaintiff to suffer damages from

additional interest and attorneys' fees from the Acon secured claim and lien due to delay

in refinancing, the Bankruptcy Court finds and concludes that although many of

Defendants' arguments lack merit, the evidence indicates that the Lien was not a "but for"

or sole cause of Plaintiff's direct and immediate pecuniary loss from having to pay

additional accruing interest and attorneys' fees on Acon's lien, and Defendants'

opposition to Plaintiff's claim for damages from having to pay more on Acon's claim is

meritorious.  In this regard, the Bankruptcy Court takes judicial notice of its files and

records in this adversary proceeding and in the underlying bankruptcy case, including

pleadings and orders filed in these proceedings.  *See In re Clark,* 525 B.R. 442, 449

(Bankr. D. Idaho 2015), *aff'd,* BAP No. ID-15-1065-KiFJu, 016 WL 1377807 (9th Cir. BAP

Mar. 29, 2016).   Plaintiff filed its bankruptcy petition on January 10, 2018, and as stated

in its status report filed in the bankruptcy case on February 14, 2018, Plaintiff stated that

it filed for bankruptcy because Acon intended to immediately foreclose on its lien and

while its refinancing transaction with Lending Xpress started in late 2017 was still

pending, there were issues that had to be worked out with the lender, which included an

unresolved Los Angeles County tax lien of $206,000 as well as Defendants' purported

mechanic's lien claimed to be $40,000, which Plaintiff asserted was fraudulent.  Plaintiff's

1  Case Status Report [Bankruptcy Case Docket No. 25].  As stated in Plaintiff's status

2  report filed in the bankruptcy case on December 17, 2018, Plaintiff stated that it was still

3  negotiating a refinancing loan with Lending Xpress, but that it finally resolved its issue

4  with the county tax lien on November 30, 2018 when the county filed an amended proof

5  of claim reducing its claim from $205,000 to $15,000 [Bankruptcy Case Docket No. 54].

6        213.    Meanwhile, on May 8, 2018, Plaintiff had filed its complaint commencing

7  this adversary proceeding which asserted the slander of title and declaratory relief claims

8  to nullify Defendants' Lien [Adversary Proceeding Docket No. 1].  On September 16,

9  2019, Plaintiff filed a motion for partial summary judgment on its second through sixth

10  causes of action [Adversary Proceeding Docket No. 120], and on November 14, 2019,

11  the Bankruptcy Court entered its order granting Plaintiff partial summary judgment, which

12  *inter alia* declared Defendants' Lien to be void under state law [Adversary Proceeding

13  Docket No. 142].  The Bankruptcy Court's order granting Plaintiff partial summary

14  adjudication, the Partial Summary Adjudication Order, was not a final judgment because

15  no party had requested that the court enter a final judgment on the claims adjudicated on

16  partial summary adjudication and because not all the claims in the adversary proceeding

17  were adjudicated as the first cause of action for slander of title remained unadjudicated.

18        214.    However, the Lien was not an impediment to Plaintiff obtaining refinancing

19  as on August 7, 2019, Plaintiff filed a motion for authorization for postpetition financing to

20  refinance its loan [Bankruptcy Case Docket No. 77], which was granted by order entered

21  on August 29, 2019 [Bankruptcy Case Docket No. 92] in spite of Defendants' opposition

22  to the motion on grounds that the refinancing would not pay off the Lien [Bankruptcy

23  Case Dockets No. 84 and 86].  Although Plaintiff's motion for authorization for

24  postpetition financing to refinance its loan was granted, Plaintiff stated in its status report

25  that another issue emerged which needed to be dealt with for it to refinance its loan, that

26  is, Plaintiff had to obtain a subordination agreement with the City of Los Angeles to

27  subordinate its existing lien in order for the lender to refinance.  The need to negotiate a

28  subordination agreement with the City of Los Angeles, which apparently required

1  approval of the Los Angeles City Council, was another impediment that Plaintiff

2  encountered regarding refinancing its loan.

3      215.    On September 9, 2020, Plaintiff filed a second motion for authorization of

4  postpetiton financing to refinance its loan with a different lender [Bankruptcy Case Docket

5  No. 209].  As stated in its moving papers, the prior lender, Lending Xpress, backed out of

6  the refinancing transaction in March 2020 due to the pandemic.  *Id.*  Plaintiff's explanation

7  that the prior lender, Lending Xpress, backed out of further refinancing negotiations was

8  its sensitivity to the then current economic environment of the pandemic, not because of

9  Defendants' Lien.  *Id.*

10      216.    After this motion was granted, Plaintiff was able to work out a subordination

11  agreement with the City of Los Angeles and obtain its refinancing to pay off the existing

12  lien of Acon.  However, although Defendants' Lien was an impediment to refinancing, the

13  evidence indicates that it was only one of a number of impediments for refinancing, and

14  that the Lien by itself was not the cause of the delay in Plaintiff obtaining refinancing to

15  attribute to it as the cause of Plaintiff's increased cost of refinancing through accruals of

16  additional interest and attorneys' fees from Acon's lien in order to shift the burden of the

17  cost to Defendants.  Accordingly, the Bankruptcy Court finds and concludes that Plaintiff

18  did not suffer damages from accruals of additional interest and attorneys' fees paid to

19  Acon from delayed refinancing due to Defendants' Lien.  The preponderance of the

20  evidence does not support McArn's testimony which is not corroborated by documentary

21  evidence that Defendant's Lien was the cause of these accruals resulting in direct and

22  immediate pecuniary loss to Plaintiff.  The evidence shows that Plaintiff had other issues

23  to resolve in order to obtain refinancing, which included negotiating a reduction of the Los

24  Angeles County tax claim, negotiating a lien subordination agreement with the City of Los

25  Angeles City and dealing with the original lender's reluctance to go forward due to the

26  pandemic, and the delay in refinancing Plaintiff's existing loan would have occurred

27  anyway, regardless of Defendants' Lien.  Accordingly, the Bankruptcy Court finds that it is

28  not appropriate to include the additional accruals of interest and attorneys' fees relating to

1    the Acon lien postpetition in the damages from the slander of title from Defendants' Lien

2    for lack of evidentiary showing that such damages resulted from direct and immediate

3    pecuniary loss to Plaintiff.

4                    ii.    **Plaintiff's Claim for Damages in Incurring Attorneys' Fees and**

5                            **Costs for Removing Defendants' Lien**

6            217.    Additionally or alternatively, Plaintiff claims damages from Defendants for

7    slander of title based on the attorneys' fees and costs it incurred in removing Defendants'

8    Lien. "In an action for wrongful disparagement of title, a plaintiff may recover (1) the

9    expense of legal proceeding necessary to remove the doubt cast by the

10   disparagement…" *Klein v. Access Insurance Co.*, 17 Cal.App.5th 595, 624 (2017).

11   "[T]he expense of legal proceedings necessary to remove the doubt cast by the

12   disparagement and to clear title is a recognized form of pecuniary damages in such

13   cases." *Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC*, 205

14   Cal.App.4th 999, 1032 (2012).  "[W]here title was disparaged in a recorded instrument,

15   ***attorney fees and costs*** necessary to clear title or remove the doubt cast on it by

16   defendant's falsehood are, ***by themselves***, sufficient pecuniary damages for purposes of

17   a cause of action for slander of title." *Id.* at 1031 (emphasis added).

18           218.    Plaintiff contends that the award of Plaintiff's attorneys' fees is a hybrid

19   matter that can be supported independently and alternatively by *Sumner Hill*

20   *Homeowners' Association, Inc. v. Rio Mesa Holdings, LLC*, 205 Cal.App.4th 999 (2012),

21   as part of the case in chief on slander of title, or California Civil Code § 8488 based on a

22   motion.  6/30/22 Trial Transcript at 3:1-11.

23           219.    As recognized in the Joint Pretrial Stipulation and shown in these proposed

24   findings of fact and recommended conclusions of law, as a result of Defendants' refusal

25   to voluntarily remove the Lien from Plaintiff's Property, Plaintiff was forced to incur legal

26   fees and costs to remove Defendants' Lien from the Property.  JPTS,

27   Admitted/Adjudicated Fact No. 32 [Adversary Proceeding Docket No. 162].  Plaintiff

28

                                                    82

contends that Defendants' Lien caused direct and immediate pecuniary loss to Plaintiff by forcing Plaintiff to incur legal fees to remove the Lien.

220.    Defendants contend that Plaintiff is not entitled to attorneys' fees for removal of a mechanic's lien under California Civil Code § 8400 *et seq.* because Plaintiff never alleged a claim under those statutory provisions, specifically the attorneys' fee provision of California Civil Code §8488(c), and never pleaded nor utilized the expedited lien release procedure under California Civil Code § 8482 to claim attorneys' fees under California Civil Code § 8488(c).  *See* Evidentiary Objections of Greta Curtis to Plaintiff's Motion for Attorney Fees and Costs at 3-8 [Adversary Proceeding Docket No. 290].

221.    Plaintiff contends that it was not required to pursue remedies through only the statutory construct of California Civil Code § 8480 *et seq.* because that very statutory construct specifically states that parties maintain other causes of action, as well.  "This article does not bar any other cause of action or claim for relief by the owner of the property."  California Civil Code § 8480(b).  Therefore, Plaintiff contends that it is entitled to recover attorneys' fees under *Sumner Hill Homeowners Association* alone and independent of the statutory construct.  In this regard, as discussed herein, the Bankruptcy Court agrees with Plaintiff that attorneys' fees may be awarded as an element of damages on its slander of title claim based on the case law in *Sumner Hill Homeowners Association.*

222.    Plaintiff argues that the Bankruptcy Court should reject and overrule Defendants' argument that a 10-day release notice under the California Civil Code §8482 was required to be awarded attorneys' fees.  Plaintiff contends that where a property owner disputes a wrongful mechanic's lien, the property owner is entitled to reasonable attorneys' fees if it is the prevailing party under California Civil Code § 8488(c).  Plaintiff notes that subsection does not mention the 10-day notice of California Civil Code §8482 at all.  Plaintiff argues that California Civil Code § 8488(c) reflects the common law doctrine, as expressed in *Sumner Hill Homeowners Association v. Rio Mesa Holdings, LLC*, 205 Cal.App.4th 999 (2012), that a property owner can obtain reasonable attorneys'

fees when forced to commence legal processes to remove cloud on title caused by a

wrongful mechanic's lien and that moreover, the 10-day notice requirement of California

Civil Code §8482 is rooted in the statutory construct for colorable mechanic's liens, where

the notice provisions reference naming and identifying the contractor, sub-contractor,

construction lender, and construction work site, which have all the hallmarks of legitimate

mechanic's liens. California Civil Code § 8482 (citing in turn to California Civil Code §

8100).  In this regard, the Bankruptcy Court disagrees with Plaintiff that the attorneys' fee

provision of California Civil Code § 8488(c) generally provides for attorneys' fees in any

proceeding to remove a mechanic's lien; rather the attorneys' fee provision relates only to

a proceeding on a petition for release of the lien under California Civil Code § 8482,

which as Defendants argue was not pleaded in Plaintiff's complaint or brought in this

adversary proceeding.  However, the Bankruptcy Court disagrees with Defendants that

Plaintiff may not be awarded attorneys' fees and costs for removal of the Lien on grounds

that Plaintiff's exclusive remedy for an award of attorneys' fees was under California Civil

Code § 8488(c).

223.    Plaintiff argues that the Bankruptcy Court should find and conclude that

Defendants' purported mechanic's lien was filed in bad faith and not appropriate for the

mechanic's lien construct in the first place, and that Plaintiff's notice to Defendants by

filing the complaint was sufficient to effectuate the purpose reflected in California Civil

Code §8480 *et seq*., particularly because this construct "does not bar any other cause of

action or claim for relief by the owner of the property."  California Civil Code § 8480(b).  In

this regard, based on the preponderance of the evidence, the Bankruptcy Court agrees

with this argument to the extent Plaintiff argues that Defendants' purported mechanic's

lien was filed in bad faith and that the statutory construction of California Civil Code §

8480 *et seq.,* does not bar any other cause of action or claim for relief by it as the owner

of the subject property.

224.    The Bankruptcy Court finds and concludes in agreement with Plaintiff that

there is a sound policy rationale for awarding attorneys' fees which is explained in the

case of *Sumner Hill Homeowners' Association, Inc.,* which is applicable here. Attorneys'

fees and costs are a recoverable damage component in a valid slander of title cause of

action. *Sumner Hill Homeowners' Association, Inc. v. Rio Mesa Holdings, LLC*, 205

Cal.App.4th at 1031. "Attorneys' fees are permissible as special damages in slander of

title actions because the defendant … by intentional and calculated action leaves the

plaintiff with only one course of action: that is, litigation … Fairness requires the plaintiff to

have some recourse against the intentional malicious acts of defendant." *Id.* at 1032

(internal quotations omitted).

225.    "[I]t is helpful to note the analogy between a cause of action for slander of

title and that of malicious prosecution. As one case put it, 'to clear a slandered title is

akin to defending an unfounded lawsuit,' since in both instances the defendant's tortious

conduct was 'calculated to result in litigation.'" *Sumner Hill Homeowners' Association,*

*Inc. v. Rio Mesa Holdings, LLC*, 205 Cal.App.4th at 1033. "[W]hat we are dealing with

here, as in the case of malicious prosecution, is a tort in which the case law has deemed

such attorney fees and costs to be a form of special damages flowing from the

defendant's tortious conduct." *Id.* at 1034. "[A]llowing recovery in the present case are

***especially compelling*** when it is considered that the slander of title here was a recorded

document." *Id.* (emphasis in the original).

226.    The Bankruptcy Court finds and concludes in agreement with Plaintiff that

Defendants' conduct in filing the Lien and in their defense litigation tactics throughout this

case were designed to inflict unnecessary litigation costs and put the Plaintiff which was

a debtor in possession with a fiduciary duty to its creditors and bankruptcy estate in the

untenable position of paying an inflated bogus claim of $40,000 in full as a secured claim

ahead of other creditors or litigate and defend the integrity of the bankruptcy estate. The

Bankruptcy Court finds and concludes in agreement with Plaintiff that it is fair to award a

reasonable amount of attorneys' fees to Plaintiff as special damages on the slander of

title claim because Defendants by calculated design increased the cost of the litigation to

1  attempt to dissuade Plaintiff and force Plaintiff to instead pay their bogus $40,000 claim

2  as "tribute" as Plaintiff calls it. [12]

3       227.   The Bankruptcy Court finds and concludes that based on the

4  preponderance of the evidence, Defendants were unnecessarily combative and added

5  unnecessary procedural expense to the litigation which resulted in protracted

6  proceedings from the start.  *See, e.g., Calvo Fisher & Jacob, LLP v. Lujan,* 234

7  Cal.App.4th 608, 626-627 (2015); *Peak-Las Positas Partners v. Bollag,* 172 Cal.App.4th

8  101, 113-114 (2009).  Having observed litigation proceedings between the parties in this

9  adversary proceeding and in the underlying bankruptcy case, the Bankruptcy Court finds

10  and concludes that the description of the litigation proceedings between the parties in

11  Plaintiff's First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 146] is fair

12  and accurate.

13       228.   As argued by Plaintiff, of particular concern in this case was Plaintiff's role

14  as a fiduciary of the bankruptcy estate and Plaintiff's management's consistent position

15  that Defendants were not owed any money at all from the Plaintiff.  Thus, as Plaintiff

16  argues, Plaintiff and the bankruptcy estate were faced with the prospect of having to pay

17  $40,000 to Defendants on what the Plaintiff considered to be outright fraud unless it

18  litigated to remove Defendants' disputed mechanic's lien.  As Plaintiff argues, when the

19  Plaintiff decided to commence the adversary proceeding, it was possible that the litigation

20  might have been of little cost, particularly as Defendants had not filed a proof of claim,

21  and an adversary proceeding was merely a procedural step under Federal Rule of

22  Bankruptcy Procedure 7001(2) necessary to remove a lien.  After filing suit, the Plaintiff

23  was put in the difficult position of deciding between (i) meritorious litigation to invalidate

24  the Lien and (ii) paying $40,000 of meritless tribute to Defendants.  According to Plaintiff,

25

---

26  [12] Plaintiff's calling Defendants' demand for payment of the Lien as "tribute" is apt as one
     definition of the term by the Merriam-Webster Dictionary is as follows: "an
     exorbitant charge levied by a person or group having the power of coercion"

27  Merriam-Webster Dictionary (online edition accessed on March 24, 2023 at
     https://www.merriam-webster.com/dictionary/tribute).

28

in similar cases involving the representation of a Chapter 7 trustee and a debtor in possession in the shoes of a trustee, the cost of litigating a dispute may reach and outstretch the amount of the disputed claim, and such balancing conundrums are often solved by the interplay of two factors: first, that some amount of the claim is actually valid, and second, that the parties engage in a dialogue for a good faith settlement.  While Plaintiff cites no authority for this proposition, based on the experience of the undersigned, it sounds correct.  As argued by Plaintiff, in this case, those two mitigating factors did not exist because it maintains that it owes Defendants nothing at all, and the parties never went to mediation.  In the only joint status report filed in this case, Defendants stated that they wanted the matter set for mediation.  Adversary Proceeding Docket No. 63 at § E.3.  According to Plaintiff, with experienced counsel, it was prepared to attempt mediation when raised at the status conference hearing, but neither Ammec's attorney nor Curtis *in pro per* appeared at the status conference on January 29, 2019, and the Bankruptcy Court issued an order to show cause.  Adversary Proceeding Docket Nos. 64 and 65.  *See* Plaintiff's First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 146].

229.    Plaintiff argues that this adversary proceeding could have been much simpler, except that Defendants willfully engaged the Plaintiff in numerous and repetitive procedural skirmishes to cause delay and increase the cost of litigation, including: (i) a motion challenging personal jurisdiction; (ii) a motion to dismiss the complaint for failure to state a claim for which relief could be granted, which Plaintiff ultimately defeated; (iii) an attempt to avoid deposition and production of documents, which Plaintiff ultimately defeated; (iv) attempts to avoid the deposition of Ammec's officer and person most knowledgeable, Carlos Montenegro, which the Plaintiff did not overcome because the Plaintiff decided that it was not economical to incur additional expenses by commencing more discovery dispute motions against Defendants; (v) attempts to harass Plaintiff and its management by forcing a deposition to be taken on Plaintiff's Property and bringing a motion on this discovery dispute, which Plaintiff ultimately defeated; (vi) Defendants'

premature motion for summary judgment that argued for a lien-pass-through theory that

would have eviscerated the Bankruptcy Code's ability to address disputed liens, which

Plaintiff ultimately defeated; and (vii) a wildly off-point opposition to the Plaintiff's motion

for partial summary adjudication, which Plaintiff ultimately overcame and prevailed.

According to Plaintiff, to sum up, this litigation was made expensive by Defendants'

extremely aggressive and unsupportable litigation tactics.  According to Plaintiff, this

adversary proceeding could have been comprised of a complaint, an answer, three

depositions (Curtis and two employees from Habitat for Humanity), and two days of trial.

*See* Plaintiff's First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 146].

230.    According to Plaintiff, the time, services rendered, and fees directly related

to prosecuting the Plaintiff's claim against Defendants were not out of proportion with the

amount of their purported mechanic's lien.  Plaintiff argues that these were core activities

necessary to prosecute this lawsuit by the Plaintiff: (1) initial investigation of the claim

[January 2018]; (2) preparation of the complaint [May 2018]; (3) preparation of a joint

status report, exchanging Federal Rule of Civil Procedure 26 disclosures, and attending

the status conference [January 2019]; (4) propounding discovery [February 2019]; (5)

preparing a motion for partial summary adjudication, attending the hearing thereon, and

preparing the order [August, September, November 2019].  All of these tasks totaled

$47,334.50.  Plaintiff argues that with a base claim of $40,000, plus interest and

Defendants' potential attorneys' fees, the amount of $47,334.50 incurred for Plaintiff's

attorneys' fees are not out of proportion for the amount at issue.  Plaintiff further argues

that by way of analogy, California state law permits disputed mechanic's liens to be

released with a bond "in an amount equal to 125% of the amount of the claim of the lien."

California Civil Code § 8424(b).  Plaintiff notes that an amount of $50,000 is equal to

125% of the $40,000 disputed mechanic's lien and that Plaintiff's total attorneys' fees and

costs related to this task are below this amount.  *See* Plaintiff's Reply to Defendants'

Opposition to Debtor's Motion for Attorneys' Fees and Costs (Plaintiff's Reply to

Defendants' Opposition to First Motion for Attorneys' Fees) [Adversary Proceeding

Docket No. 153]; Declaration of John-Patrick M. Fritz, Esq., in Support of Reply to Defendants' Opposition to Debtor's Motion for Attorneys' Fees and Costs (Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees) [Adversary Proceeding Docket No. 155].

231.    Plaintiff further argues that beyond the sum of $47,334.50 discussed immediately above, the Bankruptcy Court should find and conclude that the lion's share of the rest of Plaintiff's fees were caused by Defendants' scorched-earth litigation tactics in forcing Plaintiff to fight numerous procedural skirmishes, unprincipled discovery fights, and Defendants' nearly incomprehensible legal theories in their pleadings throughout this multi-year litigation, all as discussed herein.

232.    According to Plaintiff, Curtis has made much of the minor and early dispute in this case about the service of the original complaint on Defendants at her P.O. Box and Ammec's business address, which Curtis claims is a "vacant lot" despite it being (i) Ammec's business address since at least 2016 through trial in February 2021, (ii) the process server address on the Secretary of State website, and (iii) the address listed on the recorded Disputed Mechanic's Lien.  Plaintiff argues that nonetheless, these litigated disputes served a purpose and benefited the Plaintiff.  Plaintiff notes that regardless, these fees account for only approximately $26,212.00 of the total.  *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

233.    As argued by Plaintiff, although the Bankruptcy Court ruled that the complaint had not been served properly, that ruling was based on a scrivener error on the missing last digit of the zip code, which neither side identified or briefed, and which was only raised in the Bankruptcy Court's tentative ruling.  Plaintiff argues that upon fixing the scrivener error, personal jurisdiction was established.  Moreover, according to Plaintiff, it needed to defend against the personal jurisdiction service motion to help establish what might be required for alternative service if Defendants were hiding behind a "vacant lot"

and P.O. Box for addresses.  *See* California Code of Civil Procedure § 413.30 ("court …

may direct that summons be served in a manner which is reasonably calculated to give

actual notice to the party to be served").  Plaintiff notes that the court may designate an

agent for service or otherwise deem modified service sufficient when the defendant files

pleadings on the one hand but willfully evades service on the other hand.  *BP Products*

*North America, Inc. v. Dagra*, 232 F.R.D. 263, 264-265 (E.D. Va. 2005); *Rio Properties,*

*Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1018 (9th Cir. 2002) ("scofflaw, playing hide-and-

seek with the federal court"); *Popular Enterprises, LLC v. Webcom Media Group, Inc.*,

225 F.R.D. 560, 563 (E.D. Tenn. 2004).  *See* Plaintiff's Reply to Defendants' Opposition

to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz

Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for

Attorneys' Fees [Adversary Proceeding Docket No. 155].

234.    As argued by Plaintiff, the service of process and personal jurisdiction

issues are an illustrative example of the litigation games that Defendants have used to

unnecessarily increase costs of litigation.  Plaintiff argues that for all of 2018 and 2019,

Ammec's vacant lot address of 4118 First Street, Los Angeles, CA 90063 remained the

address for Ammec's agent for service of process, and the P.O. Box as the business

mailing address.  Plaintiff argues that it pressed the issue of personal jurisdiction and

default so as to make sure that it could accomplish service of the complaint on

Defendants by getting an explanation from Curtis as to why Ammec put a vacant lot

address on the lien and Secretary of State process server listing.  *See* Plaintiff's Reply to

Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket

No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to

First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

235.    As argued by Plaintiff, Defendants apparently understood the Federal Rules

of Civil Procedure well enough to know that litigants cannot serve Defendants by mail at

the P.O. Box or Ammec at a vacant lot, and, thus, Ammec would be nearly service-proof.

It is only through the less restrictive service requirements of Federal Rule of Bankruptcy

Procedure 7004 that the Plaintiff would be able to achieve service with the corrected zip code.  Nonetheless, Defendants continued to argue and rely on the vacant lot, P.O. Box, and Federal Rule of Civil Procedure 4 argument even after service was made.  *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

236.    Plaintiff argues that the Bankruptcy Court should find and conclude that a reasonable and appropriate amount of charges are attributable to Plaintiff's counsel responding to Defendants' unnecessary litigation pleadings.  According to Plaintiff, these tasks ranged from: (1) defeating Defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) [October 2018]; (2) successfully moving to dismiss Curtis's untimely counterclaim [November 2018]; (3) preparing the stipulation to dismiss Curtis's counterclaim with prejudice and responding to her stay violation when she filed a claim with State Labor Commission to assert the same counterclaim that had just been dismissed [December 2018]; (4) successfully opposing Defendants' motion for summary judgment and attending the original hearing and continued hearing thereon [March, April, June, July 2019]; (5) successfully opposing Defendants' discovery motion to compel the deposition of Debtor's director, which was most inappropriately noticed by Curtis at the Debtor's own premises [May 2019]; and (6) successfully responding to and overcoming Defendants' opposition to Debtor's motion for partial summary adjudication, which voided the wrongful lien [October 2019].  All of these tasks combined totaled approximately $115,314.00 in fees.  *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

237.    As argued by Plaintiff, Defendants unnecessarily raised the cost of this litigation with their baseless motion to dismiss under Federal Rule of Civil Procedure

12(b)(6).  Plaintiff argues that Curtis attempts to deflect by claiming victory on having the reference to her state license disbarment stricken from the record under Federal Rule of Civil Procedure 12(f), but a review of the time entries in October 2018 as well as those pleadings show that this was a minor issue compared to the larger issue of Defendants attempting to dismiss the entire complaint.  *See*, Adversary Proceeding Docket Nos. 38 and 40 (motions); 42 and 43 (oppositions); 47 and 48 (orders).  In Plaintiff's opinion, striking the state bar decision was tangential, and the complaint survived in almost its entirety.  *See*, Adversary Proceeding Docket No. 48 (striking paragraphs 15, 43, 44, and Exhibit "B" to the complaint).  Plaintiff argues that if Defendants had prevailed, then the entire complaint would have been dismissed, and Plaintiff would have been required to pay $40,000 for the wrongful mechanic's lien, which is a result that surely did not come to pass.  *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

238.    As argued by Plaintiff, once Defendants were forced to answer the complaint, Curtis attempted to go on the offensive and make additional new claims against Plaintiff.  In November and December 2018, Plaintiff successfully dismissed Curtis's counterclaim against the Debtor with prejudice in the adversary proceeding. Then Plaintiff successfully stopped Curtis's stay violation when she filed a claim with the Labor Commission; and if there is any question of whether this labor claim relates to this adversary proceeding, the Bankruptcy Court notes that Curtis's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), specifically stated: "Ms. Curtis was an employee of theirs [the Debtor] whom they have failed to compensate in wages and will be making a claim with the Labor Board for her wages." Adversary Proceeding Docket No. 40 at 6:9-11.  *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket

No. 155].

239.    As argued by Plaintiff, with Defendants' counterclaims foiled and discovery underway, Defendants took a new tact to frustrate the Debtor's case and brought Defendants' motion for summary judgment (the Motion for Summary Judgment) in February 2019. Adversary Proceeding Docket Nos. 69-73.  Plaintiff notes that due to the Defendants' deficiencies in their Motion for Summary Judgment, the original hearing was continued for further briefing. Adversary Proceeding Docket No. 89.  Plaintiff also notes that then, the original hearing was rescheduled again because Ammec's counsel did not appear.  Adversary Proceeding Docket No. 112.  Plaintiff further notes that with these continuances, the work on opposing Defendants' Motion for Summary Judgment covered March, April, June, and July 2019.  Plaintiff argues that Defendants' Motion for Summary Judgment was completely lacking in merit, arguing for an unprecedented and unfounded lien pass-through theory that would eviscerate Chapter 11 of the Bankruptcy Code, 11 U.S.C., if given credence and misapplying Bankruptcy Code Sections 506(d) and 546. Plaintiff argues that worse yet, Defendants' Motion for Summary Judgment ignored the highly problematic issue that the case revolved around a factual dispute, their motion was filed prior to close of discovery, and summary judgment is rarely granted for actions based on tort or vague and ambiguous contract terms because such actions involve competing factual inferences and the credibility of extrinsic evidence.  *See* Stevenson and Fitzgerald, *Rutter Group Practice Guide: Federal Civil Procedure Before Trial: California and Ninth Circuit Edition*, ¶¶ 14:265 and 14:272 (online edition, April 2023 update), *citing inter alia, Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 823-24 (9th Cir. 2011) and *Welles v. Turner Entertainment Co.*, 503 F.3d 728, 737 (9th Cir.2007).  Plaintiff argues that it soundly defeated Defendants' Motion for Summary Judgment, but at high cost because of the nature of the proceeding, which requires a memorandum of points and authorities, a separate statement of facts and conclusions of law, declarations, exhibits, and evidentiary objections.  Plaintiff argues that nonetheless, Plaintiff was forced to incur attorneys' fees to oppose Defendants' Motion for Summary

Judgment because if Plaintiff had lost the motion, then Plaintiff would have lost the entire lawsuit.  In total, the work in defending against Defendants' meritless Motion for Summary Judgment totaled approximately $64,823.50.  *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

240.    As argued by Plaintiff, in the midst of the Motion for Summary Judgment dispute, Defendants discovered that they had neglected their discovery deadlines and attempted a failed scheme to find a loophole and force their way into the Plaintiff's property for an inspection under the guise of a deposition.  According to Plaintiff, it successfully defended against this scheme of Defendants.  Plaintiff argues that Defendants brought a motion to compel discovery and asked for the extreme remedy of terminating sanctions against the Plaintiff to have the complaint completely dismissed. Adversary Proceeding Docket No. 95 at 8-9.  Plaintiff notes that it had to respond or otherwise face the possibility of a complete loss on its complaint.  Plaintiff notes that it successfully opposed the motion, and the motion was denied without so much as even a hearing.  Adversary Proceeding Docket No. 102.  Plaintiff argues that nonetheless, Defendants' conduct in the discovery dispute was so egregious, and their motion papers so meritless, that Plaintiff still had to incur approximately $21,573.50 of fees in May 2019. *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

241.    Plaintiff argues that the Bankruptcy Court should find and conclude that its attorneys' fees are appropriate and reasonable for preparing and prevailing on Plaintiff's Motion for Partial Summary Adjudication on this complex and undecided legal issue. Plaintiff contends that it was very unfortunate that Defendants' opposition papers were so irrelevant but simultaneously so very combative (*see* Adversary Proceeding Docket Nos.

127-133), so as to necessitate a response on a whole new set of issues largely irrelevant to the real issues in the Motion for Partial Summary Adjudication.  Plaintiff notes that it prevailed on all issues, facts, and law in its Motion for Partial Summary Adjudication Motion for Partial Summary Adjudication (*see*, Adversary Proceeding Docket Nos. 142 and 143), but the time necessary to respond to Defendants' off-point opposition (which included a reply, evidentiary objections, and further declarations) was approximately $18,068.00 in the month of October 2019.  *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].  However, the Bankruptcy Court has now partially modified and vacating its order granting partial summary adjudication in favor of Plaintiff, and that given that Plaintiff's partial summary adjudication motion was not dispositive in its favor on its claims to remove Defendants' lien, the fees and costs incurred on the partial summary adjudication motion were not reasonable and necessary to remove the lien.

242.    According to Plaintiff, during the first segment of this case through the hearing on Plaintiff's initially successful Motion for Partial Summary Adjudication, Plaintiff incurred approximately $115,314.00 in fees just to respond to Defendants' meritless briefing and unprincipled discovery disputes.  That figure is more than double the fees incurred by Plaintiff ($47,334.50) in its prosecution of the underlying claim, and it is more than quadruple the fees incurred by Plaintiff ($26,212.00) on the personal jurisdiction and default judgment dispute. *See* Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153 at 20]; Fritz Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

243.    Plaintiff argues that although it could have filed for a final summary adjudication under Federal Rule of Civil Procedure 54 to remove the mechanic's lien after partial summary judgment (which might have ended the litigation and attorneys' fees at

1   that point, as reflected in the first fee motion.  *See* Plaintiff's First Motion for Attorneys'

2   Fees [Adversary Proceeding Docket No. 146]; Plaintiff's Reply to Defendants' Opposition

3   to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 153]; Fritz

4   Declaration in Support of Plaintiff's Reply to Defendants' Opposition to First Motion for

5   Attorneys' Fees [Adversary Proceeding Docket No. 155]; 6/29/22 Trial Transcript at 40:7-

6   17 and 47:10-16).  As the Bankruptcy Court has partially modified and vacated its order

7   granting partial summary adjudication in Plaintiff's favor, this argument is moot as the

8   adversary proceeding had to go to trial on the claims in Plaintiff's amended complaint to

9   remove Defendants' lien, primarily the slander of title claim.

10          244.    However, Plaintiff argues that it was reasonable to ***not*** incur the additional

11   procedural costs of making a Federal Rule of Civil Procedure 54 motion at that time

12   because partial summary adjudication had been issued in November 2019, and the joint

13   pretrial conference was scheduled for substantially the same time, with trial to commence

14   in April 2020.  6/30/22 Trial Transcript at 61:15- 62:6.  Plaintiff argues that just before trial

15   was to commence, Covid-19 caused a shutdown of court trials in mid-March 2020, which

16   could not have been anticipated by Plaintiff and for which it cannot be justifiably held

17   accountable; the trial was continued numerous times throughout 2020, 2021 and 2022,

18   partly due to the pandemic, but partly at the request of Defendants.  *See* 6/30/22 Trial

19   Transcript at 32:7-12.  To some extent, the Bankruptcy Court agrees with Plaintiff on this

20   point because in the end, it was necessary to go to trial on Plaintiff's claims in the

21   amended complaint for removal of Defendants' lien, specifically, the slander of title claim.

22          245.    Plaintiff argues that the difficulty in this particular case necessitating more

23   attorneys' fees (which it argues under the circumstances are reasonable and appropriate

24   here) continued even after the trial ended in terms of preparing the Proposed Findings

25   and Conclusions because of Curtis's shifting and inconsistent explanations over three

26   days of trial (a trial unnecessarily extended by Defendants' baseless arguments and

27   unsupported defenses).  For example, in reviewing more than 550 pages of trial hearing

28   transcripts, Curtis advanced multiple inconsistent positions regarding how much lumber

Debtor allegedly stole and how much it was worth, ranging from $4,000 to $60,000.  *See*,
Plaintiff's Proposed Findings and Conclusions [Adversary Proceeding Docket No. 217] ¶¶
152-163 (summarizing trial evidence with pinpoint citations).  As another example, during
trial, in an attempt to justify the false mechanic's lien, Curtis vacillated before finally
admitting to the Court that there had been no agreement to form the basis of the lien, and
therefore, that a mechanic's lien was not proper.  *See* Plaintiff's Proposed Findings and
Conclusions [Adversary Proceeding Docket No. 217] ¶¶ 139-143 (summarizing trial
evidence with pinpoint citations).  Plaintiff's counsel had to review the entirety of the 550
pages of trial transcripts and then check it against Curtis's previous deposition transcript
for inconsistencies and falsehoods, which increased Plaintiff's attorneys' fees.  *See*
Adversary Proceeding Docket No. 221.

246.    Plaintiff argues that the difficulty of this particular case, necessitating more
of Plaintiff's attorneys' fees, was also increased by having to prove Curtis's malice by way
of circumstantial evidence.  Plaintiff argues that Curtis certainly would not admit malice,
so Plaintiff's counsel had to establish the nature of the pre-existing relationship between
the parties, the events that led up to the wrongful lien, and the events that transpired
afterwards, including Curtis's knowledge and experience as a former lawyer in choosing
to file the wrongful lien as an improper prejudgment remedy for a disputed tort claim
instead of labor/material contract.  *See* Plaintiff's Proposed Findings and Conclusions
[Adversary Proceeding Docket No. 217] ¶¶ 168-174 (summarizing trial evidence with
pinpoint citations).  Adversary Proceeding Docket No. 221.

247.    Plaintiff argues that the claimed fees are reasonable and should be
awarded in favor of Plaintiff and against Defendants under the circumstances.  Plaintiff
argues that in determining the reasonableness of attorneys' fees, the court should
consider the "protracted and contentious nature" of the action.  *In re Roger*, No EDCV 15-
00087 SJO, 2015 WL 7566647 (C.D. Cal. Nov. 25, 2015), slip op. at *10  (noting that that
protracted and contentious nature of the suit underlying an attorneys' fees demand of
over $1,000,000 militated strongly in favor of the bankruptcy court abstaining from

hearing the matter so that the state trial court could determine them, precisely because the trial court was familiar with the protracted and contentious nature of the action). Both California and federal law commit the determination of reasonableness of attorneys' fees to the discretion of the trial courts. *Id., citing, Southwest Media, Inc. v. Rau*, 708 F.2d 419, 422 (9th Cir. 1983). As Plaintiff notes, higher attorneys' fees can be considered reasonable when those higher fees are due to time-consuming discovery and many contentious motions. *Ringfree USA Corp. v. Ringfree Company, Ltd.*, No. CV 06-7813 CAS (CTx), 2009 WL 10673144, slip op. at *1 (C.D. Cal. Jan.12, 2009). Plaintiff argues here, considering the time-consuming discovery and many contentious pleadings that the Plaintiff had to fight against Defendants, the fees are reasonable and appropriate. Adversary Proceeding Docket Nos. 153 and 155.

248.    Plaintiff argues that the fees are reasonable and the award is fair because of the utilitarian purpose of dissuading dilatory tactics and unnecessary litigation. By way of analogy, one court has noted the usefulness of awarding fees on a contractual attorneys' fees clauses for breach to prevent frivolous and dilatory tactics by the breaching party. *Markt v. Ro-Mart, Inc.*, 471 F.Supp. 1292, 1299 (N.D. Cal. 1979). By way of another analogy, in the context of removing and remanding cases under 28 U.S.C. § 1447, courts have noted that "an award of fees and costs [against the party that wrongfully removes an action] is permitted simply as a means of reimbursing the plaintiff for the 'wholly unnecessary litigation cost the [other party] inflicted.'" *Alpert v. Screen Actors Guild, Inc.*, No. CV 04-10059 SVW(CWx), 2005 WL 8154963 (C.D. Cal. May 24, 2005), slip op. at *1. Plaintiff argues that here, the lion's share of fees in this adversary proceeding was incurred as a result of Defendants' frivolous and dilatory tactics and largely unnecessary litigation costs. Accordingly, Plaintiff argues that the award of these fees in favor of Plaintiff and against Defendants is proper, fair, and reasonable to respond to Defendants' litigation tactics. Adversary Proceeding Docket Nos. 153 and 155.

249.    Plaintiff argues that where attorneys' fees are inextricably linked between related claims, those fees may be allowed and rewarded, and attorneys' fees need not be

1   apportioned when incurred for presentation on an issue common to both a cause of

2   action in which fees are proper and on in which they are not allowed.  *Sumner Hill*

3   *Homeowners' Association, Inc. v. Rio Mesa Holdings, LLC*, 205 Cal.App.4th at 1035.

4          250.    Plaintiff argues that attorneys' fees are recoverable for avoiding

5   Defendants' wrongful lien and that the core nucleus of operative facts for the causes of

6   action were the same – it was the wrongful lien that slandered title, and Defendants

7   stalwartly refused to voluntarily remove the lien, such that it was only through Plaintiff's

8   application of legal process that would clear title.  Plaintiff argues that Defendants should

9   not enjoy a windfall of avoiding liability for Plaintiff's attorneys' fees simply because

10  Plaintiff is able to void the lien with one legal theory over another, for the damage is

11  already done where Defendants file a wrongful lien and then force Plaintiff to incur those

12  attorneys' fees to remove it – especially over Defendants' vigorous defense of the

13  wrongful lien.  Plaintiff argues that if the Bankruptcy Court were to award the Plaintiff

14  victory on lien avoidance on all causes of action except slander of title remaining for trial,

15  and decide that (A) all fees up to that point were not related to slander of title, while (B) all

16  fees thereafter are related to slander of title but unnecessary and unreasonable because

17  the lien was voided just at that moment, the result would be an irrational one, because

18  (A) Plaintiff already incurred $147,629.25[13] in attorneys' fees to prevail, plus (B) another

19  $121,078.00[14] of attorneys' fees through trial on slander of title so that any portion of the

20  attorneys' fees at all could be recoverable as special damages. Plaintiff argues that if the

21  Bankruptcy Court were to award Plaintiff no attorneys' fees despite Plaintiff prevailing on

22  all the causes of action, it would work the bizarre incentive to encourage tortfeasors to file

23  wrongful liens and discourage property owners from ever challenging them.  Plaintiff

24  further argues that moreover, the result would be an actual victory for Defendants

25  because they would have been permitted to make a grossly inflated wrongful lien claim

26  ─────────────────────

27  [13] Exhibit 1 hereto, part "A".

28  [14] Exhibit 1 hereto, parts "A" and "B".

for $40,000, insist on being paid $40,000 from a court-approved refinancing, actually have the wrongful lien proven to be wrong and grossly inflated, and not incur any liability for Defendants' tortious wrongful conduct for slandering title, despite forcing Plaintiff to incur hundreds of thousands of dollars of attorneys' fees to remove the wrongful lien. Plaintiff thus argues that the Bankruptcy Court should therefore find and conclude that the amount of attorneys' fees claimed must be awarded to Plaintiff as damages. Under these circumstances, Plaintiff argues that it was reasonable for it to continue to incur attorneys' fees to finish the litigation of the final claim in the suit for slander of title, even though the Plaintiff prevailed on voiding the lien on a complimentary theory on its Motion for Partial Summary Adjudication right before trial.

251.    Plaintiff argues that the Bankruptcy Court should overrule and reject Defendants' argument that Plaintiff cannot recover attorneys' fees for prevailing on slander of title for those fees incurred in pursuit of damages. Plaintiff argues that Defendants' reliance on *Seeley v. Seymour*, 190 Cal.App.3d 844, 865-866 (1987), is misplaced. In a slander of title or "wrongful disparagement of title" case, the following damages are all recoverable: "expense of legal proceedings necessary to remove the doubt cast by the disparagement" and "financial loss resulting from the impairment of vendability of the property" and "general damages for the time and inconvenience suffered by plaintiff in removing the doubt cast upon his property." *Id.* at 865 (referring to Restatement of Torts). According to Plaintiff, all of Plaintiff's attorneys' fees fall into one category or another. Plaintiff notes that Defendants rely on the statement in *Seeley v. Seymour* that: "Although attorneys' fees and litigation expenses reasonably necessary to remove the memorandum from the record were recoverable, those incurred merely in pursuit of damages against [defendant] and the other defendants were not." *Id.* at 865-866. Plaintiff argues that *Seeley v. Seymour* is distinguishable on its facts because in this case, it is only by the judicial efficiency of splitting the First Cause of Action for Slander of Title from the others to obtain partial summary adjudication on lien avoidance that the lien was avoided prior to the completion of the full trial. Plaintiff further argues

that but, to be clear, Plaintiff's Complaint was one complaint for slander of title and lien

avoidance, it would turn the case law and Restatement of Torts on its head to say that

Plaintiff cannot recover attorneys' fees for prevailing for slander of title because through

good lawyering Plaintiff succeeded in voiding the lien at the interlocutory stage on partial

summary adjudication.  Plaintiff also argues that at that point, the wrongful lien had

already slandered title, and Plaintiff had already incurred more than $180,000 in

attorneys' fees to remove the wrongful lien over Defendants' unrelenting defense but

could not recover attorneys' fees as a measure of damages without completing the

remaining slander of title claim.  According to Plaintiff, it would be contrary to the

reasoning of *Sumner Hill Homeowners' Association, Inc. v. Rio Mesa Holdings, LLC*, 205

Cal.App.4th at 1031, which specifically supports attorneys' fees rewards as special

damages for slander of title, to deny Plaintiff attorneys' fees because on the eve of trial

for slander of title Plaintiff succeeded in a complimentary cause of action to void the lien.

Plaintiff thus argues that *Seeley v. Seymour* is also distinguishable on its facts because it

involved "other defendants" and multiple causes of action, including negligence and

indemnity that went beyond the slander of title claim against that particular defendant.

*Seeley v. Seymour*, 190 Cal.App.4th at 852 and 865-866.  Plaintiff argues that an award

of Plaintiff's attorneys' fees in the amount requested and set forth on **Exhibit 1** hereto is

wholly appropriate here on both slander of title and voiding the lien.  Since the

Bankruptcy Court has partially modified and vacated the Partial Summary Adjudication

Order, this dispute is somewhat moot as the Bankruptcy Court has only considered what

attorneys' fees and costs were reasonable and necessary to remove Defendants' lien as

a cloud on title to Plaintiff's property.  Defendants' lien was not removed upon avoidance

through partial summary adjudication, and thus, the slander of title claim, including the

issue of damages, had to be litigated at trial.

       252.    Plaintiff argues that its attorneys' fees incurred through partial summary

adjudication to avoid the lien were reasonable, and that the majority of the fees incurred

were necessitated in response to Defendants' actions.  Plaintiff provided a breakdown of

the fees for that period.  Fritz Declaration at 3-5 [Adversary Proceeding Docket No. 155];

Reply [Adversary Proceeding Docket No. 153] at 20.   Plaintiff argues that the Bankruptcy

Court should find and conclude and allow the amount of $147,629.25 for the period

through granting of Partial Summary Adjudication, as set forth on **Exhibit 1** attached

hereto, as reasonable and appropriate.  As discussed herein, since the Bankruptcy Court

has partially modified and vacated the Partial Summary Adjudication Order, it has not

considered the reasonableness and necessity of attorneys' fees and costs incurred by

Plaintiff as of entry of the Partial Summary Adjudication Order.

253.   As argued by Plaintiff, for all the reasons explained above, Defendants filed

an improper lien, and, accordingly, the Bankruptcy Court should find and conclude that

the burden of Plaintiff's attorneys' fees shifted to Defendants.  6/29/22 Trial Transcript at

12:21-13-3.  Plaintiff argues that the Bankruptcy Court should find and conclude that,

inevitably, somebody suffers when an improper lien is filed, and the cost to remove the

wrongful lien either comes out of the Plaintiff's resources or out of the Plaintiff's law firm's

resources, and, therefore, to deny attorneys' fees to the Plaintiff results in a windfall to

the Defendants that asserted the wrongful lien.  6/29/22 Trial Transcript at 12:12-20.

Plaintiff argues that whatever arrangement made between the Plaintiff and its counsel

does not relieve Defendants of their responsibility or liability, which would be a windfall to

Defendants for their wrongful conduct.  6/29/22 Trial Transcript at 12:21-13:6.

254.   Plaintiff argues that the Bankruptcy Court should overrule Defendants'

argument and find and conclude that there was not a more streamlined or inexpensive

method for Plaintiff to have removed the false Lien because, regardless of what process

Plaintiff might have used, it is evident that the real expense attendant to any process

would be responding to Defendants' vigorous litigation.  As discussed herein, the

Bankruptcy Court has considered the reasonableness and necessity of the attorneys'

fees and costs incurred by Plaintiff in removing Defendants' lien as a cloud on title to its

property.

255.   Plaintiff argues that the Bankruptcy Court should reject Defendants'

assertion that Defendants did nothing to enforce the mechanic's lien and find and conclude that for almost 19 months during this bankruptcy case, Defendants did in fact attempt to enforce the lien and collect $40,000 from the bankruptcy estate.  Plaintiff notes that on March 4, 2019, Defendants filed a motion for summary judgment and argued that the lien would "ride through" bankruptcy unaffected.  Defendants' Motion for Summary Judgment at 5:1-17 [Adversary Proceeding Docket No. 69].  Plaintiff argues that the Bankruptcy Court should find and conclude that Defendants had intended to wait out the bankruptcy case and then enforce the Lien against Plaintiff outside of bankruptcy and that Defendants repeatedly argued throughout this case that they had a "properly perfected mechanic's lien" that would pass through bankruptcy unaffected – an argument that the Bankruptcy Court should find and conclude is incorrect and, therefore, reject. Defendants' Motion for Summary Judgment at 6:22-7:28 [Adversary Proceeding Docket No. 69].  Plaintiff notes that in Defendants' reply briefing on their motion for summary judgment, they again asserted that "[t]he mechanic's lien cannot be avoided as a matter of law," Defendants' Reply to Plaintiff's Opposition to Summary Judgment Motion at 2:7 [Adversary Proceeding Docket No. 85], and, again, "there is no way the Debtor can avoid Defendants' mechanics' lien … the Debtor's [Plaintiff's] plan must provide that Defendants who hold a properly perfected mechanics' lien on the Debtor's collateral … be paid in full on the effective date of the plan or [] have the right to retain their lien and later receive payments with interest."  *Id.* at 9:1-6.  Plaintiff argues that the Bankruptcy Court should find and conclude that, clearly, Defendants still intended to assert and enforce their lien more than a year into this bankruptcy case, necessitating Plaintiff to incur attorneys' fees to remove the wrongful lien.

256.    Plaintiff argues that the Bankruptcy Court should have read Defendants' cited cases of *Green v. Smith*, 261 Cal.App.2d 392 (1968) and *Pool v. City of Oakland*, 42 Cal.3d 1051, 1066 (1986), and find them unavailing, and should overrule and reject Defendants' argument that Plaintiff could have mitigated damages by using a so-called "*Lambert*" Motion or filing legal process in state court under California Civil Code § 8482

instead of filing an adversary proceeding and that the suggestion that Defendants would have removed their lien and not litigated to defend the wrongful lien if only another state court legal process had been used is simply belied by the Defendants' scorched-earth defense of the wrongful lien in in this proceeding.  *See* Defendants['] Supplemental Authorities Supporting Claim/Defense Plaintiff Failed to Mitigate Its Damages and Failed to Plead Attorney Fee Authorizing Statute [Adversary Proceeding Docket No. 313]. *citing inter alia, Lambert v. Superior Court,* 228 Cal.App.3d 383 (1991).

257.    Plaintiff argues that the Bankruptcy Court has jurisdiction over all disputes as to claims and property of the estate, which are core proceedings of the most central variety. 28 U.S.C. § 157.  The bankruptcy court claim objection process, combined with the due process safeguards of an adversary proceeding when addressing the validity of a lien, provide an efficient process to handle matters central to the debtor-creditor rights that are common in bankruptcy.  *See In re Peck Jeep Eagle Inc.*, No. 17-0013 8-LA7, 2021 WL 1511640 (Bankr. S.D. Cal. April 15, 2021), slip op. at *2; Federal Rules of Bankruptcy Procedure 3007 and 7001(2); 28 U.S.C. § 157(b)(2)(A), (B), (K).   Plaintiffs argue that if creditors (particularly those creditors with wrongful liens) could divest the Bankruptcy Court of jurisdiction by insisting that the lien-tortfeasor's choice of forum be given precedent over that of a bankruptcy debtor's central reorganization efforts in the single Bankruptcy Court – as Defendants here argue for – then the entire construct of federal supremacy and the bankruptcy laws of Congress would be undermined.  *See* United States Constitution, Article I, § 8 (bankruptcy clause).

258.    "One of the goals of the Bankruptcy Code and process is to administer claims in an efficient manner, and the claim objection process is the most efficient manner to administer claims against the estate." *In re Brand Affinity Technologies, Inc.*, 2016 WL 8316889 (Bankr. C.D. Cal. Feb. 24, 2016), slip op. at *2.  Plaintiff argues that if Defendants thought there was a more efficient process, Defendants could have made a motion for relief from the automatic stay under 11 U.S.C. § 362(a) or moved to transfer the matter to another court.  *See Matter of Interco Inc.*, 139 B.R. 718, 719 (Bankr. E.D.

Mo. 1992) (noting relief from stay and transfer options).  Defendants never took any such

steps.  Plaintiff argues that instead, Defendants appeared in this forum, the Bankruptcy

Court, and vigorously defended their wrongful lien, and only after having lost those

vigorous legal battles in Bankruptcy Court, and now argue that a more efficient process

or venue existed, seeking to penalize Plaintiff after-the-fact for Defendants' scorched-

earth litigation tactics in this adversary proceeding.

259.    Plaintiff argues that the Bankruptcy Court should overrule and reject

Defendants' argument of second-guessing Plaintiff about what legal theories or legal

processes that the Plaintiff could have or should have used instead of this adversary

proceeding.  6/29/22 Trial Transcript at 34:11-14.  Plaintiff argues that the Bankruptcy

Court should overrule and reject Defendants' arguments that Plaintiff could have

mitigated damages by using the *Lambert* motion in state court or giving a 10-day notice

for release of lien under California Civil Code § 8482.  6/30/22 Trial Transcript at 147:3-

151:6; *see also, Lambert v. Superior Court,* 228 Cal.App.3d 383, 387-388 (1991) (stating

that an owner may bring a motion to contest a mechanic's lien in a contractor's lien

enforcement action or file an action for declaratory or injunctive relief if no such lien

enforcement action had been brought).   Plaintiff further argues that the Bankruptcy Court

should find and conclude that using the state court process was not a justifiable

alternative to the adversary proceeding because, as Curtis had acknowledged,

Defendants had not served Plaintiff with the state court complaint for their lien.

260.    Plaintiff argues that it is clear that Defendants would have argued for the

validity of their wrongful mechanic's lien regardless of whether the legal process played

out in state court or bankruptcy court.  Plaintiff notes that even during closing arguments

at trial, more than two and a half years after the Bankruptcy Court ruled that Defendants'

wrongful mechanic's lien was void on partial summary adjudication, Curtis was still

arguing that the Lien had been properly perfected under Ninth Circuit law.  6/30/22 Trial

Transcript at 109:3-111:10.  Plaintiff argued that Defendants continued to show a

misunderstanding of the interplay of mechanic's lien law and bankruptcy law all the way

1 through closing arguments, more than two years after the Bankruptcy Court had ruled on

2 these issues on partial summary adjudication.  6/30/22 Trial Transcript at 118:19-120:1.

3 While Plaintiff is technically correct on these points, the Bankruptcy Court set aside its

4 Partial Summary Adjudication Order, and Defendants continued to assert the validity of

5 their lien at trial.  Plaintiff argues that the Bankruptcy Court should find and conclude that

6 a 10-day notice and demand period under California Civil Code § 8482 would have made

7 no difference, because when Plaintiff filed and served the complaint, Defendants were

8 provided 30 days to admit the invalidity for the lien, but instead argued for the validity of

9 the wrongful lien for the next 18 months through a contested ruling on summary

10 adjudication.  6/30/22 Trial Transcript at 131:14-133:17 (Curtis testimony); *see also,*

11 Federal Rule of Bankruptcy Procedure 7012 (30 days from issuance of summons for

12 response to adversary complaint if service is made).  Plaintiff points out that Defendants

13 asserted to the Bankruptcy Court that their wrongful Lien for $40,000 should be paid by

14 Plaintiff, even more than a year after the complaint had been filed.  6/30/22 Trial

15 Transcript at 140:5-19.  Plaintiff argues that the Bankruptcy Court should find and

16 conclude that some legal process by Plaintiff was reasonable and necessary for a judicial

17 declaration that the Lien was void over Defendants' continual opposition.

18    261.    Plaintiff argues that the Bankruptcy Court should find and conclude that the

19 Lien was void because it did not meet statutory requirements, and that a judicial

20 declaration from a court through legal process was necessary to declare the Lien void.

21 6/29/22 Trial Transcript at 77:25-78:3 (court comments). Plaintiff argues that the Lien was

22 wrongful and a cloud on title necessitating a judicial declaration to have it removed.

23 6/29/22 Trial Transcript at 202:1-12.  Thus, Plaintiff argues that obtaining that judicial

24 declaration necessitated Plaintiff's attorneys' fees.

25    262.    Plaintiff argues that the Bankruptcy Court should find and conclude that the

26 majority of the attorneys' fees incurred up through partial summary adjudication to

27 invalidate the Lien were appropriate and reasonable.  Plaintiff argues that many of the

28 legal fees were made necessary by Defendants' conduct, which necessitated Plaintiff to

respond.  Plaintiff notes that starting with service of process and personal jurisdiction,

Defendants' only addresses of record were a P.O. Box and a vacant lot, and appear to

have been part of Defendants' strategy to shield themselves from legal service while

nonetheless filing lawsuits and liens against Plaintiff from those addresses.  6/29/22 Trial

Transcript at 94:8-24.  Plaintiff notes that the Bankruptcy Court identified an error in a

missing digit in the zip code on service, which was not an argument raised by

Defendants, and Plaintiff had to re-serve the complaint, but the same issues and

arguments by Defendants as to their P.O. Box and vacant lot for service would have

remained and needed to be decided after the zip code issue was fixed.  6/29/22 Trial

Transcript at 94:8-24 and 103:7-104:6.

263.    Plaintiff argues that even if the Bankruptcy Court does not allow the fees

associated with ineffective service of the first complaint, 6/29/22 Trial Transcript at 110:7-

10 (court comments that such fees are nonchargeable), that would account for only

$26,212 of the total fees (portions of which were charged by Plaintiff's professionals other

than Mr. Fritz for which Plaintiff is not seeking anymore).  *See* Plaintiff's Reply to

Defendants' Opposition to First Motion for Attorneys' Fees at 20 [Adversary Proceeding

Docket No. 153]; Fritz Declaration in Support of Plaintiff's Reply to Defendants'

Opposition to First Motion for Attorneys' Fees [Adversary Proceeding Docket No. 155].

264.    Plaintiff argues that the Bankruptcy Court should find and conclude that

Plaintiff's attorneys' fees were reasonable in discovery where Defendants took

unreasonable positions to drive up the cost of the litigation.  Plaintiff argues that for

example, where Curtis refused to answer questions on behalf of Ammec, stating that

Carlos Montenegro was the person knowledgeable about the matter, then Mr.

Montenegro refusing to show up for the deposition and Ms. Curtis showing up a second

time instead, and Plaintiff made the decision to not incur further fees on the issue by

choosing not to file a motion to compel.  6/29/22 Trial Transcript at 170:21-182:25;

Adversary Proceeding Docket No. 146.  As another example, Plaintiff points out,

Defendants attempted to force a deposition to take place on a sidewalk, which was

1   clearly not reasonable, and then brought an emergency motion to compel, which the

2   Bankruptcy Court denied, but not before the Plaintiff was forced to incur attorneys' fees to

3   respond.  6/29/22 Trial Transcript at 172:21-175:18; Plaintiff's First Motion for Attorneys'

4   Fees [Adversary Proceeding Docket No. 146].

5           265.    Plaintiff argues that as the bankruptcy case progressed, Defendants took

6   additional steps to enforce the wrongful lien in the main bankruptcy case when Curtis

7   Defendants filed the only oppositions to Plaintiff's refinancing motion and argued that the

8   refinancing did not provide adequate protection for the lien for $40,000.  *See* Bankruptcy

9   Case Docket No. 84 at 9:12-26.  Plaintiff notes that Curtis also argued that Defendants

10  "are entitled to be paid in full on the effective date of the plan or have the right to retain

11  their lien and later receive payments with interest."  *See* Curtis's Opposition to Plaintiff's

12  Motion for Order Authorizing Post-Petition Financing at 10:1-2 [Bankruptcy Case Docket

13  No. 84]; Ammec, Inc.'s Opposition to Plaintiff's Motion for Order Authorizing Post-Petition

14  Financing at 8:2-3 [Bankruptcy Case Docket No. 86] (arguing same).  Ammec asserted:

15  "Curtis/Ammec have a perfected lien that must be replaced with another lien of equal

16  quality as the mechanic's lien."  Ammec, Inc.'s Opposition to Plaintiff's Motion for Order

17  Authorizing Post-Petition Financing at 7:8-9 [Bankruptcy Case Docket No. 86].  The

18  Bankruptcy Court ordered that $40,000 be impounded until the dispute over the

19  mechanic's lien could be resolved.  Order Authorizing Post-Petition Financing at 4:4-10

20  [Bankruptcy Case Docket No. 92].  Plaintiff argues that clearly, Defendants were

21  attempting to enforce the mechanic's lien well into August 2019, some 19 months after

22  Plaintiff filed its bankruptcy petition in January 2018.  As Plaintiff argues, Defendants'

23  abuse of civil proceedings crossed over from merely filing the lien to actively attempting

24  to enforce the lien through judicial proceedings in this court, despite the complete

25  invalidity of their purported mechanic's lien and $40,000 claim.  Accordingly, Plaintiff

26  argues that the Bankruptcy Court should find and conclude that Plaintiff's attorneys' fees

27  as set forth on **Exhibit 1** hereto are reasonable and appropriate award of damages in

28  favor of Plaintiff and against Defendants.

### iii.  Mitigation of Damages

266.    In their evidentiary objections to Plaintiff's motion for attorneys' fees and costs [Adversary Proceeding Docket No. 290] and their supplemental brief regarding mitigation of damages [Adversary Proceeding Docket No. 313], Defendants make two primary arguments against the award of attorneys' fees to Plaintiff: (1) Plaintiff should not be awarded the attorneys' fees because it failed to mitigate these damages since it could have proceeded against Defendants in a more efficient, cost-effective manner; and (2) Plaintiff failed to specifically plead a claim to recover attorneys' fees in the complaint under California Code of Civil Procedure § 8488(c).

267.    Plaintiff incurred approximately $270,707.25 in attorneys' fees to remove a $40,000 mechanic's lien.  Plaintiff argues that at first glance, the fees appear excessive, but considering the extensive litigation and Defendants' aggressive defense of their invalid mechanic's lien, Plaintiff argues that the attorneys' fees are reasonable and should be awarded to it.  That is, according to Plaintiff, it is entitled to attorneys' fees and costs because it prevailed in its slander of title cause of action.

268.    Defendants argue that Plaintiff failed to mitigate damages because there were at least three more expedient and cost-effective procedures that were available under California law to Plaintiff that it failed to utilize and, instead, created excessive attorneys' fees.  According to Defendants, these three methods were: (1) filing a petition for release of a mechanic's lien under California Civil Code § 8482 in state court; (2) filing a motion for removal of mechanic's lien under California Code of Civil Procedure § 765.010 in state court; and (3) filing a so-called *Lambert* Motion to remove the mechanic's lien in state court.  Defendants['] Supplemental Authorities Supporting Claim/Defense Plaintiff Failed to Mitigate Its[] Damages and Failed to Plead Attorney Fee Authorizing Statute (Defendants' Supplemental Brief on Mitigation) [Adversary Proceeding Docket No. 313].  Defendants also asserted that Plaintiff could have just asked Defendants to remove the mechanic's lien by sending them a demand letter.  *Id.*  It is not disputed that Plaintiff did not pursue any of these options, for various reasons,

1  instead Plaintiff both prosecuted and defended its claims in this adversary proceeding

2  and has prevailed on most of its claims.

3      269.   Plaintiff seeks attorneys' fees based on the first cause of action in its

4  amended complaint for slander of title.  The elements of slander of title are: (1) a

5  publication, (2) which is without privilege or justification, (3) which is false, and (4) which

6  causes direct and immediate pecuniary loss. *Manhattan Loft, LLC v. Mercury Liquors,*

7  *Inc.*, 173 Cal.App.4th at 1051.  As Plaintiff argues, attorneys' fees and litigation costs are

8  recoverable as pecuniary damages in a slander of title action when the litigation is

9  necessary to remove the doubt cast upon vendibility or value of plaintiff's property.

10 *Sumner Hill Homeowners' Association, Inc. v. Rio Mesa Holdings, LLC*, 205 Cal.App.4th

11 at 1032; *accord, Compass Bank v. Petersen*, 886 F.Supp.2d 1186, 1198 (C.D. Cal.

12 2012).  Plaintiff argues here that it proved the mechanic's lien imposed by Defendants

13 was a publication which was recorded without privilege, which was false and caused

14 pecuniary loss because of the attorneys' fees and costs that Plaintiff incurred.

15     270.   In their supplemental brief, Defendants argue that they should not be liable

16 for the entire amount of attorneys' fees that Plaintiff incurred during the slander of title

17 litigation because there were more efficient ways to deal with Defendants' asserted

18 mechanic's lien [Adversary Proceeding Docket No. 313].  To support this argument,

19 Defendants cite to the Restatement of Torts (First), § 918 which states:

20

21     (1) Except as stated in Subsection (2), a person injured by the tort of another is not
       entitled to recover damages for such harm as he could have avoided by the use of
22     due care after the commission of the tort.

23     (2) A person is not prevented from recovering damages for a particular harm
       resulting from a tort if the tortfeasor intended such harm or adverted to it and was
24     recklessly disregardful of it, unless the injured person with knowledge of the
       danger of such harm intentionally or heedlessly failed to protect his own interests.
25

26 Restatement (First) of Torts § 918 (1939) (March 2023 update).  Plaintiff argues that

27 Defendants seem to focus on the first part of this Restatement section and ignore the

28 second part.  Defendants argue Plaintiff is not entitled to attorneys' fees because Plaintiff

could have avoided some of the fees under various procedural short-cuts.  For example, Defendants suggest Plaintiff could have filed a so-called "*Lambert* Motion" in state court and simply asked them to remove the lien or provided a 10-day notice under California Civil Code § 8482 ("An owner of property may not petition the court for a release order under this article unless at least 10 days before filing the petition the owner gives the claimant notice demanding that the claimant execute and record a release of the claim of lien . . . .").  Plaintiff asserts that this argument is not persuasive because throughout this adversary proceeding, Defendants maintained they had a valid lien, even after the Bankruptcy Court ruled in favor of Plaintiff on its declaratory relief claim, granting partial summary adjudication which declared the mechanic's lien void, and Defendants challenged every step of the adversary process.  Plaintiff argues that there is no doubt that Defendants would have opposed any of the more efficient methods they suggest Plaintiff should have followed, noting also, Defendants argue that Plaintiff could have filed a "*Lambert* Motion" in the previously pending litigation related to the State Court Complaint that Defendants admit they failed to serve on Plaintiff.  In any event, while conceivably, Plaintiff could have filed a *Lambert* motion to remove Defendants' mechanic's lien, it appears that such a motion would have been a contested matter within the meaning of Federal Rule of Bankruptcy Procedure 9014 as Plaintiff had already filed for bankruptcy, and the litigation of such a matter would have involved the same factual issues as the slander of title and lien avoidance claims, that is, who owned the lumber, and whether there was any agreement between Plaintiff and Defendants to support their claimed mechanic's lien, and thus, the Bankruptcy Court does not agree with Defendants that filing a *Lambert* motion to remove the mechanic's lien would have avoided Plaintiff's incurrence of attorneys' fees and costs in litigating the slander of title claim.  *See Lambert v. Superior Court,* 228 Cal.App.3d at 387-388.   In this case, Defendants had filed their action to enforce the mechanic's lien in state court after Plaintiff filed for bankruptcy, and the lien enforcement action was filed in violation of the automatic stay and was thus void.  Therefore, Plaintiff could not have filed a *Lambert* motion in Defendants' lien enforcement

1    action and had to bring an action for declaratory relief, which it did in this adversary

2    proceeding.[15]  Even if Plaintiff could have filed a *Lambert* motion in Defendants'

3    mechanic's lien enforcement action, the parties would have had to litigate the factual

4    issues relating the validity or invalidity of the lien involving ownership of the lumber and

5    whether an agreement existed between Plaintiff and Defendants for provision of the

6    lumber as they litigated in this adversary proceeding.

7         271.    Plaintiff argues that Defendants fail to address the second part of

8    Restatement of Torts (First) § 918.  Plaintiff is not prevented from recovering damages for

9    a particular harm resulting from Defendants' baseless mechanic's lien unless Plaintiff

10   intentionally or heedlessly failed to protect its own interest.  Plaintiff argues that there is

11   no indication that Plaintiff intentionally or heedlessly failed to protect their interest and

12   that the evidence shows Plaintiff never failed to protect their interest.  Plaintiff argues that

13   in fact, it carefully and rigorously prosecuted their slander of title claim so that it would not

14   have to pay Defendants $40,000 for a false mechanic's lien.  Defendants' main argument

15   is not that Plaintiff failed to protect its own interest, their main argument is that Plaintiff

16   was overly aggressive in prosecuting the slander of title cause of action.  Plaintiff argues

17   that considering Defendants improperly recorded a mechanic's lien against Plaintiff's

18

19   [15] As noted in *Manela v. Stone*, 66 Cal.App.5th 90 (2021), "the grant of a motion to remove
         a mechanic's lien is essentially a judgment in the underlying [mechanic's lien]
20       foreclosure action that no lien exist---a judgment that, upon recordation, removes
         the lien from the public records … [a]nd … is a final, appealable judgment for
21       which writ relief would ordinarily be denied." *Id.* at 101-102, *citing and quoting,
         Howard S. Wright Construction Co. v. Superior Court,* 106 Cal.App.4th 314, 318
22       (2003)(internal quotation marks omitted).  "A motion to remove a mechanic's lien
         should be granted only when the lienholders . . . fail to make a threshold showing of
23       the 'probable validity' of the lien." *Id.* at 102, *citing, Lambert v. Superior Court,*
         228 Cal.App.3d at 387.  Since there was no proper lien enforcement action pending
24       due to the automatic stay in Plaintiff's bankruptcy case, Plaintiff would have had to
         file an action for declaratory relief and bring a motion to remove the lien based on
25       *Lambert* and litigate the factual issues relating to the validity of the lien, which it
         did anyway.  Whether a *Lambert* motion would have saved litigation expense is
26       speculative, and the Bankruptcy Court has taken into account that the awardable
         reasonable and necessary attorneys' fees and litigation costs are less than claimed
27       by Plaintiff by focusing on the litigation of the factual issues central to resolution of
         Plaintiff's claims to remove Defendants' lien.

28

112

property and vigorously argued that they had a valid mechanic's lien throughout the litigation, Plaintiff was only responding to Defendants' litigation tactics which incurred the substantial attorneys' fees in this litigation.

272.    Plaintiff argues that Defendants did not meet their burden to prove that it failed to mitigate any damages. *Agam v. Gavra*, 236 Cal.App.4th 91 (2015).  The standard for mitigation of damages is set forth in *Valle de Oro Bank v. Gamboa*, 26 Cal.App.4th 1686 (1994).  "Typically, the rule of mitigation of damages comes into play when the event producing injury or damage has already occurred and it then has become the obligation of the injured or damaged party to avoid continuing or enhanced damages through reasonable efforts."  *Id*. at 1691.

273.    Plaintiff argues that the inquiry under the doctrine of mitigation of damages is whether the injured party "act[ed] reasonably and with due diligence, in good faith." *Green v. Smith,* 261 Cal.App.2d 392, 397 (1968).  "The reasonableness of the efforts of the injured party must be judged in the light of the situation confronting him at the time the loss was threatened and not by the judgment of hindsight."  *Id*. at 396. "The fact that reasonable measures other than the one taken would have avoided damage is not, in and of itself, proof of the fact that the one taken, though unsuccessful, was unreasonable. … If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen."  *Id*. at 397 (internal citations omitted).  Also, "[t]he fact that in retrospect a reasonable alternative course of action is shown to have been feasible is not proof of the fact that the course actually pursued by plaintiff was unreasonable."  *Id*. at 398.  "It is sufficient if [Plaintiff] acts reasonably and with due diligence, in good faith."  *Id*. at 397.  Plaintiff notes that in this case, Defendants urge the court to consider the options that Plaintiff did not pursue but have not shown that the course of actions Plaintiff took were unreasonable.

274.    Plaintiff argues that even though the Bankruptcy Court voided the mechanic's lien against the property with its Partial Summary Adjudication Order entered on November 14, 2019 granting in favor of Plaintiff for the disallowance of claim,

declarative relief and lien avoidance causes of action, and ruled that "Any and all liens asserted by the Defendants against the Property are void and unenforceable," Defendants continued to argue that their mechanic's lien was valid in the slander of title portion of the litigation.  Adversary Proceeding Docket No. 142.  As in *Seeley v. Seymore*, 190 Cal.App.3d 844, 858 (1987), a recorded document that may have no effect on title can still give rise to a slander of title cause of action.  Plaintiff notes that in this case, the Bankruptcy Court did not immediately award fees regarding the lien avoidance/declaratory relief causes of action because there was a pending slander of title cause of action.  Plaintiff argues that it prevailed in the slander of title cause of action and proved there were damages in the form of attorneys' fees, that Defendants also contend the lien was void, pursuant to state law, by the time Plaintiff filed their adversary proceeding and Plaintiff did not need to proceed with the litigation; and that however, Defendants expected Plaintiff to have understood the mechanic's lien was void either because of the declaratory relief ruling or through expiration of the state court process, while Defendants continued to defend the mechanic's lien in the pending adversary proceeding during litigation of the slander of title cause of action.  In this regard, the Bankruptcy Court agrees with Plaintiff that it had to proceed to litigate the adversary proceeding through trial to establish its claims to remove Defendants' lien, the slander of title claim in particular, as the Partial Summary Adjudication Order was partially modified and vacated, necessitating a trial on the claims to remove the lien.

275.    Defendants argue that Plaintiff failed to mitigate their damages by refusing to pay Curtis the $40,000 when the original lender, Lender Xpress, offered a refinancing loan to Plaintiff.  Defendants' Proposed Findings at 12 [Adversary Proceeding Docket No. 269].  Defendants specifically argue: "Plaintiff's CEO/President Michelle Mc[A]rn stated that she was not going to pay Curtis no matter how much money she had left over because of the malice and hate Mc[A]rn and Eric Radley fostered against Curtis after she [Curtis] cut off their pillage of Curtis'[s] lumber."  *Id.*  While it is undisputed that McArn was not willing to pay Curtis for the Lien, it is not a reasonable mitigation measure for the

victim of the tort of slander of title, Plaintiff, to give the perpetrators of the slander of title, Defendants, what they demand, or as Plaintiff asserts, to pay baseless tribute to Defendants.  In hindsight, it may have been more economical for Plaintiff to have paid the tribute demanded by Defendants for release of the Lien, but the cost of litigation over the validity of the Lien ran up in large part from Defendants' aggressive litigation tactics.  The Bankruptcy Court disagrees with Defendants that Plaintiff should have mitigated their damages from slander of title by paying off Defendants for the wrongful lien, the instrument of slander of title.

276.    Plaintiff argues that Defendants basically argue that Plaintiff could have mitigated their attorneys' fees damages while Defendants fought Plaintiff every step of the litigation process and that they cannot use the doctrine of mitigation of damages as a shield and a sword.  *See American Express Travel Related Services Co., Inc. v. D & A Corp.,* No. CV-F-04-6737 OWW/TAG, 2007 WL 3217565 (E.D. Cal. 2007), slip op. at *43 (The use of the doctrine in a breach of contract "case did not provide a shield against the unwarranted piling up of damages, but rather constituted a sword against the Bank's contractual right to recover damages resulting from [defendant's] admitted breach of contract." *Id., discussing Valle de Oro Bank v. Gamboa,* 26 Cal.App.4th 1686, 1694 (1994)).  Plaintiff argues that in other words, Defendants recorded a false $40,000 mechanics lien for loss of personal property valued at cost against Plaintiff's Property that Curtis admitted at trial did not cost or otherwise show was worth $40,000, then she and her co-defendant, Ammec, vigorously fought the slander of title cause of action to defend the false lien, and now Defendants do not want to pay for the consequences of their actions resulting in incurrence of attorneys' fees by Plaintiff.  Plaintiff notes that Defendants argue that Plaintiff should have mitigated the damages for attorneys' fees and somehow simplified the process so that Plaintiff did not incur such a significant amount of attorneys' fees.  Plaintiff argues that it acted reasonably and with due diligence, in good faith, while Defendants fought every step of the litigation which caused Plaintiff to incur the large amount of attorneys' fees, and that Plaintiff should be awarded

all reasonable fees.

277.    According to Plaintiff, Defendants state they were never asked to remove the lien before or after Plaintiff filed its Chapter 11 bankruptcy petition.  Supplemental Brief, Adversary Proceeding Docket No. 313, 3:16-17.  Plaintiff argues that this statement is in direct conflict with the admitted or adjudicated facts that were part of the joint pretrial stipulation and order thereon.  According to the Amended Joint Pre-Trial Stipulation as Modified at the Hearing on Joint Pre-Trial Conference ("JPTS") [Adversary Proceeding Docket No. 162], the following facts were admitted or were adjudicated on partial summary adjudication and required no proof for trial: "Although the Plaintiff made several demands on the Defendants to remove the Disputed Lien from the Property, the Defendants have refused to comply with such demands. . . As a result of the Defendants' refusal to voluntarily remove the Disputed Lien from the Property and litigation related thereto, the Plaintiff was forced to incur legal fees and costs to remove the Disputed Lien from the Property."  JPTS at 5, Admitted/Adjudicated Facts Nos. 31 and 32 [Adversary Proceeding Docket No. 162].  As argued by Plaintiff, Defendants imply that Plaintiff could have simply asked Defendants to remove the mechanic's lien which would have saved costs, but considering Defendants argued the validity of their lien during every step of litigation for this adversary proceeding, including the slander of title portion of the litigation, Defendants' implication that they would have just remove the lien if they had simply been asked is not credible.  The Bankruptcy Court also notes the testimony of the witnesses that Plaintiff by McArn and Eric Radley and Defendants by Curtis filed police reports with the local authorities on each other before Plaintiff filed its bankruptcy case with Plaintiff demanding that Curtis remove the Lien and with Curtis demanding that the Lien be paid because Plaintiff and its agents stole the lumber.  Based on the foregoing, there is no factual basis to support Defendants' claim that they were not asked to remove the Lien.

278.    Having considered the arguments and briefing of the parties, the Bankruptcy Court agrees with Plaintiff that it did not fail to mitigate its damages by

pursuing all of the causes of action in the adversary complaint, including the slander of title cause of action.  On this record, the Bankruptcy Court finds and concludes that (1) given that Defendants' purported mechanic's lien was a cloud on title of Plaintiff's Property, asserting a slander of title cause of action in this adversary proceeding was an appropriate legal remedy; and (2) given the vindicative nature of Defendants' actions in filing a baseless mechanic's lien to extract $40,000 in tribute from Plaintiff, sending threatening emails to Plaintiff's president, McArn, and its agent, Eric Radley, suing in state court their family members with no apparent involvement in the lumber transaction, attempting a litigation strategy to bypass Plaintiff's bankruptcy case to enforce the baseless lien outside of bankruptcy, and asserting meritless litigating positions in this adversary proceeding, Plaintiff was justified in seeking a judicial declaration that Defendants' Lien was void and a slander of title.  Obtaining a judicial declaration that Defendants' Lien was void and a slander of title was a silver stake needed to kill off their fraudulent lien given Defendants' persistence in enforcing the lien despite its patent invalidity.  In the view of the Bankruptcy Court, it was also essential for Plaintiff to obtain a factual finding that the lumber obtained by Plaintiff was through purchase by its agent, Eric Radley, and not by larceny or conversion of lumber owned by Curtis in order to deter Defendants from pursuing enforcement of the Lien outside of Plaintiff's bankruptcy case through harassment of Plaintiff and its agents and interfering with Plaintiff's reorganization under its confirmed bankruptcy plan, and this necessity involved additional incurrence of attorneys' fees and costs.

### iv.  Whether Plaintiff Specifically Pleaded Attorneys' Fees

279.    Defendants contend that Plaintiff did not make a proper claim for attorneys' fees in the adversary complaint because it never explicitly cited to California Civil Code § 8488(c) and did not comply with Federal Rule of Civil Procedure 26(e) which required a duty to disclose.  Plaintiff argues that this argument is not persuasive.  Plaintiff notes that under California Civil Code § 8488(c), the prevailing party is entitled to attorneys' fees.  Plaintiff argues that there is no language in California Civil Code § 8488(c) that requires

117

attorneys' fees to be specifically pled in the complaint.  Plaintiff argues that Defendants

did not cite to any case law that requires California Civil Code §8488(c) to be specifically

pleaded.  Federal Rule of Civil Procedure 26(e) relates to discovery.  Plaintiff seeks

attorneys' fees as an element of their slander of title claim which are allowed under

*Sumner Hill Homeowners' Association, Inc.,* 205 Cal.App.4th at 1032.

280.    Plaintiff notes that to support Defendants' argument that Plaintiff was

required to state they seek attorneys' fees, they cite to California Civil Code § 8484 which

relates to a petition for release of an order.  Pursuant to California Civil Code § 8484(a)-

(h),

> A petition for a release order shall be verified and shall allege all of the following:
>
> (a) The date of recordation of the claim of lien. A certified copy of the claim of lien shall be attached to the petition.
> (b) The county in which the claim of lien is recorded.
> (c) The book and page or series number of the place in the official records where the claim of lien is recorded.
> (d) The legal description of the property subject to the claim of lien.
> (e) Whether an extension of credit has been granted under Section 8460, if so to what date, and that the time for commencement of an action to enforce the lien has expired.
> (f) That the owner has given the claimant notice under Section 8482 demanding that the claimant execute and record a release of the lien and that the claimant is unable or unwilling to do so or cannot with reasonable diligence be found.
> (g) Whether an action to enforce the lien is pending.
> (h) Whether the owner of the property or interest in the property has filed for relief in bankruptcy or there is another restraint that prevents the claimant from commencing an action to enforce the lien.

California Civil Code § 8484.  Plaintiff argues that despite Defendants' statement in their

supplemental brief at 10:6-19 that Plaintiff was require to "claim that the owner has

incurred and will incur attorney's fees in bringing and prosecuting the petition," there is no

provision of § 8484 that requires a claim of attorneys' fees.  Plaintiff argues that it

appears Defendants did not accurately cite the requirements of California Civil Code §

8484 and that regardless, the adversary complaint clearly indicates that Plaintiff sought

attorneys' fees.

281.    Plaintiff argues that based on the adversary complaint, Defendants had

sufficient notice that Plaintiff sought attorneys' fees.  Plaintiff clearly met the pleading requirements of Federal Rule of Civil Procedure 8(a)(1)-(3) ("A pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.").  Plaintiff argues that it sought attorneys' fees under their slander of title claim as pecuniary damages.  In the caption of the complaint, Plaintiff listed the following: "Complaint for: . . . (6) Attorneys' Fees and Costs."   Complaint at 1 [Adversary Proceeding Docket No. 1].  Plaintiff notes that in the body of the complaint, in the first cause of action for slander of title, Plaintiff alleges it suffered pecuniary loss and "costs and fees associated with obtaining clear title." Complaint at 5:3-6.  At the end of the complaint, in the claim for relief section for the first cause of action (slander of title), Plaintiff sought "Attorneys' fees and costs associated with this Complaint to remove doubt cast by Defendants' disparagement of the Property." Complaint at 7:5-6. Plaintiff notes that additionally, it sought attorneys' fees and costs on all claims for relief.  Complaint at 7:17.  Plaintiff argues that the complaint contained sufficient information to put Defendants on notice that Plaintiff sought attorneys' fees.

282.    The Bankruptcy Court notes that Plaintiff alleged in its amended complaint at paragraph 27: "Debtor has suffered pecuniary damage as a result of Defendants' false publication, in an amount to be proven at trial, for, among other things, chilled offers for purchase of the Property, false claims against Debtor's estate on account of the false Alleged Obligation, and the costs and fees associated with obtaining clear title." Amended Complaint [Adversary Proceeding Docket No. 44].  The prayer for relief in the amended complaint requested an award of attorneys' fees and costs on all causes of action, including the slander of title claim.  *Id.*  In light of this record, the Bankruptcy Court finds and concludes that Defendants had adequate notice of Plaintiff's claims for attorneys' fees and costs in prosecuting its claims to remove their lien, the slander of title claim in particular.

283.    Plaintiff argues that additionally, the Bankruptcy Court awarded attorneys' fees and costs to Plaintiff in its November 14, 2019 order the other causes of action in this adversary complaint for the disallowance of claim, avoidance of lien and declaratory relief causes of action, Adversary Proceeding Docket No. 142, and that the Bankruptcy Court waited to award these fees and costs until parties completed the slander of title litigation.  Plaintiff argues that Defendants knew that additional fees and costs would be incurred to complete the slander of title litigation and knew they would potentially be liable for these additional fees and costs.

284.    The Bankruptcy Court generally agrees with Plaintiff that its claim for attorneys' fees was sufficiently pleaded to give notice that it was seeking an award of attorneys' fees and costs because such an award was expressly requested in Plaintiff's original complaint and its amended complaint, which is the operative complaint.  The Bankruptcy Court also agrees with Plaintiff that California Civil Code §8488(c) is the exclusive remedy for an award of attorneys' fees and costs for statutory removal of a mechanic's lien which needed to have been pleaded in this case if Plaintiff was seeking statutory attorneys' fees, but that the Bankruptcy Court also agrees with Plaintiff that it may seek an award of attorneys' fees and costs as an element of damages on its common law tort slander of title claim based on the common law as shown in the previously cited case of *Sumner Hill Homeowners Association v. Rio Mesa Holdings, LLC*.  The Bankruptcy Court, however, disagrees with Plaintiff's assertion that the Bankruptcy Court has already awarded it attorneys' fees and costs in the Partial Summary Adjudication Order as the court only stated that Plaintiff was entitled to apply for such an award, not that it was making an award at that time, as the consideration of motions for an award of attorneys' fees and costs comes normally at the end of litigation after entry of a final order or judgment, and the litigation of the adversary proceeding has not been completed as the slander of title cause of action had not been adjudicated.  *See* Local Bankruptcy Rule 7054-1(g).  For the foregoing reasons, Plaintiff is not precluded from claiming an award of attorneys' fees and costs in this adversary proceeding.

### E.  Defendants' Additional Arguments in Opposition to Plaintiff's Slander of Title Claim

285.    In addition to Defendants' argument that the Lien was privileged, which has been addressed above, they argue that Plaintiff has failed to prove that it incurred damages as a result of publication of the purported mechanic's lien.  Defendants' Proposed Findings at 12-13  [Adversary Proceeding Docket No. 269]; Defendants' Objections to Plaintiff's Proposed Findings) at 5-11 [Adversary Proceeding Docket No. 270].

286.    Defendants first argue that Plaintiff on its Schedule A/B of its bankruptcy schedules filed in the bankruptcy case listed potential causes of action against Greta Curtis as its assets, leaving blank the inquiry as to "Nature of claim," stating the "Amount requested" as "$0.00" and stating the "Current value of debtor's interest" as "Unknown" and that these statements on the bankruptcy schedules are judicial admissions that Plaintiff suffered no damages as a result of the potential causes of action against Curtis. Defendants' Proposed Findings at 4 [Adversary Proceeding Docket No. 269]; Defendants' Objections to Plaintiff's Proposed Findings) at 5-6 [Adversary Proceeding Docket No. 270], *citing and quoting*, Schedule A/B – Assets – Real and Personal Property [Bankruptcy Case Docket No. 15].  The Bankruptcy Court initially notes that it is an open question in the Ninth Circuit whether or not the doctrine of judicial admissions applies to bankruptcy schedules.  *See, In re Barker*, 839 F.3d 1189, 1195-1196 (9th Cir. 2016).  Thus, the Bankruptcy Court has doubts about the applicability of the doctrine of judicial admission here.  The Bankruptcy Court also has doubts about whether these schedules are judicial admissions because the schedule of assets reflect the assets of the debtor and bankruptcy estate as of the date of the filing of the bankruptcy petition, the commencement of the bankruptcy case, and the Plaintiff had not filed a claim against Curtis at that time and there would have been no amount requested in a claim that had not been filed.  Moreover, Plaintiff in its bankruptcy schedules indicated that the current value of its potential causes of action against Curtis were unknown, which is not zero or no damages.   Finally, regarding Defendants' judicial admission argument, the

Bankruptcy Court notes that based on the pleadings, the damages claimed by the Plaintiff occurred after the date of the filing of its bankruptcy petition, that is, for additional accruals of interest and attorneys' fees on Acon's lien incurred after the petition was filed and for attorneys' fees and costs that were incurred by Plaintiff in bringing this adversary proceeding to expunge Defendants' Lien instituted after the petition was filed.  Thus, the statements in Plaintiff's bankruptcy schedules cannot be considered judicial admissions that there were no damages as the damages accrued afterwards and there is uncertainty in the law as to whether statements in bankruptcy schedules constitute judicial admissions.

287.    Defendants also argue that the Bankruptcy Court's Partial Summary Adjudication Order in favor of Plaintiff rendered the remaining issues in this adversary proceeding "moot" because the Bankruptcy Court determined that their purported mechanic's lien expired by operation of law and thus, Plaintiff should have mitigated its damages from incurring attorneys' fees and costs subsequently. Defendants' Objections to Plaintiff's Proposed Findings) at 10, 26 [Adversary Proceeding Docket No. 270].  This argument lacks merit because the Bankruptcy Court's Partial Summary Adjudication Order determining that Defendants' Lien was void was not a final judgment as not all the claims in the adversary proceeding were adjudicated pursuant to Federal Rules of Bankruptcy Procedure 7054 and Federal Rule of Civil Procedure 54, and Defendants did not act to release the Lien once the Bankruptcy Court granted partial summary adjudication to Plaintiff, and thus, the Lien remained and remains a cloud on title to Plaintiff's Property.  Moreover, Defendants have continued to oppose Plaintiff's remaining claim for slander of title, requiring Plaintiff to continue to litigate this adversary proceeding as Defendants have not conceded that the Lien is void and have not removed it from title to Plaintiff's Property.  Finally, the Bankruptcy Court partially modified and vacated the Partial Summary Adjudication Order, which retracted its ruling that the lien was void for failure to comply with the notice filing requirement of 11 U.S.C. § 546(b), and thus, the claims to void or remove the lien had to be tried.

288.    Defendants further argue that Plaintiff is estopped from claiming damages

122

from them because Plaintiff as the owner of real property received the benefit of

Defendants' labor, material and/or services, which enhanced the value of the property.

Defendants' Proposed Findings at 14 [Adversary Proceeding Docket No. 269].

Defendants argue that "[t]he real property interest of a person who did not contract for a

work of improvement on that property is subject to a lien if the work for which the lien is

claimed is provided with the person['s] knowledge" and that "[t]he owner has received the

benefit of the improvement, the noncontracting owner is placed in the position of a party

to the contract by the conclusive presumption that the work was done at his or her

instance or request." *Id., citing,* California Civil Code §8442(b); *Blakemore Equipment

Co. v. Braddock, Logan & Valley,* 269 Cal.App.2d 12, 17 (1969); *M. Arthur Gensler, Jr. &

Associates, Inc. v. Larry Barrett, Inc.,* 7 Cal.3d 695, 708 (1972); and *Nolte v. Smith,* 189

Cal.App.2d 140, 144 (1961).  Defendants argue factually that Plaintiff received the

benefits of Curtis's lumber, which enhanced Plaintiff's property, and while testimony from

Plaintiff's witnesses was that Plaintiff did not know who the lumber belonged to, it

accepted the benefits of the lumber.  *Id.*   While the Bankruptcy Court recognizes that the

legitimacy of these cited authorities, the Bankruptcy Court determines that these

authorities are inapposite because factually speaking, Plaintiff did not benefit from lumber

owned by Curtis, but lumber purchased by Eric Radley, and thus, there is no factual basis

for an estoppel to support a determination of the Lien at issue to be an equitable

mechanic's lien under California Civil Code § 8442(b).

289.    Regarding Defendants' estoppel argument, they alternatively assert that

there was an agreement between Curtis and Eric Radley for the purchase of the lumber

that supports an estoppel against Plaintiff.  Defendants' Objections to Plaintiff's Proposed

Findings at 4 and n. 1 [Adversary Proceeding Docket No. 270].  Defendants argue: "The

common law doctrine of estoppel created an agreement between Curtis and Plaintiff as a

result of Eric Radley's offer to Curtis on behalf of Plaintiff to pay for half the lumber and

Curtis'[s] acceptance of the offer."  *Id.* at 4.  However, as Defendants assert in a footnote:

"Eric Radley never paid the $500 or $1000 to Curtis because he did not have cash he

only had a check per Mc[A]rn's testimony."  *Id.* at 4 n. 1.  This assertion is an admission

by Defendants that there was a contract or agreement between Eric Radley and Curtis

for the joint purchase of the lumber as Plaintiff argues.  These circumstances, if true,

would indicate that Eric Radley and Curtis had a contract for purpose of the lumber

jointly, but Eric Radley breached the contract for nonpayment of his share of the

purchase price, and he would still be entitled to his share of the lumber, but owing Curtis

for his share of the purchase price.  However, as the Bankruptcy Court has found, Eric

Radley did pay for his one-half share of the joint purchase of the lumber by giving $1,000

in cash to Curtis.  Accordingly, the Bankruptcy Court determines that there is no estoppel

here to support a mechanic's lien because the lumber provided to Plaintiff was from Eric

Radley's one-half share of the lumber, not Curtis's one-half share.

290.    Defendants also make a second alternative assertion for their estoppel

argument that Curtis made a charitable subscription to Plaintiff: "Although Plaintiff alleges

Curtis and Plaintiff did not have an agreement for the lumber the contrary is true.  Curtis

always maintained in her testimony that she planned to donate some lumber to Plaintiff

the exact amount was never designated.  Curtis'[s] pledge was a charitable subscription

that was enforceable, against her, under the common law of promissory estoppel."

Defendants' Objections to Plaintiff's Proposed Findings at 4 [Adversary Proceeding

Docket No. 270].  The Bankruptcy Court determines that this alternative assertion lacks

merit because Defendants cite no legal authority in support this assertion and these

circumstances do not indicate any enforceable agreement to supply material to support a

mechanic's lien for failure of consideration as well as factually, the lumber provided to

Plaintiff came from Eric Radley.

291.    Defendants also argue that Plaintiff is not entitled to an award of attorneys'

fees because Plaintiff could not assign its right to obtain attorneys' fees to Plaintiff's

counsel because slander of title is a tort and the common law does not provide for

assignment of torts.   Defendants' Supplemental Brief on Mitigation at 10-11 [Adversary

Proceeding Docket No. 313].  Defendants argue that the Bankruptcy Court's order

approving the first interim fee application of counsel for Plaintiff [Bankruptcy Case Docket

No. 116] was an improper attempt to assign the right to proceed against them to recover

attorneys' fees and costs allegedly waived by counsel in the bankruptcy case.  *Id., citing,*

*Pony v. County of Los Angeles,* 433 F.3d 1138, 1145 (9th Cir. 2006).  Defendants

contend that as reflected in the order on counsel's first interim fee application, counsel's

commitment to pursue Defendants in the adversary proceeding was an accord and

satisfaction of the fee dispute between Plaintiff and its counsel and that the fee dispute

was resolved with accepting 50 percent of the claimed fees and agreeing to seek the

remainder of the claimed fees from Defendants, which Defendants argue is an accord

and satisfaction coupled with an assignment.  *Id.*  According to Defendants, the Ninth

Circuit held in the *Pony* case that a plaintiff may assign the right to collect attorneys' fees,

but it may not transfer the right to seek the fees, and therefore, an award of attorneys'

fees and costs against them may not be maintained.  *Id.*  The Bankruptcy Court finds and

concludes that Defendants' argument that Plaintiff may not seek an award of attorneys'

fees and costs on its slander of title claim in this adversary proceeding on grounds that

Plaintiff made an improper assignment of its right to proceed against them for fees and

costs lacks merit.  The operative agreement between Plaintiff and its counsel resolving

their dispute over counsel's first interim fee application in the bankruptcy case is set forth

in the Stipulation between Debtor and Levene, Neale, Bender, Yoo & Brill L.L.P.

Regarding First Interim Fee Application of Levene, Neale, Bender, Yoo & Brill L.L.P. for

Approval of Fees and Reimbursement of Expenses [Bankruptcy Case Docket No. 107]

which stated: "The Debtor [Plaintiff] approves of all of the fees and costs set forth in the

Application . . . . LNBYB [Plaintiff's counsel] will not seek recovery from the Debtor for

payment of any of the fees for services rendered by LNBYB in connection with the

Adversary Proceeding, except that any money that the Debtor or LNBYB may recover

from Defendants for awards of attorneys' fees and costs in favor of Debtor and against

Defendants in the Adversary Proceeding shall be used to pay LNBYB's fees and

expenses for services rendered in and related to the Adversary Proceeding."  This

language does not constitute an assignment of Plaintiff's rights to seek damages on its

tort claims as Defendants argue.  Under this language, Plaintiff maintained its rights to

seek and collect damages from Defendants on its claims in the adversary proceeding,

including the slander of title tort claim, but that it agreed that if Plaintiff recovered awards

of attorneys' fees and costs in its favor and against Defendants in the adversary

proceeding, Plaintiff and counsel agreed that such awards were to be used to pay

counsel's fees and expenses rendered in and related to the adversary proceeding.  The

case of *Pony v. County of Los Angeles* is inapplicable because that case involved an

express contractual provision between the plaintiff and her counsel in which she assigned

her right to seek an award of attorneys' fees to her counsel, which right is nonassignable

under California law applicable to personal injury torts as recognized by the Ninth Circuit.

In this case, there was no such assignment.  It also appears that *Pony v. County of Los

Angeles* is inapplicable because the California case law relied upon by the Ninth Circuit

to hold that tort rights are nonassignable only pertained to personal injury torts, and not

property torts like slander of title at issue in this case.

### F.  Whether the Attorneys' Fees and Costs Claimed by Plaintiff to Clear Title Were Reasonable and Necessary

292.    As previously noted, Plaintiff seeks an award of attorneys' fees and costs

on its first cause of action for slander of title.  The elements of slander of title are: (1) a

publication, (2) which is without privilege or justification, (3) which is false, and (4) which

causes direct and immediate pecuniary loss. *Manhattan Loft, LLC v. Mercury Liquors,

Inc.*, 173 Cal.App.4th at 1051.  As Plaintiff argues, attorneys' fees and litigation costs are

recoverable as pecuniary damages in a slander of title action when the litigation is

necessary to remove the doubt cast upon vendibility or value of plaintiff's property.

*Sumner Hill Homeowners' Association, Inc. v. Rio Mesa Holdings, LLC*, 205 Cal.App.4th

at 1032; *accord, Compass Bank v. Petersen*, 886 F.Supp.2d at 1198.  Plaintiff argues

that it has proved the purported mechanic's lien imposed by Defendants was a

publication which was recorded without privilege, which was false and caused pecuniary

loss because of the attorneys' fees and costs that Plaintiff incurred to remove the lien.

293.    As previously noted, Plaintiff incurred approximately $270,707.25 in

attorneys' fees to remove Defendants' $40,000 purported mechanic's lien, and as Plaintiff

acknowledges that at first glance, the fees appear excessive, but Plaintiff argues that considering the extensive litigation and Defendants' aggressive defense of their invalid mechanic's lien, these attorneys' fees are reasonable and should be awarded to Plaintiff. That is, according to Plaintiff, it is entitled to attorneys' fees and costs it now claims because it prevailed on its slander of title cause of action to remove Defendants' lien as a cloud on title to its property.

294.    As recognized in the *Sumner Hill Homeowners' Association* case, "[w]hen a defendant's tortious conduct (i.e., the unprivileged publication of a falsehood constituting a slander of title) forces the plaintiff to litigate in order to clear his title, the plaintiff's attorneys' fees and costs are necessary to accomplish that purpose constitute actual harm or injury to the plaintiff that was proximately caused by the tort and therefore should be compensated." 205 Cal.App.4th at 1032, *citing Wright v. Rogers,* 172 Cal.App.2d 349, 366 (1959). Accordingly, attorneys' fees and costs are recoverable as damages for pecuniary loss from a slander of title, and such damages are "independently recoverable, and are not merely an add-on to other forms of pecuniary loss." *Id.* at 1031-1032.

295.    Also, as stated in *Sumner Hill Homeowners' Association,* "'Pecuniary loss' is an essential element of a slander of title cause of action." 205 Cal.App.4th at 1030, *citing and quoting, Manhattan Loft, LLC v. Mercury Liquors, Inc.,* 173 Cal.App.4th at 1057. As further stated by the court in *Sumner Hill Homeowners' Association,* "[t]his element is described in the Restatement Second of Torts, section 633, subdivision (1), as follows: 'The pecuniary loss for which a published of injurious falsehood is subject to liability is restriction to [¶] (a) the pecuniary loss that results directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by disparagement, and [¶] (b) *the expense of measures reasonably necessary to counteract publication, including litigation to remove the doubt cast upon vendibility or value by disparagement.'"* 205 Cal.App.4th at 1030 (italics added in original). Regarding this Restatement provision, the court in *Sumner Hill Homeowners' Association* stated: "California courts have adopted the Restatement definition of pecuniary damages for purposes of a slander of title cause of action." *Id., citing inter alia, Appel v. Burman,* 159

Cal.App.3d 1209, 1215 (1984).  Significantly for purposes of this case, the Bankruptcy

Court notes that "the expense of measures reasonably necessary to counteract

publication, including litigation to remove the doubt cast upon vendibility or value by

disparagement" are compensable as pecuniary loss damages with an emphasis on

"reasonably necessary" measures.  *Id.; see also, Wright v. Rogers,* 172 Cal.App.3d at

366 ("The Restatement says the publisher of disparaging matter is liable for 'the expense

of litigation reasonably necessary to remove the doubt cas[t] by the disparagement upon

the other's property in the thing or upon the quality thereof.' (Rest., Torts, § 633(b).)").

296.    In *Mai v. HKT Cal, Inc.*, 66 Cal.App.5th 255 (2021), the court made

instructive comments regarding claiming attorneys' fees as damages applicable here:

> In limited circumstances, it is permissible for plaintiffs to recover attorney's fees as damages. The claim that Mai made here—that she was forced to procure the services of an attorney to defend herself in the Fike suit as a result of Robinson's fraud—falls into one of these limited categories known as the "tort of another" theory. While such doctrines are sometimes described as exceptions to the general "American rule" that each party pays for their own attorney's fees (see, e.g., *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505, 198 Cal.Rptr. 551, 674 P.2d 253; *Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1155, 230 Cal.Rptr. 276), this characterization can be misleading. It is better to conceptualize these cases as claims for compensatory damages where the facts happen to permit the plaintiff to seek attorney's fees as a type of compensatory award. As our Supreme Court has stated, attorney's fees that are recoverable as damages function in "the same way that medical fees would be part of the damages in a personal injury action." (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817, 210 Cal.Rptr. 211, 693 P.2d 796 (*Brandt*).) In this context, an award of fees is "not really an 'exception' at all but an application of the usual measure of ... damages." (*Sooy v. Peter* (1990) 220 Cal.App.3d 1305, 1310, 270 Cal.Rptr. 151 (*Sooy*).)

> For that reason, it is critical to distinguish attorney's fees as damages "from 'attorney's fees qua attorney's fees.' " (*Third Eye Blind, Inc. v. Near North Entertainment Ins. Services, LLC* (2005) 127 Cal.App.4th 1311, 1325, 26 Cal.Rptr.3d 452.) Although this fundamental distinction has been described repeatedly (*see Brandt, supra*, 37 Cal.3d at p. 817, 210 Cal.Rptr. 211, 693 P.2d 796; *Sooy, supra*, 220 Cal.App.3d at p. 1310, 270 Cal.Rptr. 151), it persists in causing occasional confusion in both trial and appellate courts. But the distinction is far more than academic. It affects the burden that plaintiffs bear to produce evidence in support of their substantive claims, and it differs in significant ways from the requirements for a posttrial motion for fees as costs. (See Code Civ. Proc., § 1033.5, subd. (a)(10).).

*Id.* at 260-261 (footnotes omitted).

297.    The court in *Mai* provided additional guidance in showing how attorneys'

fees as damages are proven:

> . . . In our view, the considerations are quite different when reviewing a judgment following a full trial, as opposed to a postjudgment motion where most or all the evidence is presented by declaration. Moreover, it is difficult to justify a different rule for proving attorney fees than would apply to other similar expenses recoverable as damages. Rather than looking to the standards governing posttrial motions for attorney's fees, as *Copenbarger* did, we find more helpful guidance in the general principles governing a plaintiff's burden of production to establish compensatory damages.
>
> The plaintiff's responsibility in making a preliminary showing of medical expenses in personal injury cases provides a helpful starting place, since it constitutes a close analogue: " 'When a pedestrian is struck by a car, he goes to a physician for treatment of his injuries, and the motorist, if liable in tort, must pay the pedestrian's medical fees. Similarly, ... an insurance company's refusal to pay benefits has required the insured to seek the services of an attorney to obtain those benefits, and the insurer, because its conduct was tortious, should pay the insured's legal fees.' " (*Brandt, supra*, 37 Cal.3d at p. 817, 210 Cal.Rptr. 211, 693 P.2d 796.) Phrasing the *Brandt* principle for broader application on the facts of our case, where a defendant's conduct requires the plaintiff to incur attorney's fees in prosecuting or defending a lawsuit (generally involving a third party), the defendant should pay the plaintiff's legal fees.  To support a claim for medical expenses as damages, plaintiffs must demonstrate the amount of each claimed expense. (Haning et al., *California Practice Guide: Personal Injury* (2020) Damages, ch. 3-C, §§ 3:350–3:351.) Beyond this, plaintiffs must also show the expenses were reasonable and incurred as a result of injuries caused by the defendant. (*McAllister v. George* (1977) 73 Cal.App.3d 258, 264, 140 Cal.Rptr. 702 (*McAllister*); *Gimbel v. Laramie* (1960) 181 Cal.App.2d 77, 81, 5 Cal.Rptr. 88 (*Gimbel*).) Testimony that they paid the cost of medical treatment for injuries caused by the defendant is sufficient evidence that such costs were reasonable, and satisfies the plaintiff's initial burden of production. (*Malinson v. Black* (1948) 83 Cal.App.2d 375, 379, 188 P.2d 788 (*Malinson*).)
>
> Similar standards govern other cases involving damage to property. (See, e.g., *Laubscher v. Blake* (1935) 7 Cal.App.2d 376, 383, 46 P.2d 836 [finding the cross-complainant's evidence that he paid a certain amount to repair his car in an accident caused by the defendant sufficient to support the award of damages].) We see no reason why the same principles should not apply in any case where the plaintiff pays for professional services to deal with the consequences of the defendant's unlawful action, and then seeks to recover those costs as compensatory damages against the defendant. A prima facie case as to the costs

incurred and their reasonableness can be established by the plaintiff's testimony that bills for the services were paid.

*Id.* at 265-266.

298.    Based on this standard set forth in *Sumner Hill Homeowners' Association and Mai,* Plaintiff must show that the attorneys' fees and costs it claims as damages from the disparagement of title of its property were reasonable and necessary to remove the lien as a disparaging cloud on title with evidence that the fees and costs were actually incurred.  Where attorneys' fees and costs are claimed as damages, they are not awarded as costs pursuant to California Code of Civil Procedure § 1021, for example, but as proven up as an element of damages as part of the substantive claim.  *Id.*  In this case, Plaintiff's claim of damages from incurring attorneys' fees and costs on its slander of title claim is determined by the court as the trier of fact, here, the Bankruptcy Court subject to de novo review by the District Court.

299.    Plaintiff has shown that the attorneys' fees and litigation costs to remove the Lien as a disparaging cloud on title were actually incurred as shown by evidence admitted at trial that services were rendered by its counsel for services to remove the lien as a cloud on title in the form of invoices from counsel with billing entries for each service rendered as attested to by the declaration of its counsel, Mr. Fritz.  Records of Attorneys' Fees in Format Requested by the Court; Declaration of John-Patrick M. Fritz, Esq., Adversary Proceeding Docket No. 275, filed on February 25, 2022; 6/29/22 Trial Transcript at 168.  That Plaintiff is obligated to pay these fees and expenses for counsel's services representing Plaintiff in the bankruptcy case, including any adversary proceedings, is substantiated by the employment application of its counsel [Adversary Proceeding Docket No. 17) signed by its president, McArn, and its counsel, Mr. Fritz, which application was approved by court order [Adversary Proceeding Docket No. 26], as well as the Retainer Agreement between counsel and Plaintiff, which was filed at the Bankruptcy Court's request [Adversary Proceeding Docket No. 320]..  This obligation was modified by the stipulation between Plaintiff and counsel on counsel's first interim fee application providing that counsel would agree to limit payment of its allowed fees and

costs in a certain amount, but that any award of attorneys' fees and costs in the adversary proceeding would be used to pay the entire allowed fee amount [Adversary Proceeding Docket No. 107].  Although Plaintiff has not paid the attorneys' fees and costs billed by its counsel as claimed as damages in this adversary proceeding, Plaintiff is contractually obligated to pay such attorneys' fees and costs if awarded in this adversary proceeding to counsel pursuant to the agreement for employment authorization for counsel as approved by the Bankruptcy Court and the subject contract modification between Plaintiff and counsel.  While cases such as *Mai v. HKT Cal, Inc.*, and the cases cited therein indicate that proof of payment of attorneys' fees by a plaintiff is sufficient evidence to establish a prima facie case of attorneys' fees as damages, those cases did not state that this is the only method of proving attorneys' fees as damages.  The Bankruptcy Court finds and concludes that these arrangements establish that Plaintiff will have suffered such damages in the form of attorneys' fees and costs allowed and awarded in this adversary proceeding.  That is, the documentation of the retainer agreement between Plaintiff and counsel, the employment application for counsel signed by Plaintiff's president, the modification of the employment agreement by stipulation between Plaintiff and counsel, the billing entries prepared by counsel who testified under oath in his declarations filed in support of the fee motions and at trial as well as his testimony at trial are sufficient to establish a prima facie showing that Plaintiff incurred attorneys' fees and expenses to remove Defendants' lien.

300.    In this case, the Bankruptcy Court conducted two additional days of trial on the issue of attorneys' fees and costs as damages.  Defendants were provided with the billing entries and the counsel declaration in support thereof in advance of trial, and they had the opportunity to cross-examine the attorney who performed the services reflected in the billing entries and to offer evidence in opposition thereto.  The Bankruptcy Court made oral rulings on the billing entries and Defendants' objections thereto as reflected on Exhibit 1 attached thereto, which was prepared by Plaintiff's counsel and submitted with Plaintiff's proposed findings of fact and conclusions of law [Adversary Proceeding Docket No. 309].

301.    "A judge may also take judicial notice of the documents the plaintiff's attorney prepared that are in the court file as a means of providing evidence of the legal work that was performed."  California Center for Judicial Education & Research, *California Judges Benchbook: Civil Proceedings – Trial,* §16.45 (online edition, June 2022 update), citing, *Mai v. HKT Cal, Inc.,* 66 Cal.App.5th at 523-525.  "The court [in *Mai v. HKT Cal, Inc.*] also held that a judge has the ability and discretion to make midtrial adjustments in procedure to remedy what the judge considers a manifestly unfair result. *Id., citing, Mai v. HKT Cal., Inc.,* 66 Cal.App.5th at 511, 526.

302.    Allowance and awarding of Plaintiff's attorneys' fees and costs against Defendants in this adversary proceeding as pecuniary loss damages are dependent on Plaintiff's showing that such fees and costs were necessary and reasonable.  *See, e.g., Frank Pisano & Associates v. Taggart,* 29 Cal.App.3d at 25 ("The pecuniary loss for which a publisher of disparaging matter is liable is restricted to that pecuniary loss which directly and immediately results from the impairment of vendibility or the thing in question caused by the publication of the disparaging matter and ***the expense of litigation reasonably necessary to remove the doubt cast by the disparagement on the property***.") (emphasis added), *citing, Davis v. Wood,* 61 Cal.App.2d 788, 797 (1943); *Gudger v. Manton,* 21 Cal.2d 537, 554-555 (1943); Restatement of Torts (First), §624 (1938)(online edition March 2023 update).

303.    The guidance in California law as to what the standard is for the Bankruptcy Court to apply in this case in determining an award of attorneys' fees and costs as damages for a tort is sparse in that the award is not statutory or contractual, and not made as costs, but as damages, and there is little case law on what constitutes reasonable and necessary expenses, that is, whether the lodestar method, percentage method or some other method should be applied.  *See* California Center for Judicial Education & Research, California Judges Benchbook: Civil Proceedings – Trial, §16.45 (general rule), §§ 16.100-14.104 (statutory fees – lodestar method) and §§16.133-16.135 (nonstatutory fees for common fund and substantial benefit cases – percentage method). As previously noted, the court in *Sumner Hill Homeowners' Association,* following the

Restatement Second of Torts, section 633, subdivision (1), stated that pecuniary loss damages from a slander of title includes "*the expense of measures reasonably necessary to counteract publication, including litigation to remove the doubt cast upon vendibility or value by disparagement.*'" 205 Cal.App.4th at 1030 (italics added in original).  In other words, in this case, Plaintiff must show that it incurred reasonable and necessary expense, including attorneys' fees to remove Defendants' improper mechanic's lien.  As to what constitutes reasonable and necessary fees, the Bankruptcy Court looks to the law of determining reasonable and necessary attorneys' fees under the Bankruptcy Code by analogy.

304.    In that the attorneys' fees and costs at issue were incurred by Plaintiff pursuant to the employment agreement between Plaintiff and its counsel approved by the Bankruptcy Court in this case, which provides for compensation for professional services rendered pursuant to 11 U.S.C. § 330.  Thus, the Bankruptcy Court considers the application of the standard for allowance of reasonable and necessary fees under 11 U.S.C. § 330 as helpful guidance in determining whether the fees and expenses to remove Defendants' lien were reasonable and necessary.  However, the analysis of determining attorneys' fees and litigation costs as damages for a tort is not exactly the same as reasonable compensation of bankruptcy estate professionals under 11 U.S.C. § 330 as evaluating whether or not attorneys' fees and litigation costs were reasonable and necessary to remove a cloud on title is somewhat retrospective as to what actually was reasonable and necessary to effectuate relief in removing the lien as opposed to what is reasonably likely to benefit the estate, which is more of a prospective view.

305.    The Bankruptcy Court cites and quotes one of its recent opinions on allowance and awarding reasonable and necessary attorneys' fees under 11 U.S.C. § 330 in *In re Trinh*, No. 2:18-bk-117475-RK Chapter 7, 2022 WL 898758 (Bankr. C.D. Cal. Mar. 28, 2022):

**11 U.S.C. § 330**

Under 11 U.S.C. § 330(a)(1), a bankruptcy court is authorized to award "reasonable compensation for actual, necessary services rendered by ... an

attorney" and any paraprofessional person employed by an attorney. The court also has the power to award a reduced fee to a professional requesting compensation under Section 330. 11 U.S.C. § 330(a)(2).

In determining fees allowed to a professional of a bankruptcy estate, the court must examine "all relevant factors, including: (A) the time spent on [the] services; (B) the rates charged for [the] services; (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of [the case]; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in [nonbankruptcy cases]." 11 U.S.C. § 330(a)(3). The court also must not allow compensation for (i) unnecessary duplication of services, or (ii) services that were not:

> (I) Reasonably likely to benefit the debtor's estate, or
> (II) Necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A)(ii).

**ii. The Lodestar Method**

Courts customarily apply a formula known as the 'lodestar' method to complement these statutory factors, multiplying a reasonable number of hours expended by a reasonable hourly rate to determine allowable compensation. *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 960 (9th Cir. 1991); *In re Manoa Finance Co., Inc.,* 853 F.2d 687, 691 (9th Cir. 1988). In *Manoa Finance Company*, the Ninth Circuit held that a compensation award based on the lodestar method is "presumptively a reasonable fee." 853 F.2d at 691. Although courts customarily begin a fee determination by applying the lodestar method—the "primary" fee calculation formula adopted by the Ninth Circuit—the lodestar is not exclusively applied, given the "uniqueness of bankruptcy proceedings." *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.,* 924 F.2d at 960. Further, a court may downwardly adjust a law firm's fees with reference to the work actually and reasonably performed, the value of that work to the estate, the performance of the firm's attorneys, the reasonable hourly rates for such work, and the prevailing community rates, among other factors. *In re Morry Waksberg M.D., Inc.*, 692 Fed. Appx. 840, 842 (9th Cir. June 6, 2017) (*quoting In re Manoa Finance Co., Inc.*, 853 F.2d at 691).

When determining the amount of reasonable fees, the court's examination ... should include the following questions: First, were the services authorized? Second, were the services necessary or beneficial to the administration of the estate at the time they were rendered? Third, are the services adequately documented? Fourth, are the fees requested reasonable, taking into consideration

the factors set forth in § 330(a)(3)? Finally, ... the court must [also consider] whether the professional exercised reasonable billing judgment.

*In re Mednet*, 251 B.R. 103, 108 (9th Cir. BAP 2000) (citation omitted).

Regarding the requirement that bankruptcy estate professionals exercise billing judgment, the Ninth Circuit has stated that employment authorization does "not give [the professional] free reign to run up a tab without considering the maximum probable recovery." *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.*, 924 F.2d at 958. Before undertaking work on a bankruptcy matter, a professional is obligated to consider:

(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?

(b) To what extent will the estate suffer if the services are not rendered?

(c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

Id. at 959-960 (citation omitted). Moreover, " '[w]hen a cost benefit analysis indicates that the only parties who will likely benefit from [a service] are the trustee and his professionals,' the service is unwarranted and a court does not abuse its discretion in denying fees for those services." *In re Mednet*, 251 B.R. at 108-109 (*quoting In re Riverside-Linden Investment Co.*, 925 F.2d 320, 321 (9th Cir. 1991)).

A bankruptcy court has broad discretion to determine the number of hours reasonably expended by a professional. *Wechsler v. Macke International Trade, Inc. (In re Macke International Trade, Inc.)*, 370 B.R. 236, 254 (9th Cir. BAP 2007). "[E]ven where evidence supports [that] a particular number of hours [were] worked, the court may give credit for fewer hours if the time claimed is 'excessive, redundant, or otherwise unnecessary.' " *Id. (quoting Dawson v. Washington Mutual Bank, F.A. (In re Dawson)*, 390 F.3d 1139, 1152 (9th Cir. 2004)).

While "the applicant must demonstrate only that the services were 'reasonably likely' to benefit the estate at the time the services were rendered," *In re Mednet*, 251 B.R. at 108, "an attorney fee application in bankruptcy will be denied to the extent that the services rendered were for the benefit of the debtor and did not benefit the estate." *In re Crown Oil, Inc.*, 257 B.R. 531, 540 (Bankr. D. Mont. 2000) (quoting *Keate v. Miller (In re Kohl)*, 95 F.3d 713 (8th Cir. 1996)) (citations and internal quotation marks omitted). "This rule is based on the legislative history of the Bankruptcy Code section 330(a) and the unfairness of allowing the debtor to deplete the estate by pursuing its interests to the detriment of creditors." Id. (citations and internal quotation marks omitted). "The same unfairness occurs when a debtor's professionals seek to deplete the estate ... to the detriment of the estate and creditors." *In re Crown Oil, Inc.,* 257 B.R. at 540.

Nevertheless, the court in *Crown Oil* observed:

> ... [Courts] do not conclude that only successful actions may be compensated under § 330. To the contrary, so long as there was a reasonable chance of success which outweighed the cost in pursuing the action, the fees relating thereto are compensable. Moreover, professionals must often perform significant work in making the determination whether a particular course of action could be successful. Such services are also compensable so long as, at the outset, it was not clear that success was remote.

*In re Crown Oil, Inc.*, 257 B.R. at 541 (*quoting In re Jefsaba, Inc.*, 172 B.R. 786, 789 (Bankr. E.D. Pa. 1994)) (internal quotation marks omitted). That is, as the court in *Crown Oil* further observed:

> One bankruptcy court writes: "The Court does not expect the attorney to succeed in every endeavor he undertakes on behalf of the client. But the endeavor for which the estate is expected to pay must be reasonably calculated to produce a benefit to the estate."

*In re Crown Oil, Inc.*, 257 B.R. at 241 (*quoting In re Hunt*, 124 B.R. 263, 267 (Bankr. S.D. Ohio 1990).

*In re Trinh*, slip op. at *3-5.

306.    The Bankruptcy Court has also found instructive observation of the Supreme Court of the United States in *Hensley v. Eckerhart,* 461 U.S. 424 (1983), although involving a statutory fee award pursuant to 42 U.S.C. §1988:

> A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee. Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates. The applicant should exercise "billing judgment" with respect to hours worked, see *supra,* at 1939–1940, and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.

> We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award. When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained.

1

*Id.* at 437-438 (footnote omitted).

2

307.    As previously noted, Plaintiff has acknowledged that it incurred

3

4

approximately $270,707.25 in attorneys' fees to remove a $40,000 purported mechanic's

5

lien of Defendants, which Plaintiff is now claiming as damages for having to remove the

6

lien.  Plaintiff argues that at first glance, the fees appear excessive, but considering the

7

extensive litigation and Defendants' aggressive defense of their invalid mechanic's lien,

8

the attorneys' fees are reasonable and should be awarded to Plaintiff.  That is, according

9

to Plaintiff, it is entitled to all of these claimed attorneys' fees and costs because it

prevailed in its slander of title cause of action.

10

308.    As the Supreme Court stated in *Hensley v. Eckerhart*, "Ideally, of course,

11

litigants will settle the amount of a fee."  461 U.S. at 437.  Although Plaintiff offered at trial

12

to settle the amount of fees as damages at $135,000, or half of the claimed fees, there

13

14

was no settlement as Defendants rejected Plaintiff's offer.  6/29/22 Trial Transcript at 7-

19.

15

309.    As the Supreme Court further stated in *Hensley v. Eckerhart*, "Where

16

settlement is not possible, the fee applicant bears the burden of establishing entitlement

17

to an award and documenting the appropriate hours expended and hourly rates."  461

18

U.S. at 437.  As previously stated, *Hensley v. Eckerhart* was a statutory fee case in which

19

the lodestar method is generally applied.

20

310.    In this case, Plaintiff's counsel offered its billing statements with individual

21

billing entries showing the hours expended and hourly rates for services rendered to

22

Plaintiff in work to remove Defendants' purported mechanic's lien, which were received

23

into evidence, and during two days of trial, counsel gave testimony regarding these

24

services, which was subject to cross-examination by Defendants, who were given the

25

billing statements in advance of trial and were able to file written objections to the billing

26

statements and entries.  6/29/22 Trial Transcript at 26-226; 6/30/22 Trial Transcript at 8-

65.

27

311.    The Bankruptcy Court has reviewed Defendants' written objections to the

28

Individual billing entries and statements of Plaintiff's counsel, noting that the objections to the individual billing entries were categorial objections, which were already reflected in Defendants' pleadings already addressed above, and not specifically addressed to the individual billing entries themselves.  The Bankruptcy Court made oral rulings on Defendants' objections to the individual billing entries, which are reflected in Exhibit 1 attached hereto, which had been prepared and submitted by Plaintiff with its proposed findings of fact and conclusions of law [Adversary Proceeding Docket No. 309]. Generally speaking, the Bankruptcy Court finds and concludes that Plaintiff's counsel documented the hours expended and the hourly rates for work actually performed for Plaintiff to remove Defendants' lien as reflected on Exhibit 1 attached hereto, which note the Bankruptcy Court's oral rulings at trial.  The Bankruptcy Court considers these oral rulings as tentative as it believes that they are not the end of the analysis.

312.    As the Supreme Court also stated in *Hensley v. Eckerhart*, the applicant (i.e.,counsel "should exercise 'billing judgment' . . . ."  461 U.S. at 437.  In this regard, the Supreme Court in *Hensley v. Eckerhart* elaborated by stating:

> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting.  It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

*Id.* at 434.

313.    In the bankruptcy context, "billing judgment" is important also as a requirement of 11 U.S.C. § 330 that bankruptcy estate professionals exercise billing judgment as the Ninth Circuit has stated that employment authorization does "not give [the professional] free reign to run up a tab without considering the maximum probable recovery." *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.,* 924 F.2d at

958.  That is, before undertaking work on a bankruptcy matter, a professional is obligated

to consider:  (a) Is the burden of the probable cost of legal services disproportionately

large in relation to the size of the estate and maximum probable recovery? (b) To what

extent will the estate suffer if the services are not rendered?  (c) To what extent may the

estate benefit if the services are rendered and what is the likelihood of the disputed

issues being resolved successfully?  *Id.* at 959-960 (citation omitted). Moreover, " '[w]hen

a cost benefit analysis indicates that the only parties who will likely benefit from [a

service] are the trustee and his professionals,' the service is unwarranted and a court

does not abuse its discretion in denying fees for those services." *In re Mednet*, 251 B.R.

at 108-109 (*quoting In re Riverside-Linden Investment Co.*, 925 F.2d 320, 321 (9th Cir.

1991)).

314.    In hindsight, it is problematic to award Plaintiff attorneys' fees of some

$270,000 as reasonably and necessarily incurred to remove a $40,000 purported lien

clouding title, or the amount of fees was six, almost seven, times the amount of the lien

amount.  That is, as Defendants argue, Plaintiff could have saved itself much of these

incurred fees by paying them off their fraudulent mechanic's lien, which as Plaintiff

argues that to make payment of such unreasonable tribute would have breached its

fiduciary duty to the creditors of the bankruptcy estate.  While the Bankruptcy Court

agrees with Plaintiff's position, this agreement does not necessary mean that every fee

that has been billed by Plaintiff's counsel was reasonable and necessary to remove

Defendants' Lien.

315.    In Plaintiff's counsel's first fee motion covering the period from January 17,

2018 to November 5, 2019, fees totaling $189,757.50 for 364.5 hours of professional time

and costs totaling $6,351.05 were sought.  Adversary Proceeding Docket No. 146, filed

on November 26, 2019, at 23-37 [internal page citation at 20-34] and Exhibits A and B

attached thereto (billing entries and breakdown of costs).  The first fee motion stated that

the authority for such fees and costs was California Civil Code § 8488(c).  *Id.* at 32

[internal page citation at 29].  In the reply to Defendants' opposition to the first fee motion,

counsel provided a breakdown of the fees as follows: (1) Prosecution of Complaint:

139

$47,334.50; (2) Personal Jurisdiction and Default Judgment Dispute: $26,312.00; and (3) Responding to Defendants' Motions and Discovery: $115,314.00.  Adversary Proceeding Docket No. 153, filed on December 10, 2019, at 10-22 (internal page citation at 5-17).

316.    In Plaintiff's counsel's second fee motion covering the period from November 6, 2019 to April 19, 2021, fees totaling $95,913.00 for 172.3 hours of professional time and costs totaling $6,351.05 were sought.  Adversary Proceeding Docket No. 221, filed on April 29, 2021, at 19-29 (internal page citations at 22-32 and Exhibits A and B attached thereto (billing statements and breakdown of costs).  In the reply to Defendants' opposition to the second fee motion, additional fees totaling $28,198.50 were sought for the period from April 29, 2021 to January 11, 2022.  Docket No. 273, filed on January 12, 2022 at 16-18 (internal page citation at 14-16) and Exhibits A and B attached thereto (billing entries and breakdown of costs).  According to the billing entries for the second fee motion and the reply, most of the services listed in the billing entries were for trial preparation and work.

317.    Regarding billing judgment of its counsel, as previously noted, Plaintiff argues that this adversary proceeding could have been much simpler, except that Defendants willfully engaged the Plaintiff in numerous and repetitive procedural skirmishes to cause delay and increase the cost of litigation, including: (i) a motion challenging personal jurisdiction; (ii) a motion to dismiss the complaint for failure to state a claim for which relief could be granted, which Plaintiff ultimately defeated; (iii) an attempt to avoid deposition and production of documents, which Plaintiff ultimately defeated; (iv) attempts to avoid the deposition of Ammec's officer and person most knowledgeable, Carlos Montenegro, which the Plaintiff did not overcome because the Plaintiff decided that it was not economical to incur additional expenses by commencing more discovery dispute motions against Defendants; (v) attempts to harass Plaintiff and its management by forcing a deposition to be taken on Plaintiff's Property and bringing a motion on this discovery dispute, which Plaintiff ultimately defeated; (vi) Defendants' premature motion for summary judgment that argued for a lien-pass-through theory that would have eviscerated the Bankruptcy Code's ability to address disputed liens, which

Plaintiff ultimately defeated; and (vii) a wildly off-point opposition to the Plaintiff's motion

for partial summary adjudication, which Plaintiff ultimately overcame and prevailed.

According to Plaintiff, to sum up, this litigation was made expensive by Defendants'

extremely aggressive and unsupportable litigation tactics.  According to Plaintiff, this

adversary proceeding could have been comprised of a complaint, an answer, three

depositions (Curtis and two employees from Habitat for Humanity), and two days of trial.

Actually, this is a fair assessment of what was reasonable and necessary to remove

Defendants' lien as discussed herein.

318.    While the Bankruptcy Court agrees with Plaintiff's observation that the

adversary proceeding could have been much simpler, the Bankruptcy Court's agreement

does not necessary mean that every fee that has been billed by Plaintiff's counsel was

reasonable and necessary to remove Defendants' Lien.  Having reviewed all of the

pleadings, including the original and amended complaints and the responses thereto and

having presided over all of the litigation proceedings, the Bankruptcy Court is thoroughly

familiar with the nature of the proceedings in this litigation.  As such, the Bankruptcy

Court is of the view that this litigation was rather simple and straightforward as the key

factual issues were whether (1) Eric Radley and Curtis jointly purchased the lumber that

Plaintiff obtained and used or Curtis purchased it on her own; (2) if Curtis purchased on

her own, whether Plaintiff benefitted from use of her lumber knowing it came from her.

These factual issues were raised in Plaintiff's first cause of action for slander of title and

third cause of action for avoidance of lien.  Factually, if Eric Radley bought the lumber

obtained by Plaintiff or he stole it without Curtis's agreement, there was no basis for

Defendants' mechanic's lien which required an agreement between Plaintiff and

Defendants for them to provide materials to Plaintiff (i.e., the lumber).  The

preponderance of the evidence as discussed above showed that the lumber obtained by

Plaintiff was purchased by Eric Radley, and there was no basis for Defendants to claim a

mechanic's lien for that lumber, and there was never any agreement between Defendants

to Plaintiff for them to provide Plaintiff with the lumber to base a mechanic's lien in favor

of Defendants, and there was no factual basis for valuing the lien at the inflated price of

$40,000.

319.    In the Bankruptcy Court's view, this adversary proceeding involved rather ordinary, straightforward civil tort litigation claims.  However, as Plaintiff argues, complexity was added in this adversary proceeding due to Defendants' obstructionist litigation tactics and positions.  The Bankruptcy Court agrees with this argument to some extent, but it does not agree that all of the claimed fees and costs were reasonable and necessary to remove Defendants' Lien.

320.    As previously noted, Plaintiff argues that the time, services rendered, and fees directly related to prosecuting the Plaintiff's claim against Defendants were not out of proportion with the amount of their purported mechanic's lien.  That is, according to Plaintiff, these were core activities necessary to prosecute this lawsuit by the Plaintiff: (1) initial investigation of the claim [January 2018]; (2) preparation of the complaint [May 2018]; (3) preparation of a joint status report, exchanging Federal Rule of Civil Procedure 26 disclosures, and attending the status conference [January 2019]; (4) propounding discovery [February 2019]; (5) preparing a motion for partial summary adjudication, attending the hearing thereon, and preparing the order [August, September, November 2019].  All of these tasks totaled $47,334.50.  Plaintiff argues that with a base claim of $40,000, plus interest and Defendants' potential attorneys' fees, the amount of $47,334.50 incurred for Plaintiff's attorneys' fees are not out of proportion for the amount at issue.  Plaintiff further argues that by way of analogy, California state law permits disputed mechanic's liens to be released with a bond "in an amount equal to 125% of the amount of the claim of the lien."  California Civil Code § 8424(b).  Plaintiff notes that an amount of $50,000 is equal to 125% of the $40,000 disputed mechanic's lien and that Plaintiff's total attorneys' fees and costs related to this task are below this amount.

321.    The Bankruptcy Court does not agree with this analysis and does not adopt this argument of Plaintiff to justify these fees.  First of all, these fees only represent a small portion of the total fees claimed by Plaintiff and should not be considered in isolation.  That is, the Bankruptcy Court determines that it needs to evaluate Plaintiff's

1   request for an award of fees in its totality.  Second, even looking at these fees in

2   isolation, the Bankruptcy Court would find that not all of the fees were reasonable and

3   necessary.  For example, the fees claimed for attending the status conference on

4   January 28, 2019 in the amount of $1,914 (2.9 hours for preparation and attendance)

5   appears excessive in a case where the amount in controversy is $40,000.  Counsel

6   appeared in person for the status conference rather remotely by telephone, which is a

7   matter which involves billing discretion.  The amount of fees for work on Plaintiff's motion

8   for partial summary adjudication of $24,650 (42.3 hours of work at an hourly billing rate of

9   $580) [16] appears excessive in a $40,000 case, especially since the only issue was a legal

10  one whether Defendants timely filed a lawsuit or equivalent notice to enforce their

11  purported mechanic's lien within 90 day statutory time period, and whether the deadline

12  to file such enforcement lawsuit was tolled from the automatic stay which arose upon

13  Plaintiff's bankruptcy case filing.  Because Plaintiff's partial summary adjudication motion

14  was essentially about this one legal issue, in the Bankruptcy Court's view, it was not

15  reasonable and necessary to have expended 42.3 hours of attorney time on what should

16  have been a simple motion, and moreover, as it turns out, granting partial summary

17  adjudication on this issue was not reasonable or necessary as subsequently Ninth Circuit

18  case law clarified that the deadline was tolled, and there was no basis to avoid the lien for

19  failure to file a notice under 11 U.S.C. § 546(b) as argued by Plaintiff in its motion for

20  partial summary adjudication.  The temporary granting of Plaintiff's summary adjudication

21  motion which the Bankruptcy Court later rescinded based on newly determined case law

22  did not result in services reasonable and necessary to remote the lien as the lien was not

23  eventually removed based on partial summary adjudication.  The case had to be tried on

24  the factual issues of whether the lumber which was the subject of Defendants' lien was

25

26

27

28

---

[16] In these proposed findings of fact and conclusions of law, the Bankruptcy Court has made rough computations of time spent on specific proceedings or tasks based on the billing entries reflected on Exhibit 1 attached hereto.  The Bankruptcy Court in its computations has attempted to be accurate as possible in these computations, but they may not be exact.

jointly purchased by Eric Radley and Greta Curtis or Greta Curtis alone, and if Curtis purchased the lumber alone, whether she had a lien for benefiting Plaintiff with a gift of the lumber, or whether Eric Radley converted the lumber on Plaintiff's behalf.

322.    Not much discovery was needed to try this matter as Plaintiff knew that its case was based on the testimony of its witnesses, Eric Radley and Barrington Radley, that Eric Radley jointly purchased the lumber with Greta Curtis and the lumber that he took for Plaintiff was from his one-half share, and Plaintiff only needed to take the deposition of Greta Curtis as a participant in the lumber purchase transaction and to take the deposition of Habitat for Humanity regarding the purchase price of the lumber since Curtis inflated the value of the lumber.  Accordingly, the Bankruptcy Court does not find and conclude that the sum total of $47,334.30 was reasonable and necessary for these services based on counsel's exercise of billing judgment.

323.    Plaintiff further argues that beyond the sum of $47,334.50 discussed immediately above, the Bankruptcy Court should find and conclude that the lion's share of the rest of Plaintiff's fees were caused by Defendants' scorched-earth litigation tactics in forcing Plaintiff to fight numerous procedural skirmishes, unprincipled discovery fights, and Defendants' nearly incomprehensible legal theories in their pleadings throughout this multi-year litigation, all as discussed herein.

324.    In support of this contention, Plaintiff argues that Curtis has made much of the minor and early dispute in this case about the service of the original complaint on Defendants at her P.O. Box and Ammec's business address, which Curtis claims is a "vacant lot" despite it being (i) Ammec's business address since at least 2016 through trial in February 2021, (ii) the process server address on the Secretary of State website, and (iii) the address listed on the recorded Disputed Mechanic's Lien.  Nonetheless, these litigated disputes served a purpose and benefited the Plaintiff.  Plaintiff notes that regardless, these fees account for only approximately $26,212.00 of the total.   The Bankruptcy Court does not find that it was reasonable and necessary to incur $26,212.00 in attorneys' fees and costs representing approximately 46 hours of attorney time in

effecting sufficient service of process on Defendants in a $40,000 case to remedy counsel's initial reliance on incorrect information in Ammec's filings with the California Secretary of State and inadequate due diligence in finding a service address for Curtis for purposes of Federal Rule of Bankruptcy Procedure 7004(b)(2) and (3).  Plaintiff's counsel just needed to make another attempt at proper service on Defendants once Defendants objected to the initial service.  Regardless of whether Defendants' filings with the California Secretary of State were misleading or not, it should not have taken 46 hours of attorney time to fix the service of process problem, and neither Plaintiff as the client nor Defendants as a matter of damages should be burdened with fees from inefficiency.   The Bankruptcy Court finds and concludes that 10 hours of attorney time ($5,600 based on an hourly rate of $560) at most would have been reasonable and necessary for services relating to service of process on Defendants, though the work of finding proper service addresses for Defendants and effecting service should have been handled by lower cost billing professionals.  (However, the Bankruptcy Court observes here that counsel has waived fees incurred for services by other professionals at the firm, which was a proper exercise of billing judgment.)

325.    Regarding counsel's billing judgment, Plaintiff argues that the incurred attorneys' fees increased more than anticipated, but were reasonable and necessary because Defendants willfully engaged the Plaintiff in numerous and repetitive procedural skirmishes to cause delay and increase the cost of litigation, including: (i) a motion challenging personal jurisdiction; (ii) a motion to dismiss the complaint for failure to state a claim for which relief could be granted, which Plaintiff ultimately defeated; (iii) an attempt to avoid deposition and production of documents, which Plaintiff ultimately defeated; (iv) attempts to avoid the deposition of Ammec's officer and person most knowledgeable, Carlos Montenegro, which the Plaintiff did not overcome because the Plaintiff decided that it was not economical to incur additional expenses by commencing more discovery dispute motions against Defendants; (v) attempts to harass Plaintiff and its management by forcing a deposition to be taken on Plaintiff's Property and bringing a motion on this discovery dispute, which Plaintiff ultimately defeated; (vi) Defendants'

premature motion for summary judgment that argued for a lien-pass-through theory that would have eviscerated the Bankruptcy Code's ability to address disputed liens, which Plaintiff ultimately defeated; and (vii) a wildly off-point opposition to the Plaintiff's motion for partial summary adjudication, which Plaintiff overcame and prevailed temporarily.

326.    As previously stated, the Bankruptcy Court generally agrees with this characterization by Plaintiff of Defendants' litigation positions and tactics in this adversary proceeding, that is, generally speaking, Defendants' litigating positions generally lacked merit and mostly not difficult to oppose, but this does not mean that the claimed fees and costs dealing with Defendants' litigation positions and tactics were reasonable and necessary to remove the Lien or that Plaintiff's counsel was exempt from exercising reasonable business judgment in claiming fees.  One prominent example is the billing of 53.3 hours of attorney time opposing Defendants' motion for summary judgment.   The amount of fees for work on Defendants' motion for summary judgment of $30,914 (53.3 hours of work at an hourly billing rate of $580) appears excessive in a $40,000 case, especially since the arguments made by Defendants that they were entitled to summary judgment on the slander of title claim because the Bankruptcy Court lacked jurisdiction to enter a final judgment on that claim, that Defendants were entitled to summary judgment on the other claims because they had not filed a proof of claim in the bankruptcy case, they had a properly perfected mechanic's lien and thus, their lien passed through unaffected by the bankruptcy case clearly lacked merit.  The Bankruptcy Court has jurisdiction over Plaintiff's slander of title claim involving property of Plaintiff's bankruptcy estate as a noncore claim under nonbankruptcy law to hear and determine such claim subject to de novo review by the United States District Court pursuant to 28 U.S.C. §§157(c) and 1334, showing that Defendants were not entitled to judgment as a matter of law on this ground.  *See Executive Benefits Insurance Agency v. Arkison,* 573 U.S. 25 (2014); Federal Rule of Bankruptcy Procedure 9033.   Although Defendants did not file a proof of claim for the lien claim, Plaintiff could challenge the lien on its property as an asset of the bankruptcy estate through an adversary proceeding to avoid lien pursuant to 28 U.S.C. §§157(b)(2)(K) and 1334 and Federal Rule of Bankruptcy

Procedure 7001, showing that Defendants were not entitled to summary judgment on this ground.  Moreover, Plaintiffs offered evidence to controvert the validity of Defendants' lien to demonstrate genuine issues of material fact to warrant denial of summary judgment. These are simple and straightforward counterarguments to Defendants' arguments for their summary judgment motion which should not have taken 53 hours of attorney time from Plaintiff's counsel.

327.    Another example of fees that may not have been entirely reasonable and necessary is from Plaintiff's premature motions for attorneys' fees filed before trial and entry of final judgment.  Generally, motions for attorneys' fees are brought after entry of a final order or judgment as recognized in Local Bankruptcy Rule 7054-1(g) when fees as costs may be taxed.  This is especially true in this adversary proceeding because the claimed attorneys' fees here are not taxed as costs, but awarded as damages as proven at trial.  Apparently, Plaintiff's counsel was under the mistaken impression that the Bankruptcy Court could award attorneys' fees as costs before the adversary proceeding was concluded and that fees as damages on the slander of title claim could be sought by motion rather than proven at trial as an element of damages, which is clearly incorrect. Plaintiff seeks fees of $17,690 for 30.5 hours of attorney time at an hourly rate of $580 for Plaintiff's first motion for an award of attorneys' fees and costs and $7,260 for 12 hours of attorney time at an hourly rate of $605 for Plaintiff's second motion for an award of attorneys' fees and costs, for a total amount of fees of $24,950.  For example, the fees claimed for Plaintiff's two fee motions, which the Bankruptcy Court considers as premature, in the total amount of $24,950 (42.5 hours for of attorney time) appears excessive in a case where the amount in controversy is $40,000.  However, in mitigation, counsel would have needed to expend time to prove up the fees as damages on the slander of title claim at trial, and counsel in the fee calculation reflected in Exhibit 1 has not claimed fees for any work to prepare for, and during, the two day trial on fees as damages on June 29 and 30, 2022, which included the testimony of counsel regarding the claimed fees.  Moreover, counsel has not billed for work in preparing the billing entries showing the fees for service on work to remove Defendants' lien served on

Defendants before trial.  However, some of the work may be accounted for in the billing of 41.1 hours of attorney time at $605 for a total amount of fees of $24,865.55 in preparing of Plaintiff's original proposed findings of fact and conclusions of law, which addresses in part the claim for an award of attorneys' fees and costs.  While Plaintiff's original and amended proposed findings of fact and conclusions of law are detailed, the amount of fees for preparing the original proposed findings and conclusions of law in the amount of $24,865.55 (41.1 hours of attorney time) appears excessive in a case where the amount in controversy is $40,000.  The Bankruptcy Court notes that the claimed fees as damages do not include attorney time for preparing the amended proposed findings of fact and conclusions of law lodged by Plaintiff after the two days of trial on fees as damages.

328.    Another small example of fees not reasonably and necessarily incurred to remove Defendants' Lien is the 1.7 hours of attorney time spent on Curtis's postpetition complaint with the California Labor Commissioner for alleged prepetition wages that are claimed on Exhibit 1 as damages for slander of title, which should not be included as damages since Curtis's purported wage claim has nothing to do with removal of a mechanic's lien through the slander of title claim.

329.    The Bankruptcy Court notes that in mitigation of damages, Plaintiff's counsel agreed not to assert fees as damages for work performed by counsel's firm other than Mr. Fritz, its lead counsel, representing 15.95 percent of the fees that had been previously requested by the firm.  6/29/22 Trial Transcript at 11.

330.    Defendants argue that Plaintiff failed to mitigate its damages because there were at least three more expedient and cost-effective procedures that were available under California law to Plaintiff that it failed to utilize and, instead, created excessive attorneys' fees.  According to Defendants, these three methods were: (1) filing a petition for release of a mechanic's lien under California Civil Code § 8482 in state court; (2) filing a motion for removal of mechanic's lien under California Code of Civil Procedure § 765.010 in state court; and (3) filing a so-called *Lambert* Motion to remove the mechanic's lien in state court.  It is conceivable that possibly if Plaintiff had utilized one of

these methods to remove Defendants' Lien that Plaintiff's incurrence of attorneys' fees
and costs to remove the lien could have been reduced.  However, this is a matter of
speculation and may not have been necessarily the case as Plaintiff argues, and the
Bankruptcy Court agrees, that this case became much more expensive because
Defendants were unnecessarily combative and added unnecessary procedural expense
to the litigation from the start.  *See, e.g., Calvo Fisher & Jacob, LLP v. Lujan*, 234
Cal.App.4th 608, 626-627 (2015); *Peak-Las Positas Partners v. Bollag*, 172 Cal.App.4th
101, 113-114 (2009).  Having observed litigation proceedings between the parties in this
adversary proceeding and in the underlying bankruptcy case, the Bankruptcy Court finds
and concludes that the descriptions of the litigation proceedings between the parties in
Plaintiff's fee motions were fair and accurate.

     331.    It is problematic that in this case, the award of attorneys' fees exceeds the
amount of other compensatory damages, which as discussed above, the Bankruptcy
Court determines that there were no other such damages other than the legal expenses
in incurring attorneys' fees and costs to remove the lien in the amount of $40,000, which
was the amount in controversy.  Here, the amount of attorneys' fees and costs sought as
damages exceeds $270,000, which exceeds the other compensatory damages, which
appear to be none, and which exceeds by the amount of controversy of $40,000, by
several times, or six times to be more exact.  As one California authority has stated: "A
judge may properly find that an award of attorneys' fees to a prevailing plaintiff in an
amount greater than the amount of damages recovered is reasonable, when the amount
of fees the plaintiff incurred was increased by the defendant's own conduct, for example,
in resisting the plaintiff's discovery requests, requiring the plaintiff to bring numerous
motions to compel the defendant to comply with the plaintiff's discovery requests, and in
propounding broad requests for production to the plaintiff that required significant efforts
by the plaintiff's attorney to gather and prepare the documents for production."  California
Center for Judicial Education & Research, California Judges Benchbook: Civil
Proceedings – Trial, §16.87, *citing, Calvo Fisher & Jacob, LLP v. Lujan*, 234 Cal.App.4th
608, 626-627 (2015).  This authority further noted in *Peak-Las Positas Partners v. Bollag*,

172 Cal.App.4th 101, 113-114 (2009) that in a real property dispute, the trial judge was not precluded from awarding the plaintiff attorneys' fees in an amount that exceeded the purchase price of property, when the judge found that the defendant interjected collateral issues to complicate the litigation, that the defendant's vigorous defense necessitated a great deal of work by the plaintiff's attorneys, and that there was no duplication of litigation efforts by the plaintiff's attorneys.  *Id.*  This authority also noted in *Cheema v. L.S. Trucking, Inc.,* 39 Cal.App.5th 1142, 1153-1154 (2019) that the appellate court noted that while the total recovery of $19,113.84 in a breach of contract action was relatively small in relation to the amount of attorneys' fees awarded, $100,415, this ratio was not dispositive if the judge determined that the effort that the plaintiff's attorneys expended was reasonably necessary to accomplish this recovery, and that defendant cited no authority for the proposition that a fee award must always be less than the damage award, and the appellate court was aware of no such authority.  *Id.*  These California legal authorities provide illustrative examples showing that a fee award may exceed the other award of damages if circumstances warrant, such as defendant's litigious conduct exacerbating the cost of plaintiff's representation, which is the case here.

332.    As previously noted, the Ninth Circuit in requiring that bankruptcy estate professionals exercise billing judgment stated that employment authorization does "not give [the professional] free reign to run up a tab without considering the maximum probable recovery." *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.*, 924 F.2d at 958.  Moreover, as the Ninth Circuit has also recognized that before undertaking work on a bankruptcy matter, a professional is obligated to consider whether the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery.  *Id.* at 959-960 (citation omitted).  Counsel for Plaintiff knew that the amount in controversy was the $40,000 claimed in Defendants' Lien, and counsel did not have free rein to run up the tab without considering the maximum probable recovery which might be arguably considered to be the expungement of the $40,000 lien.  Plaintiff and its counsel appears to recognize that a $270,000 fee bill appears excessive in light of the amount in controversy, but the Bankruptcy Court agrees

1
2
3
4
5
6
7
8
9
10

with Plaintiff that paying unreasonable tribute to Defendants on their illegitimate lien is not what Plaintiff should have done to mitigate its damages, which in the Bankruptcy Court's view is antithetical to our system of legal justice.  The Bankruptcy Court agrees with Plaintiff's argument in part that the litigation of this case was made more costly than expected due to the factually and legally meritless positions and obstructionist tactics of Defendants in this adversary proceeding.  Such ill behavior justifies an award of attorneys' fees and costs in excess of any other compensatory damages or the amount in controversy.  However, as discussed above, the Bankruptcy Court does not consider all of the fees claimed by counsel to have been reasonable and necessary to remove Defendants' Lien.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

333.    In consideration of what was reasonable and necessary fees to remove Defendants' lien, the Bankruptcy Court has considered the relatively straightforward nature of this civil tort litigation, the exercise of billing judgment by Plaintiff's counsel or lack thereof, and the difficulties in dealing with the factually and legally meritless positions and obstructionist tactics of Defendants.  Under the authority of the *Sumner Hill Homeowners' Association* case, the Bankruptcy Court considers what attorneys' fees and litigation costs were reasonable and necessary to remove Defendants' lien as a slander of title, and this consideration is generally in retrospect, that is, what was needed to remove the lien, and what was reasonable.  In retrospect, Plaintiff should have adhered more to its original and simpler plan of preparing and filing the complaint, taking minimal discovery consisting of depositions of Greta Curtis and the Habitat employees and trying the factual issue of the purchase of the lumber to remove the lien.  The Bankruptcy Court determines that 24.0 hours of attorney time were reasonable and necessary for counsel to investigate Plaintiff's slander of title and lien avoidance claims and prepare a complaint to remove Defendants' purported lien.  The factual basis for the claims to remove the lien in the slander of title and lien avoidance claims was the testimony of Plaintiff's witnesses, Eric and Barrington Radley, that Eric Radley was the joint purchaser and owner of the lumber that Defendants claimed was the subject of their purported mechanic's lien based on Greta Curtis's claim that she was the sole purchaser and owner of the lumber.  It

should not have taken much attorney time to investigate Plaintiff's claims to remove

Defendants' lien based on this straightforward evidence and prepare a complaint.  The

Bankruptcy Court does not allocate time spent for amending the complaint to address

Defendants' objections which it sustained and for taking Defendants' default which were

not reasonable and necessary to remove Defendants' lien, and the enormous cost of

over $26,000 in attorneys' fees was not reasonable and necessary to effectuate service

of process on Defendants.  The Bankruptcy Court also notes that Plaintiff's claim

disallowance claim was not necessary to remove Defendants' lien as that claim was

directed at achieving plan confirmation in the underlying bankruptcy case.  The

Bankruptcy Court further that the services in prosecuting Plaintiff's lien avoidance claim

were not reasonable and necessary as the litigation of that claim did not result in a

pretrial disposition resulting in the removal of Defendants' lien as that claim was

dependent on the same factual issues as the slander of title claim, that is, who purchased

the lumber, and that the grant of partial summary adjudication was improvident based on

newly established Ninth Circuit case law.  The Bankruptcy Court determines that 24.0

hours of attorney time were reasonable and necessary to respond to Defendants'

motions to dismiss and summary judgment and attend other pretrial proceedings,

including status conferences.  Defendants' arguments in support of their motions to

dismiss and summary judgment were somewhat insubstantial and were not difficult to

require much attorney time to refute.  The Bankruptcy Court does not allow time spent on

Plaintiff's motion for partial summary adjudication as the motion was unsuccessful in

removing the Defendants' lien and that Plaintiff's case for lien avoidance  had to be tried

with the slander of title claim anyway.  The Bankruptcy Court determines that 32.0 hours

of attorney time were reasonable and necessary for discovery proceedings as Plaintiff

only need to take the depositions of Greta Curtis and employees at Habitat for Humanity

as to respond to Defendants' discovery requests relating to the slander of title claim.  The

Bankruptcy Court determines that 24.0 hours of attorney time was reasonable and

necessary for preparation for trial on the factual issues relating to the removal of

Defendants' lien, which primarily related to the purchase of the lumber, that is, preparing

trial declarations of Plaintiff's fact witnesses, Eric and Barrington Radley, the submission of the trial exhibits, which were minimal in number (i.e. about 10 exhibits for Plaintiff), and generally undisputed as Defendants submitted substantially the same exhibits, and preparation of cross-examination of Greta Curtis.  The Bankruptcy Court determines that 40.0 hours of attorney time were reasonable and necessary for the five days of trial of the claims to remove Defendants' lien.  The Bankruptcy Court determines that 24.0 hours of attorney time were reasonable for post-trial work in preparing and lodging proposed findings of fact and conclusions of law to remove Defendants' lien.  In total, the Bankruptcy Court determines that the total attorney time reasonable and necessary to remove Defendants' lien is 168.0 hours.  The services were rendered by Mr. Fritz, whose hourly rate ranged between $565.00 in 2018 to $605.00 in 2022.  The Bankruptcy Court determines that a reasonable hourly rate for Mr. Fritz in this case is $585.00.  Thus, the reasonable and necessary fees incurred by Plaintiff to remove Defendants' lien is 168.0 hours at Mr. Fritz's reasonable hourly rate of $585.00 for a total of $98,280.00.

334.    Plaintiff claims litigation costs as part of its pecuniary damages to remove Defendants' lien in support of its slander of title claim as set forth in its fee motion papers, $22,402.81 in its first fee motion covering the period from January 17, 2018 to September 30, 2019 [Adversary Proceeding Docket No. 146 at 52]. $6,013.20 in its second fee motion covering the period from October 1, 2019 to April 28, 2021 [Adversary Proceeding Docket No. 221 at 59], and $872.22 in its reply to Defendants' opposition to its second fee motion covering the period from April 29, 2021 to January 11, 2022, for a total of $29,288.23.  This sum is relatively large in comparison to $40,000.00 amount of Defendants' asserted lien, which should have necessitated an exercise of reasonable billing judgment.  The Bankruptcy Court notes that the litigation costs asserted by Plaintiff substantially consists of costs which are not taxable costs within the meaning of California Code of Civil Procedure § 1033 and 1033.5, which provisions govern recovery of litigation costs in civil cases other than a limited civil case under California law. In the cited California case that recognizes that attorneys' fees and litigation costs are awardable as pecuniary damages for a slander of title claim to remove a matter

constituting an improper cloud on title, *Sumner Hill Homeowners' Association v. Rio Mesa Holdings, LLC,* 205 Cal.Ap.4th at 1027-1038, the court did not address which litigation costs are so awardable, that is, as between litigation costs taxable under California Code of Civil Procedure §§ 1033 and 1033.5 and those which are not so taxable.  In awarding litigation costs as pecuniary damages on a slander of title claim under California law, the Bankruptcy Court determines that it can only award litigation costs expressly recognized as litigation costs under California law, that is, pursuant to California Code of Civil Procedure §§.1033 and 1033.5.  Accordingly, the Bankruptcy Court determines that most of the costs claimed by Plaintiff are not taxable as litigation costs under California Code of Civil Procedure §§ 1033 and 1033.3 and that the only awardable litigation costs are the court reporting fees of $897.00 for depositions and a witness fee of $40.00 for a total of $937.00, which were reasonable and necessary to remove Defendants' lien in proving up Plaintiff's slander of title cause of action.  The other claimed litigation costs, such as Westlaw research, attorney service costs, postage, UCC search, Pacer, court transcripts not ordered by the court, etc., are not taxable litigation costs within the meaning of California Code of Civil Procedure § 1033.5, and thus, not awardable.

335.    Based on all of these considerations, the Bankruptcy Court finds and determines that the reasonable and necessary attorneys' fees and costs incurred by Plaintiff in removing the improper lien of Defendants is $99,217.00, consisting of $98,280.00 in attorneys' fees and $937.00 in litigation costs.

**G. Conclusion as to Plaintiff's First Cause of Action (Slander of Title)**

336.    The Bankruptcy Court finds and concludes that the preponderance of the evidence shows that Defendants slandered title to Plaintiff's property when Defendants published the Lien, which contained: (i) a false statement that there was an agreement between the parties; (ii) a false statement that Defendants had a contract claim for $40,000; (iii) a false statement that Plaintiff had taken 20 walls of lumber from Defendants; and (iv) a false statement that the lumber that was the subject of the Lien had a value of $40,000 based on cost.

337.    The Bankruptcy Court finds and concludes that the preponderance of the evidence shows that Defendants had no privilege to file the Lien as a purported mechanic's lien because there was no "work authorized for a work improvement" under California Civil Code §§ 8400 and 8404, there was no agreement or contract between the parties, and the Defendants' purported claim for conversion sounded in tort, not contract.

338.    The Bankruptcy Court finds and concludes that the preponderance of the evidence  shows that Defendants' filing of the Lien was with malice because: (i) Defendants knew that the Lien's assertion of an "agreement" was a false statement; (ii) Defendants knew that the lumber in Plaintiff's possession did not have a value of $40,000 based on cost as stated in the Lien; (iii) moreover, Defendants could not have reasonably believed that the lumber in Plaintiff's possession had a value of $40,000 based on cost as stated in the Lien; and (iv) Defendants knew that Plaintiff had not taken 20 prefabricated walls as stated in the Lien, or (v) at the very least, Defendants should reasonably should have reasonably known from the observation of the lumber and photographs taken by Curtis that Plaintiff had taken only 5 – not 20 – of the prefabricated wood walls. Moreover, the Bankruptcy Court finds and concludes that Defendants acted with malice in filing the lien because Plaintiff did not take any of Defendants' lumber as the five wood walls in Plaintiff's possession had belonged to Eric Radley by purchase, which he gave to Plaintiff.

339.    The Bankruptcy Court finds and concludes that the preponderance of the evidence shows that Defendants' filing of the Lien was with malice based on ill will because (i) Defendants through Curtis used the Lien as an improper prejudgment remedy for a tort claim against Plaintiff in the amount of $40,000 for the value of the lumber based on cost as represented in the Lien when the lumber cost at most $1,000, and Defendants knew through Curtis, with her legal knowledge and experience as a former lawyer, that the illegitimate Lien would put Plaintiff in the impossible position of paying a baseless claim of $40,000 or otherwise force Plaintiff to hire attorneys and incur thousands of dollars of attorneys' fees to remove the Lien; (ii) Defendants through Curtis

155

continued to prosecute the illegitimate Lien claim against Eric Radley, Barrington Radley, McArn, and McArn's four children in state court after Plaintiff filed for bankruptcy and was represented by counsel; and (iii) Defendants through Curtis continued to perpetuate the falsities of the Lien in the bankruptcy case in filing an objection to Plaintiff's refinancing motion and demanding that $40,000 and more for Defendants' alleged attorneys' fees be set aside to pay Defendants from the bankruptcy estate on account of the Lien.

340.   The Bankruptcy Court finds and concludes that the preponderance of the evidence shows that ultimately, Defendants' improper and unjustified filing of the Lien caused damages to Plaintiff by forcing Plaintiff to hire attorneys and incur reasonable and necessary attorneys' fees and costs, in an amount of $99,217.00 to defend against the false Lien and clear it from title, which was reasonable and appropriate under the circumstances based on Defendants' conduct through this litigation.

341.   The Bankruptcy Court finds and concludes that the preponderance of the evidence shows that Plaintiff did not fail to mitigate its damages as discussed above.

**H.  Plaintiff's Second Cause of Action (Disallowance of Claim)**

342.   In previously granting partial summary adjudication in favor of Plaintiff on its Second Cause of Action (Disallowance of Claim), there is no need for further adjudication by the Bankruptcy Court on this cause of action.  The Bankruptcy Court has determined that it has authority to enter a final judgment on the second cause of action and is entering a final judgment on this claim concurrently herewith as it expressly determines that there is no just reason for delay in entering a final judgment on the claim pursuant to Federal Rule of Civil Procedure 54(b), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7054.

**I.  Plaintiff's Third Cause of Action (Avoidance of Lien)**

343.   Because the Bankruptcy Court modified and vacated its prior ruling granting partial summary adjudication in favor of Plaintiff on its Third Cause of Action (Avoidance of Lien), this cause of action remains to be adjudicated.

344.   Plaintiff in its Amended Complaint [Adversary Docket No. 44] alleges that

pursuant to Federal Rule of Bankruptcy Procedure 7001, the Bankruptcy Court should void Defendants' purported mechanic's lien because: (1) Defendants did not advance any funds, product or services on account of the alleged obligation owed by Plaintiff in exchange for the lien; (2) no amount is owing to Defendants on account of the alleged obligation owed by Plaintiff; and (3) Defendants' claims based on the alleged obligation and lien are unenforceable.

345.    Based on the evidence supporting the above proposed findings of fact and conclusions of law on Plaintiff's first cause of action for slander of title, the Bankruptcy Court determines that Plaintiff has shown by a preponderance of the evidence that Defendants' purported mechanic's lien should be avoided because they did not advance any funds, product or service to support the alleged obligation in exchange for the lien, that no amount is owing by Plaintiff to Defendants on account of the alleged obligation and that Defendants' claims based on the alleged obligation and lien are unenforceable as there is no such obligation as alleged.

346.    However, the Bankruptcy Court's determination of Plaintiff's Third Cause of Action (Avoidance of Lien) is dependent on its above proposed findings of fact and conclusions of law on Plaintiff's First Cause of Action (Slander of Title), which are subject to de novo review by the United States District Court.

347.    In the interests of comity and consistency, the Bankruptcy Court's determination of Plaintiff's Third Cause of Action (Avoidance of Lien) is subject to the approval of the proposed findings of fact and conclusions of law on Plaintiff's First Cause of Action (Slander of Title) by the United States District Court.  Given the amount in controversy, and the factual nature of the primary litigation dispute between the parties, the ultimate determination of this litigation should be made by the United States District Court.

## J.  Plaintiff's Fourth Cause of Action (Declaratory Relief) as to Claim Disallowance

348.    In previously granting partial summary adjudication in favor of Plaintiff on its Fourth Cause of Action (Declaratory Relief) as to Disallowance of Claim, there is no need

1  for further adjudication by the Bankruptcy Court on this cause of action.  The Bankruptcy

2  Court has determined that it has authority to enter a final judgment on the second cause

3  of action and is entering a final judgment on this claim concurrently herewith as it

4  expressly determines that there is no just reason for delay in entering a final judgment on

5  the claim pursuant to Federal Rule of Civil Procedure 54(b), made applicable to this

6  adversary proceeding by Federal Rule of Bankruptcy Procedure 7054.

7  **K.  Plaintiff's Fourth Cause of Action (Declaratory Relief) as to Avoidance of Lien**

8  349.    Because the Bankruptcy Court modified and vacated its prior ruling granting

9  partial summary adjudication in favor of Plaintiff on its Fourth Cause of Action

10 (Declaratory Relief) as to Avoidance of Lien, this cause of action remains to be

11 adjudicated.

12 350.    Plaintiff in its Amended Complaint [Adversary Docket No. 44] alleges that

13 pursuant to Federal Rule of Bankruptcy Procedure 7001, the Bankruptcy Court should

14 void Defendants' purported mechanic's lien because: (1) Defendants did not advance any

15 funds, product or services on account of the alleged obligation owed by Plaintiff in

16 exchange for the lien; (2) no amount is owing to Defendants on account of the alleged

17 obligation owed by Plaintiff; and (3) Defendants' claims based on the alleged obligation

18 and lien are unenforceable and grant declaratory relief for avoidance of the lien.

19 351.    Based on the evidence supporting the above proposed findings of fact and

20 conclusions of law on Plaintiff's first cause of action for slander of title, the Bankruptcy

21 Court determines that Plaintiff has shown by a preponderance of the evidence that

22 Defendants' purported mechanic's lien should be avoided because they did not advance

23 any funds, product or service to support the alleged obligation in exchange for the lien,

24 that no amount is owing by Plaintiff to Defendants on account of the alleged obligation

25 and that Defendants' claims based on the alleged obligation and lien are unenforceable

26 as there is no such obligation as alleged, and declaratory relief to avoid the lien should be

27 granted.

28 352.    However, the Bankruptcy Court's determination of Plaintiff's Fourth Cause

of Action (Declaratory Relief) as to Avoidance of Lien is dependent on its above proposed findings of fact and conclusions of law on Plaintiff's First Cause of Action (Slander of Title), which are subject to de novo review by the United States District Court.

353.    In the interests of comity and consistency, the Bankruptcy Court's determination of Plaintiff's Fourth Cause of Action (Declaratory Relief) as to Avoidance of Lien is subject to the approval of the proposed findings of fact and conclusions of law on Plaintiff's First Cause of Action (Slander of Title) by the United States District Court

## V.    FURTHER PROCEEDINGS

354.    Although the Bankruptcy Court has authority to enter a final judgment on Second, Third and Fourth Causes of Action, the Bankruptcy Court will only enter a final judgment on Plaintiff's Second Cause of Action and its Fourth Cause of Action as to Disallowance of Claim only.

355.    As to Plaintiff's remaining causes of action, the Bankruptcy Court issues the above proposed findings of fact and conclusions of law for de novo review by the United States District Court. Based on the above proposed findings of fact and conclusions of law, the Bankruptcy Court respectfully recommends that the District Court approve and adopt the above proposed findings of fact and conclusions of law and enter a final judgment in favor of Plaintiff on its First Cause of Action (Slander of Title), Third Cause of Action (Avoidance of Lien) and Fourth Cause of Action (Declaratory Relief) as to Avoidance of Lien.

356.    Pursuant to Federal Rule of Bankruptcy Procedure 9033(a), "[i]n a proceeding in which the bankruptcy court has issued proposed findings of fact and conclusions of law, the clerk shall serve forthwith copies on all parties by mail and note the date of mailing on the docket."  (The references to the "clerk" in Rule 9033 are to the "bankruptcy clerk," or the clerk of the Bankruptcy Court, pursuant to Federal Rule of Bankruptcy Procedure 9001(3).)

357.    Pursuant to Federal Rule of Bankruptcy Procedure 9033(b), within 14 days after being served with a copy of the Bankruptcy Court's proposed findings of fact and

conclusions of law, a party may serve and file with the clerk of the court written objections which identify the specific findings or conclusions objected to and state the grounds for each objection, and a party may respond to another party's objections within 14 days after being served with a copy thereof.  Also, pursuant to Federal Rule of Bankruptcy Procedure 9033(b), a party objecting to the Bankruptcy Judge's proposed findings or conclusions shall arrange promptly for the transcription of the record, or such portions of it as all parties may agree upon or the bankruptcy judge deems sufficient, unless the district judge otherwise directs.

358.    Failure to file objections within the specified time may waive the right to object to these proposed findings of fact and recommended conclusions of law. Federal Rule of Bankruptcy Procedure 9033; *In re Delano Retail Partners, LLC*, No. 11-37711-B-7, Adv. No. 13-2250-B, 2014 WL 4966476, slip op. at *13 (Bankr. E.D. Cal. Sept. 29, 2014), *citing, Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir.1998) and *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.1991).

359.    Pursuant to Federal Rule of Bankruptcy Procedure 9033(c), the Bankruptcy Judge may for cause extend the time for filing objections by any party not to exceed 21 days from the expiration of the time otherwise prescribed by Rule 9033.  A request to extend the time for filing objections must be made before the time for filing objections has expired, except that a request made no more than 21 days after the expiration of time for filing objections may be granted upon a showing of excusable neglect.

360.    The Bankruptcy Judge will review the objections and responses thereto to these proposed findings of fact and conclusions of law, and may amend the proposed findings of fact and conclusions of law and submit them to the United States District Court, or may submit the original proposed findings of fact and conclusions of law to the United States District Court.  In this regard, the Bankruptcy Court will apply the procedures of Local Civil Rule L.R. 72-3 of the United States District Court for the Central District of California applicable to reports and recommendations of the United States Magistrate Judges to its proposed findings of fact and conclusions of law issued pursuant

1 | to Federal Rule of Bankruptcy Procedure 9033.

2 |      361.   Pursuant to Federal Rule of Bankruptcy Procedure 9033(d), the District

3 | Judge shall make a de novo review upon the record or, after additional evidence, of any

4 | portion of the Bankruptcy Judge's findings of fact or conclusions of law to which specific

5 | written objections has been made in accordance with Rule 9033, and the District Judge

6 | may accept, reject or modify the proposed findings of fact or conclusions of law, receive

7 | further evidence or recommit the matter to the Bankruptcy Judge with instructions.

8 |      IT IS SO ORDERED.

9 | **# # #**

Date: September 26, 2023

Robert Kwan
United States Bankruptcy Judge

EXHIBIT 1

ATTACHMENT – PRELIMINARY RULINGS ON ATTORNEYS' FEES

**Exhibit 1 to Findings and Conclusions**
Part "A"- January 23, 2018,  to November 5, 2019

| CHARGE DATE | WORK CODE DESCRIPTION | DESCRIPTION | LAWYER'S INITIALS | HOURS WORKED | AMOUNT CHARGED | LAWYER'S RATE | Court Ruling | AMOUNT ALLOWED |
|---|---|---|---|---|---|---|---|---|
| 01/23/2018 | ANALYSIS OF | lawsuit filed by Greta Curtis | jpf | 0.2 | 113 | 565 | | 113 |
| 01/25/2018 | PREPARATION OF | notice of stay against Greta Curtis lawsuit | jpf | 0.3 | 169.5 | 565 | | 169.5 |
| 01/25/2018 | PREPARATION OF | notice of stay against Acon lawsuit | jpf | 0.2 | 113 | 565 | Waived 6/29/22 Hr Tr 58:16 | 0 |
| 01/25/2018 | PREPARATION OF | stay violation letter to Greta Curtis | jpf | 0.3 | 169.5 | 565 | | 169.5 |
| 01/25/2018 | ANALYSIS OF | decision and order to disbar Greta Curtis for information in motion to avoid lien | jpf | 0.7 | 395.5 | 565 | | 395.5 |
| 02/13/2018 | ANALYSIS OF | article re: fraud by a church pastor and Greta Curtis | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 02/14/2018 | TELEPHONE CONFERENCE WITH | Bill Tanner re: prepetition litigation | jpf | 0.3 | 169.5 | 565 | 6/29/22 Hr Tr 68:21 | 84.75 |
| 03/21/2018 | TELEPHONE CONFERENCE WITH | client re: Greta Curtis issues | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 05/07/2018 | PREPARATION OF | complaint against Greta Curtis and Ammec Inc. | jpf | 0.3 | 169.5 | 565 | | 169.5 |
| 06/11/2018 | PREPARATION OF | request for default judgment against Ammec Inc. in lien avoidance lawsuit | jpf | 0.2 | 113 | 565 | | 113 |
| 06/11/2018 | PREPARATION OF | request for default judgment against | jpf | 0.2 | 113 | 565 | | 113 |

| | | Ammec Inc. in lien avoidance lawsuit | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 06/12/2018 | PREPARATION OF | opposition to motion to dismiss complaint against Greta Curtis | jpf | 0.2 | 113 | 565 | | 113 |
| 06/12/2018 | PREPARATION OF | opposition to Greta Curtis motion to dismiss for lack of personal jursidiction | jpf | 5.1 | 2881.5 | 565 | | 2881.5 |
| 06/13/2018 | ANALYSIS OF | Clerk's notice of entered default | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 06/13/2018 | PREPARATION OF | opposition to Curtis motion to dismiss adversary proceeding | jpf | 0.3 | 169.5 | 565 | | 169.5 |
| 06/18/2018 | TELEPHONE CONFERENCE WITH | Greta Curtis re: default entered against Ammec, Inc. | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 06/20/2018 | ANALYSIS OF | amended notice of motion from Greta Curtis | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 06/21/2018 | PREPARATION OF | opposition to motion to dismiss by Greta Curtis | jpf | 1.3 | 734.5 | 565 | | 734.5 |
| 06/21/2018 | PREPARATION OF | opposition to motion to dismiss by Greta Curtis | jpf | 0.9 | 508.5 | 565 | | 508.5 |
| 06/22/2018 | PREPARATION OF | opposition to motion to dismiss Greta Curtis complaint | jpf | 0.5 | 282.5 | 565 | | 282.5 |
| 06/22/2018 | ANALYSIS OF | voluminous state court litigation record involving Greta Curtis as plaintiff or defendant | jpf | 4.7 | 2655.5 | 565 | | 2655.5 |

| 06/25/2018 | ANALYSIS OF | motion to excise default against Ammec | jpf | 0.8 | 452 | 565 | | 452 |
|---|---|---|---|---|---|---|---|---|
| 06/25/2018 | PREPARATION OF | joint status report in adversary proceeding against Curtis and Ammec | jpf | 0.4 | 226 | 565 | | 226 |
| 07/02/2018 | PREPARATION OF | opposition to Ammec motion to dismiss complaint for lack of personal jurisdiction | jpf | 5.4 | 3051 | 565 | | 3051 |
| 07/03/2018 | PREPARATION OF | opposition to motion to dismiss complaint for lack of personal jurisdiction for Ammec | jpf | 2.2 | 1243 | 565 | | 1243 |
| 07/03/2018 | PREPARATION OF | opposition to motion to dismiss complaint for lack of personal jurisdiction for Ammec | jpf | 1.8 | 1017 | 565 | | 1017 |
| 07/03/2018 | PREPARATION OF | opposition to motion to dismiss complaint for lack of personal jurisdiction for Curtis | jpf | 1.9 | 1073.5 | 565 | | 1073.5 |
| 07/03/2018 | PREPARATION OF | opposition to motion to dismiss complaint for lack of personal jurisdiction for Ammec and Curtis with exhibits | jpf | 0.4 | 226 | 565 | | 226 |
| 07/12/2018 | TELEPHONE CONFERENCE W/ CLIENT | re: lawsuit with Greta and evidentiary objections | jpf | 0.6 | 339 | 565 | | 339 |

| 07/12/2018 | ANALYSIS OF | litigation pleadings received from Greta Curtis and Ammec's counsel on mechanic lien lawsuit | jpf | 0.2 | 113 | 565 | | 113 |
|---|---|---|---|---|---|---|---|---|
| 07/16/2018 | PREPARATION FOR HEARING | motions to dismiss for lack of personal jurisdiction in Ammec/Curtis case | jpf | 0.6 | 339 | 565 | | 339 |
| 07/16/2018 | ANALYSIS OF | possible personal service on Curtis and Ammec | jpf | 0.6 | 339 | 565 | | 339 |
| 07/16/2018 | ANALYSIS OF | amended and updated service list for alias summons of complaint on Curtis and Ammec | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/16/2018 | TELEPHONE CONFERENCE W/ CLIENT | re: service of summons on Curtis and Ammec | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/17/2018 | EMAIL EXCHANGE WITH | Jason Suh re: Ammec/Curtis hearing | jpf | 0.1 | 56.5 | 565 | 6/29/22 Hr Tr 98:10 | 0 |
| 07/17/2018 | PREPARATION FOR HEARING | on Ammec/Curtis motions to dismiss | jpf | 0.2 | 113 | 565 | | 113 |
| 07/17/2018 | APPEARANCE AT HEARING | motion to dismiss the complaints on service on Greta Curtis and Ammec, and adversary proceeding status conference | jpf | 3.6 | 2034 | 565 | | 2034 |
| 07/17/2018 | PREPARATION OF CORRESPONDENCE | to client re: results of hearing on Ammec/Curtis adversary proceeding matters | jpf | 0.1 | 56.5 | 565 | | 56.5 |

| 07/18/2018 | ANALYSIS OF | possible service list addresses for Greta Curtis | jpf | 0.7 | 395.5 | 565 | | 395.5 |
|---|---|---|---|---|---|---|---|---|
| 07/19/2018 | PREPARATION OF | service of Curtis/Ammec complaint | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/19/2018 | ANALYSIS OF | service issues for complaint on Curtis and Ammec | jpf | 0.4 | 226 | 565 | | 226 |
| 07/19/2018 | PREPARATION OF | proposed order on Ammec's motion to dismiss complaint | jpf | 0.4 | 226 | 565 | | 226 |
| 07/19/2018 | PREPARATION OF | proposed order on Curtis' motion to dismiss complaint | jpf | 0.3 | 169.5 | 565 | | 169.5 |
| 07/20/2018 | TELEPHONE CONFERENCE WITH | John Barriage re: proposed orders on motions to dismiss complaint | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/23/2018 | TELEPHONE CONFERENCE WITH | John Barriage re: email address for sending proposed orders on motions to dismiss | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/23/2018 | PREPARATION OF CORRESPONDENCE | to John Barriage re: proposed orders on motions to dismiss | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/23/2018 | EMAIL EXCHANGE WITH | John Barriage re: proposed orders on motions to dismiss | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/23/2018 | PREPARATION OF | proposed orders on motions to dismiss | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/23/2018 | TELEPHONE CONFERENCE W/ CLIENT | re: Ammec mechanic lien and lawsuit | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 07/24/2018 | PREPARATION OF | withdrawal of request for default judgment | jpf | 0.4 | 226 | 565 | 6/29/22 Hr Tr 110:7 | 0 |

| 08/22/2018 | ANALYSIS OF | motion to dismiss | jpf | 0.2 | 113 | 565 | | 113 |
|---|---|---|---|---|---|---|---|---|
| 09/27/2018 | ANALYSIS OF | state court mechanic lien lawsuit by Greta Curtis for possible | jpf | 0.4 | 226 | 565 | 6/29/22 Hr Tr 117:15 | 0 |
| 09/27/2018 | TELEPHONE CONFERENCE W/ CLIENT | re: state court lawsuit by Greta Curtis and hearing on default | jpf | 0.1 | 56.5 | 565 | 6/29/22 Hr Tr 117:25 | 0 |
| 10/02/2018 | TELEPHONE CONFERENCE W/ CLIENT | re: Greta Curtis lien litigation | jpf | 0.3 | 169.5 | 565 | | 169.5 |
| 10/02/2018 | ANALYSIS OF | filed opposition to Curtis and Ammec motion to dismiss complaint | jpf | 0.2 | 113 | 565 | | 113 |
| 10/30/2018 | ANALYSIS OF | court's signed orders on Ammec's and Curtis' motions to dismiss adversary proceeding complaint | jpf | 0.2 | 113 | 565 | | 113 |
| 11/19/2018 | PREPARATION OF | motion to dismiss cross-claim of Greta Curtis | jpf | 0.2 | 113 | 565 | | 113 |
| 11/19/2018 | PREPARATION OF | motion to dismiss Curtis' cross-complaint | jpf | 2.2 | 1243 | 565 | | 1243 |
| 11/20/2018 | TELEPHONE CONFERENCE W/ CLIENT | motion to dismiss Curtis' counterclaims | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 11/20/2018 | TELEPHONE CONF. W/ COURT STAFF | re: hearing date on motion to dismiss Curtis Cross-claim | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 11/20/2018 | PREPARATION OF | request for judicial notice in support of motion to dismiss Curtis Cross-claim | jpf | 0.4 | 226 | 565 | | 226 |

| 11/20/2018 | PREPARATION OF | motion to dismiss Curtis Cross-claim | jpf | 0.4 | 226 | 565 | | 226 |
|---|---|---|---|---|---|---|---|---|
| 11/28/2018 | PREPARATION OF | limited reply to Curtis opposition on motion to dismiss cross-complaint | jpf | 1.1 | 621.5 | 565 | | 621.5 |
| 12/03/2018 | ANALYSIS OF | Labor Commission letter and action against debtor | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/03/2018 | TELEPHONE CONFERENCE WITH | to Labor Commissioner letter and action against debtor and possible stay violation | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/03/2018 | TELEPHONE CONFERENCE WITH | to Labor Commissioner letter and action against debtor and possible stay violation | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/04/2018 | TELEPHONE CONFERENCE W/ CLIENT | re: court's voluntary dismissal of state court lawsuitby Greta Curtis | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/04/2018 | TELEPHONE CONFERENCE WITH | Labor Commission re: lawsuit against Debtor | jpf | 0.2 | 113 | 565 | | 113 |
| 12/04/2018 | PREPARATION OF CORRESPONDENCE | to client re: Labor Commission lawsuit against Debtor | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/04/2018 | ANALYSIS OF CORRESPONDENCE | from Greta Curtis re: offer to voluntarily dismiss counter-claim in bankruptcy | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/04/2018 | PREPARATION OF | stipulation to voluntarily dismiss Curtis cross-complaint | jpf | 0.7 | 395.5 | 565 | | 395.5 |

| 12/04/2018 | PREPARATION OF CORRESPONDENCE | to Curtis re: stipulation to voluntarily dismiss Curtis cross-complaint | jpf | 0.1 | 56.5 | 565 | | 56.5 |
|---|---|---|---|---|---|---|---|---|
| 12/04/2018 | TELEPHONE CONFERENCE W/ CLIENT | re: stipulation to voluntarily dismiss Curtis cross-complaint | jpf | 0.2 | 113 | 565 | | 113 |
| 12/04/2018 | PREPARATION OF | proposed order granting stipulation to voluntarily dismiss Curtis cross-complaint | jpf | 0.2 | 113 | 565 | | 113 |
| 12/04/2018 | PREPARATION OF | notice of voluntary withdrawal of motion to dismiss Curtis cross-complaint | jpf | 0.2 | 113 | 565 | | 113 |
| 12/04/2018 | TELEPHONE CONF. W/ COURT STAFF | re: notice of voluntary withdrawal of motion to dismiss Curtis cross-complaint | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/04/2018 | PREPARATION OF CORRESPONDENCE | to Labor Commissioner re: stay violation | jpf | 0.5 | 282.5 | 565 | | 282.5 |
| 12/05/2018 | TELEPHONE CONFERENCE W/ CLIENT | re: Curtis motion to dismiss counterclaim | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/05/2018 | PREPARATION OF CORRESPONDENCE | to Labor Commision re: potential stay violation | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/05/2018 | TELEPHONE CONFERENCE WITH | Labor Commissioner re: stay violation | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/05/2018 | PREPARATION OF CORRESPONDENCE | to Labor Commissioner re: | jpf | 0.1 | 56.5 | 565 | | 56.5 |

| | | stay violation | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12/07/2018 | ANALYSIS OF | Labor Commission lawsuit filed by Greta Curtis | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/10/2018 | TELEPHONE CONFERENCE W/ CLIENT | Curtis stay violation with labor board | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/10/2018 | TELEPHONE CONFERENCE WITH | Labor commissioner re: stay violation; email to labor commission re: same | jpf | 0.1 | 56.5 | 565 | | 56.5 |
| 12/19/2018 | PREPARATION OF | discovery interrogatories to Greta Curtis | jpf | 0.8 | 452 | 565 | | 452 |
| 01/09/2019 | PREPARATION OF | joint status report for Curtis adversary proceeding | jpf | 0.6 | 348 | 580 | | 348 |
| 01/09/2019 | PREPARATION OF | initial disclosures for discovery under Rule 26 for Curtis litigation | jpf | 0.6 | 348 | 580 | | 348 |
| 01/10/2019 | PREPARATION OF CORRESPONDENCE | to client re: initial disclosures under Rule 26 in lawsuit against Curtis on mechanic's lien | jpf | 0.1 | 58 | 580 | | 58 |
| 01/10/2019 | PREPARATION OF | Rule 26 meet and confer letter to Curtis and Ammec | jpf | 0.3 | 174 | 580 | | 174 |
| 01/10/2019 | PREPARATION OF | initial disclosures for Curtis and Ammec lawsuit | jpf | 0.2 | 116 | 580 | | 116 |
| 01/10/2019 | PREPARATION OF | initial disclosures and meet and confer letter to Curtis and Ammec | jpf | 1.4 | 812 | 580 | | 812 |

| 01/14/2019 | ANALYSIS OF | joint status report completed by Greta Curtis | jpf | 0.1 | 58 | 580 | | 58 |
|---|---|---|---|---|---|---|---|---|
| 01/14/2019 | ANALYSIS OF | Rule 26 disclosures from Greta Curtis | jpf | 0.1 | 58 | 580 | | 58 |
| 01/14/2019 | PREPARATION OF | special interrogatories to Curtis and Ammec | jpf | 1.2 | 696 | 580 | | 696 |
| 01/15/2019 | TELEPHONE CONFERENCE W/ CLIENT | joint status report and litigation strategy against Greta Curtis on fraudulent mechanic's lien | jpf | 0.7 | 406 | 580 | | 406 |
| 01/28/2019 | PREPARATION FOR HEARING | on Curtis and Ammec status conference | jpf | 0.4 | 232 | 580 | | 232 |
| 01/29/2019 | APPEARANCE AT HEARING | on Curtis adversary proceeding status conference | jpf | 2.9 | 1682 | 580 | | 1682 |
| 02/01/2019 | ANALYSIS OF | signed scheduling order on Curtis adversary proceeding | jpf | 0.1 | 58 | 580 | | 58 |
| 02/01/2019 | ANALYSIS OF | order to show cause why Curtis and Ammec should not be sanctioned | jpf | 0.1 | 58 | 580 | | 58 |
| 02/07/2019 | PREPARATION OF CORRESPONDENCE | to client re: update on court's order to show cause and scheduling order in lawsuit against Curtis and Ammec | jpf | 0.1 | 58 | 580 | | 58 |
| 02/13/2019 | PREPARATION OF | discovery requests to Ammec and Curtis | jpf | 3.3 | 1914 | 580 | | 1914 |
| 02/13/2019 | PREPARATION OF | discovery requests to Ammec and Curtis | jpf | 0.4 | 232 | 580 | | 232 |

10

| 02/14/2019 | PREPARATION OF | requests for admission to Curtis | jpf | 0.5 | 290 | 580 | | 290 |
| 02/15/2019 | PREPARATION OF | requests for admissions in Curtis litigation | jpf | 0.9 | 522 | 580 | | 522 |
| 02/15/2019 | PREPARATION OF | requests for production of documents in Curtis litigation | jpf | 0.2 | 116 | 580 | | 116 |
| 02/15/2019 | PREPARATION OF | special interrogatories in Curtis litigation | jpf | 1 | 580 | 580 | | 580 |
| 02/15/2019 | PREPARATION OF | notice of subpoena to Ammec as FRCP 30(b)(6) witness | jpf | 0.4 | 232 | 580 | | 232 |
| 02/18/2019 | PREPARATION OF | discovery requests to Curtis in adversary proceeding litigation | jpf | 1.1 | 638 | 580 | | 638 |
| 02/19/2019 | TELEPHONE CONFERENCE W/ CLIENT | re: Curtis litigation and discovery | jpf | 0.4 | 232 | 580 | | 232 |
| 02/19/2019 | PREPARATION OF | discovery in Curtis lawsuit | jpf | 1.7 | 986 | 580 | | 986 |
| 02/19/2019 | PREPARATION OF | discovery to Ammec in Curtis Lawsuit | jpf | 0.8 | 464 | 580 | | 464 |
| 03/06/2019 | ANALYSIS OF | Curtis opposition to order to show cause for sanctions | jpf | 0.1 | 58 | 580 | | 58 |
| 03/06/2019 | ANALYSIS OF | motion for summary judgment filed by Greta Curtis | jpf | 0.5 | 290 | 580 | | 290 |
| 03/06/2019 | ANALYSIS OF | case law re: lien pass through without proof of claim for Greta Curtis motion for summary judgment | jpf | 1.6 | 928 | 580 | | 928 |

| 03/11/2019 | ANALYSIS OF | case law re: lien pass through for preparation of opposition to Curtis' motion for summary judgment | jpf | 2.3 | 1334 | 580 | | 1334 |
|---|---|---|---|---|---|---|---|---|
| 03/12/2019 | PREPARATION OF | opposition to motion for summary judgment | jpf | 1.7 | 986 | 580 | | 986 |
| 03/14/2019 | ANALYSIS OF | case law on lien and proof of claim issue for opposition to Curtis' motion for summary judgment | jpf | 0.8 | 464 | 580 | | 464 |
| 03/14/2019 | PREPARATION OF | opposition to Curtis' motion for summary judgment | jpf | 0.9 | 522 | 580 | | 522 |
| 03/14/2019 | PREPARATION OF | opposition to Curtis' motion for summary judgment | jpf | 2.4 | 1392 | 580 | | 1392 |
| 03/20/2019 | PREPARATION FOR MEETING | on deposition of Curtis and Ammec | jpf | 0.2 | 116 | 580 | | 116 |
| 03/20/2019 | TELEPHONE CONFERENCE WITH | Greta Curtis re: deposition | jpf | 0.1 | 58 | 580 | | 58 |
| 03/20/2019 | TELEPHONE CONFERENCE WITH | Greta Curtis and John Barriage re: deposition schedule | jpf | 0.2 | 116 | 580 | | 116 |
| 03/20/2019 | PREPARATION OF | amended deposition notices for rescheduled depositions | jpf | 0.4 | 232 | 580 | | 232 |
| 03/20/2019 | PREPARATION OF CORRESPONDENCE | to Greta Curtis and John Barriage re: deposition schedule | jpf | 0.2 | 116 | 580 | | 116 |
| 03/22/2019 | ANALYSIS OF CORRESPONDENCE | from Curtis re: refusal to appear at deposition | jpf | 0.1 | 58 | 580 | | 58 |

12

| 03/22/2019 | PREPARATION OF CORRESPONDENCE | to Curtis re: refusal to appear at deposition | jpf | 1.6 | 928 | 580 | | 928 |
|---|---|---|---|---|---|---|---|---|
| 03/22/2019 | PREPARATION FOR DEPOSITION | of Greta Curtis | jpf | 0.4 | 232 | 580 | | 232 |
| 03/24/2019 | PREPARATION FOR DEPOSITION | of Greta Curtis | jpf | 3.8 | 2204 | 580 | | 2204 |
| 03/25/2019 | PREPARATION FOR DEPOSITION | for Greta Curtis and Ammec Inc. | jpf | 1.3 | 754 | 580 | | 754 |
| 03/25/2019 | APPEARANCE AT | deposition of Greta Curtis | jpf | 3.2 | 1856 | 580 | | 1856 |
| 03/25/2019 | PREPARATION FOR DEPOSITION | for Ammec Inc. | jpf | 0.4 | 232 | 580 | | 232 |
| 03/25/2019 | APPEARANCE AT | deposition of Ammec Inc. | jpf | 1.4 | 812 | 580 | | 812 |
| 03/25/2019 | TELEPHONE CONFERENCE W/ CLIENT | re: results of deposition for Ammec Inc. and Greta Curtis | jpf | 0.1 | 58 | 580 | | 58 |
| 03/26/2019 | PREPARATION OF | opposition to Curtis' motion for summary judgment | jpf | 4.2 | 2436 | 580 | | 2436 |
| 03/26/2019 | PREPARATION OF | opposition to Curtis' motion for summary judgment | jpf | 0.7 | 406 | 580 | | 406 |
| 03/27/2019 | PREPARATION OF | opposition to Curtis motion for summary judgment | jpf | 0.9 | 522 | 580 | | 522 |
| 03/27/2019 | PREPARATION OF | opposition to Curtis motion for summary judgment | jpf | 2.1 | 1218 | 580 | | 1218 |
| 03/27/2019 | ANALYSIS OF | Curtis' responses to discovery | jpf | 0.3 | 174 | 580 | | 174 |
| 03/27/2019 | ANALYSIS OF | Curtis litigation history | jpf | 0.7 | 406 | 580 | | 406 |
| 03/29/2019 | PREPARATION OF | discovery to third parties in Curtis lawsuit | jpf | 1.1 | 638 | 580 | | 638 |

| 03/29/2019 | TELEPHONE CONFERENCE W/ CLIENT | re: information and witnesses on Curtis lawsuit | jpf | 0.6 | 348 | 580 | | 348 |
|---|---|---|---|---|---|---|---|---|
| 04/01/2019 | PREPARATION OF | discovery to Habitat for Humanity on Curtis lawsuit | jpf | 0.2 | 116 | 580 | | 116 |
| 04/01/2019 | TELEPHONE CONFERENCE WITH | Habitat for Humanity re: subpoena of records and persons | jpf | 0.3 | 174 | 580 | | 174 |
| 04/01/2019 | PREPARATION OF | subpoena to Habitat for Humanity | jpf | 0.3 | 174 | 580 | | 174 |
| 04/03/2019 | PREPARATION OF | declaration in support of opposition to Curtis' motion for summary judgment | jpf | 1.2 | 696 | 580 | | 696 |
| 04/03/2019 | PREPARATION OF | opposition to Curtis' motion for summary judgment | jpf | 4.8 | 2784 | 580 | | 2784 |
| 04/04/2019 | PREPARATION OF CORRESPONDENCE | to client opposition to Curtis' motion for summary judgment | jpf | 0.2 | 116 | 580 | | 116 |
| 04/04/2019 | PREPARATION OF | deposition subpoena to Habitat for Humanity employees | jpf | 0.3 | 174 | 580 | | 174 |
| 04/04/2019 | PREPARATION OF | notice of deposition to Ammec's officer Carlos Montenegro | jpf | 0.1 | 58 | 580 | | 58 |
| 04/04/2019 | PREPARATION OF | opposition to Curtis' motion for summary judgment | jpf | 0.3 | 174 | 580 | | 174 |
| 04/04/2019 | TELEPHONE CONFERENCE W/ CLIENT | re: declarations in support of opposition to summary judgment | jpf | 0.1 | 58 | 580 | | 58 |

14

| 04/04/2019 | PREPARATION OF | opposition to Curtis' motion for summary judgment | jpf | 5.1 | 2958 | 580 | | 2958 |
|---|---|---|---|---|---|---|---|---|
| 04/05/2019 | PREPARATION OF | discovery to Habitat for Humanity and Ammec | jpf | 2.1 | 1218 | 580 | | 1218 |
| 04/05/2019 | PREPARATION OF | evidentiary objections to Curtis declaration on summary judgment | jpf | 1.4 | 812 | 580 | | 812 |
| 04/05/2019 | PREPARATION OF | opposition to motion for summary judgment | jpf | 1.6 | 928 | 580 | | 928 |
| 04/08/2019 | PREPARATION OF | opposition to summary judgment | jpf | 1.1 | 638 | 580 | | 638 |
| 04/08/2019 | PREPARATION OF | opposition to summary judgment | jpf | 3.3 | 1914 | 580 | | 1914 |
| 04/08/2019 | TELEPHONE CONFERENCE W/ CLIENT | re: declarations in support of motion for summary judgment | jpf | 0.1 | 58 | 580 | | 58 |
| 04/08/2019 | PREPARATION OF | opposition to motion for summary judgment | jpf | 1.1 | 638 | 580 | | 638 |
| 04/08/2019 | PREPARATION OF | opposition to motion for summary judgment | jpf | 0.3 | 174 | 580 | | 174 |
| 04/09/2019 | PREPARATION OF CORRESPONDENCE | to Greta Curtis and John Barriage re: courtesy copies of opposition to motion for summary judgment | jpf | 0.4 | 232 | 580 | | 232 |
| 04/10/2019 | ANALYSIS OF | deposition transcripts of Curtis and Ammec | jpf | 0.2 | 116 | 580 | | 116 |
| 04/10/2019 | TELEPHONE CONFERENCE W/ | re: deposition transcripts of Curtis | jpf | 0.2 | 116 | 580 | | 116 |

|  | CLIENT | and Ammec |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| 04/12/2019 | PREPARATION OF | depositions of Ammec and Habitat for Humanity | jpf | 0.2 | 116 | 580 |  | 116 |
| 04/15/2019 | ANALYSIS OF | discovery objection from Carlos Montenegro | jpf | 0.1 | 58 | 580 |  | 58 |
| 04/15/2019 | ANALYSIS OF | document production request from Greta Curtis | jpf | 0.1 | 58 | 580 |  | 58 |
| 04/16/2019 | ANALYSIS OF | discovery responses and propounded discovery from Greta Curtis | jpf | 0.5 | 290 | 580 |  | 290 |
| 04/16/2019 | PREPARATION OF CORRESPONDENCE | to client re: Greta Curtis discovery requests | jpf | 0.1 | 58 | 580 |  | 58 |
| 04/16/2019 | TELEPHONE CONFERENCE WITH | Eric Radley re: Habitat for Humanity and Greta dispute | jpf | 0.1 | 58 | 580 |  | 58 |
| 04/16/2019 | PREPARATION OF | meet and confer letter to Ammec to compel Montenegro's deposition attendance | jpf | 2.4 | 1392 | 580 |  | 1392 |
| 04/17/2019 | PREPARATION OF | discovery meet and confer letter to Curtis and Ammec | jpf | 0.6 | 348 | 580 |  | 348 |
| 04/17/2019 | PREPARATION FOR DEPOSITION | of Carlos Montengro and Ammec's person most knowledgeable | jpf | 1.7 | 986 | 580 |  | 986 |
| 04/17/2019 | ANALYSIS OF | email from Ammec's counsel re: discovery dispute | jpf | 0.2 | 116 | 580 |  | 116 |
| 04/17/2019 | PREPARATION OF CORRESPONDENCE | to Ammec's counsel re: discovery dispute | jpf | 0.8 | 464 | 580 |  | 464 |

| 04/17/2019 | ANALYSIS OF CORRESPONDENCE | from Greta Curtis re: discovery dispute | jpf | 0.1 | 58 | 580 | | 58 |
|---|---|---|---|---|---|---|---|---|
| 04/18/2019 | PREPARATION FOR DEPOSITION | of Carlos Montenegro | jpf | 0.2 | 116 | 580 | | 116 |
| 04/18/2019 | TELEPHONE CONFERENCE WITH | Eric Radley re: Greta Curtis and litigation | jpf | 0.2 | 116 | 580 | | 116 |
| 04/18/2019 | ANALYSIS OF | Curtis' reply in support of motion for summary judgment | jpf | 0.4 | 232 | 580 | | 232 |
| 04/18/2019 | ANALYSIS OF | ancillary supporting documents for Curtis' reply in support of motion for summary judgment | jpf | 0.3 | 174 | 580 | | 174 |
| 04/18/2019 | ANALYSIS OF | evidentiary objections in support of Curtis' reply on motion for summary judgment | jpf | 0.2 | 116 | 580 | | 116 |
| 04/18/2019 | TELEPHONE CONFERENCE WITH | Habitat for Humanity re: witness depositions | jpf | 0.2 | 116 | 580 | | 116 |
| 04/18/2019 | APPEARANCE AT | deposition of Greta Curtis as Person Most Knowledgeable of Ammec Inc. | jpf | 1.2 | 696 | 580 | | 696 |
| 04/18/2019 | | investigation into allegation by Curtis that she left receipt with office building staff | jpf | 0.2 | 116 | 580 | | 116 |
| 04/18/2019 | ANALYSIS OF | Curtis' discovery requests to People Who Care | jpf | 1.1 | 638 | 580 | | 638 |

| 04/19/2019 | PREPARATION OF CORRESPONDENCE | to Habitat for Humanity re: depositions | jpf | 0.4 | 232 | 580 | | 232 |
|---|---|---|---|---|---|---|---|---|
| 04/19/2019 | PREPARATION OF | discovery responses to Greta Curtis | jpf | 0.3 | 174 | 580 | | 174 |
| 04/19/2019 | TELEPHONE CONFERENCE W/ CLIENT | re: Curtis discovery | jpf | 0.2 | 116 | 580 | | 116 |
| 04/22/2019 | PREPARATION OF | objections and response to Curtis' notice of deposition to Debtor | jpf | 2.3 | 1334 | 580 | | 1334 |
| 04/22/2019 | PREPARATION OF | objections and response to Curtis' notice of deposition to Debtor | jpf | 1.6 | 928 | 580 | | 928 |
| 04/23/2019 | PREPARATION OF | amended deposition notices for Habitat for Humanity | jpf | 0.9 | 522 | 580 | | 522 |
| 04/23/2019 | PREPARATION OF | discovery responses and objections to Curtis' notice of deposition | jpf | 0.7 | 406 | 580 | | 406 |
| 04/24/2019 | ANALYSIS OF | amended deposition notice from Greta Curtis | jpf | 0.1 | 58 | 580 | | 58 |
| 04/24/2019 | PREPARATION OF CORRESPONDENCE | to client re: amended deposition notice from Greta Curtis | jpf | 0.2 | 116 | 580 | | 116 |
| 04/24/2019 | TELEPHONE CONFERENCE W/ CLIENT | re: deposition scheduling | jpf | 0.3 | 174 | 580 | | 174 |
| 04/24/2019 | PREPARATION OF CORRESPONDENCE | to Greta Curtis re: deposition of Debtor's person most knowledgeable | jpf | 0.2 | 116 | 580 | | 116 |

| 04/24/2019 | PREPARATION OF | discovery responses to Greta Curtis | jpf | 0.3 | 174 | 580 | | 174 |
|---|---|---|---|---|---|---|---|---|
| 04/24/2019 | PREPARATION OF | discovery responses to Curtis | jpf | 0.3 | 174 | 580 | | 174 |
| 04/24/2019 | PREPARATION OF | discovery dispute declaration | jpf | 1.4 | 812 | 580 | | 812 |
| 04/25/2019 | PREPARATION OF | discovery responses to Greta Curtis | jpf | 0.2 | 116 | 580 | | 116 |
| 04/25/2019 | CONFERENCE WITH CLIENT | for deposition of Michelle McArn by Greta Curtis | jpf | 0.7 | 406 | 580 | | 406 |
| 04/25/2019 | ANALYSIS OF | Court's order continuing hearing on motion for summary judgment | jpf | 0.2 | 116 | 580 | | 116 |
| 04/25/2019 | TELEPHONE CONFERENCE WITH | client re: pictures for deposition | jpf | 0.2 | 116 | 580 | | 116 |
| 04/25/2019 | PREPARATION FOR DEPOSITION | of Habitat for Humanity | jpf | 0.4 | 232 | 580 | | 232 |
| 04/26/2019 | APPEARANCE AT | deposition of Habitat for Humanity in Curtis/Ammec litigation | jpf | 5.3 | 3074 | 580 | | 3074 |
| 04/26/2019 | ANALYSIS OF | Greta Curtis application for ordre shortening time on motion to compel discovery | jpf | 0.1 | 58 | 580 | | 58 |
| 04/26/2019 | ANALYSIS OF | court order denying Greta Curtis application for ordre shortening time on motion to compel discovery | jpf | 0.1 | 58 | 580 | | 58 |
| 04/29/2019 | ANALYSIS OF | order and tentative ruling on motion for summary judgment | jpf | 0.1 | 58 | 580 | | 58 |

| | | hearing | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 05/03/2019 | ANALYSIS OF | discovery sanctions motion by Greta Curtis | jpf | 0.2 | 116 | 580 | | 116 |
| 05/03/2019 | ANALYSIS OF | discovery sanctions motion by Greta Curtis | jpf | 0.4 | 232 | 580 | | 232 |
| 05/10/2019 | PREPARATION OF | opposition to motion to compel discovery | jpf | 3.1 | 1798 | 580 | | 1798 |
| 05/11/2019 | PREPARATION OF | opposition to Curtis motion to compel discovery | jpf | 2.7 | 1566 | 580 | | 1566 |
| 05/11/2019 | PREPARATION OF | opposition to motion to compel discovery | jpf | 2.9 | 1682 | 580 | | 1682 |
| 05/12/2019 | PREPARATION OF | opposition to motion to compel discovery | jpf | 5.6 | 3248 | 580 | | 3248 |
| 05/12/2019 | PREPARATION OF | opposition to motion to compel discovery | jpf | 1.1 | 638 | 580 | | 638 |
| 05/13/2019 | PREPARATION OF | opposition to motion to compel discovery | jpf | 1.2 | 696 | 580 | | 696 |
| 05/13/2019 | PREPARATION OF | opposition to motion to compel discovery | jpf | 3.7 | 2146 | 580 | | 2146 |
| 05/13/2019 | PREPARATION OF | Fritz declaration in support of opposition to motion to compel discovery | jpf | 2.2 | 1276 | 580 | | 1276 |
| 05/13/2019 | PREPARATION OF | opposition to motion to compel discovery | jpf | 3.4 | 1972 | 580 | | 1972 |
| 05/14/2019 | PREPARATION OF | evidentiary objections to Curtis | jpf | 1.6 | 928 | 580 | | 928 |

| | | Declaration on discovery sanctions | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 05/14/2019 | PREPARATION OF | opposition to Curtis' motion to compel discovery | jpf | 1.4 | 812 | 580 | | 812 |
| 05/14/2019 | TELEPHONE CONFERENCE W/ CLIENT | regarding declaration in opposition to Curtis motion to compel | jpf | 0.1 | 58 | 580 | | 58 |
| 05/14/2019 | PREPARATION OF | opposition to Curtis' motion to compel discovery | jpf | 1.3 | 754 | 580 | | 754 |
| 05/20/2019 | ANALYSIS OF | revisions/corrections to deposition of Greta Curtis | jpf | 0.1 | 58 | 580 | | 58 |
| 05/20/2019 | ANALYSIS OF | court order denying Curtis' motion to compel deposition | jpf | 0.1 | 58 | 580 | | 58 |
| 05/28/2019 | ANALYSIS OF | Curtis and Ammec renewed motion for summary judgment | jpf | 0.4 | 232 | 580 | | 232 |
| 05/29/2019 | ANALYSIS OF | deposition transcripts from Habitat for Humanity | jpf | 0.2 | 116 | 580 | | 116 |
| 06/03/2019 | PREPARATION OF | opposition to motion for summary judgment | jpf | 4.1 | 2378 | 580 | | 2378 |
| 06/04/2019 | PREPARATION OF | opposition papers for motion for summary judgment | jpf | 0.8 | 464 | 580 | | 464 |
| 06/09/2019 | PREPARATION FOR HEARING | on motion for summary judgment by Curtis and Ammec | jpf | 2.3 | 1334 | 580 | | 1334 |
| 06/11/2019 | APPEARANCE AT HEARING | on motion for summary judgment | jpf | 3.1 | 1798 | 580 | | 1798 |

| 07/11/2019 | ANALYSIS OF | other litigation cases involving Greta Curtis | jpf | 0.3 | 174 | 580 | | 174 |
| 07/12/2019 | ANALYSIS OF | mechanics' lien issues in Cutis litigation | jpf | 1.2 | 696 | 580 | | 696 |
| 07/16/2019 | APPEARANCE AT HEARING | on motion for summary judgment | jpf | 3.9 | 2262 | 580 | | 2262 |
| 07/24/2019 | PREPARATION OF | declaration in support of evidence for trial against Curtis and Ammec | jpf | 0.6 | 348 | 580 | | 348 |
| 07/30/2019 | ANALYSIS OF | court's order granting and denying in part Curtis motion for summary judgment | jpf | 0.1 | 58 | 580 | | 58 |
| 08/14/2019 | ANALYSIS OF | evidence, impeachment, and trial issues in evaluation of Curtis' settlement offer | jpf | 1.3 | 754 | 580 | | 754 |
| 08/20/2019 | ANALYSIS OF | issues re: motion for summary judgment against Curtis on grounds of section 546(b) | jpf | 0.3 | 174 | 580 | | 174 |
| 08/20/2019 | ANALYSIS OF | case re: 546(b) notice requirements on Curtis' lien | jpf | 0.3 | 174 | 580 | | 174 |
| 09/09/2019 | PREPARATION OF | motion for summary judgment against Curtis | jpf | 0.4 | 232 | 580 | | 232 |
| 09/10/2019 | PREPARATION OF | motion for summary judgment against Curtis | jpf | 0.4 | 232 | 580 | | 232 |
| 09/10/2019 | PREPARATION OF | motion for summary judgment against | jpf | 1.1 | 638 | 580 | | 638 |

| | | Curtis | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 09/10/2019 | PREPARATION OF | proposed findings of fact and conclusions of law in support of MSJ against Curtis and Ammec | jpf | 1.9 | 1102 | 580 | | 1102 |
| 09/10/2019 | PREPARATION OF | motion for summary judgment against Curtis | jpf | 2.2 | 1276 | 580 | | 1276 |
| 09/11/2019 | PREPARATION OF | motion for summary judgment | jpf | 0.9 | 522 | 580 | | 522 |
| 09/12/2019 | PREPARATION OF | motion for summary judgment against Curtis and Ammec | jpf | 0.7 | 406 | 580 | | 406 |
| 09/13/2019 | PREPARATION OF | joint pretrial stipulation for Curtis lawsuit | jpf | 2.3 | 1334 | 580 | | 1334 |
| 09/16/2019 | PREPARATION OF | pretrial joint stipulation for Curtis lawsuit | jpf | 0.7 | 406 | 580 | | 406 |
| 09/16/2019 | PREPARATION OF | pretrial plaintiff witness list | jpf | 0.1 | 58 | 580 | | 58 |
| 09/16/2019 | PREPARATION OF CORRESPONDENCE | to Curtis and Barriage re: joint pretrial stipulation and witness list | jpf | 0.1 | 58 | 580 | | 58 |
| 09/20/2019 | PREPARATION OF | joint pretrial stipulation | jpf | 2.4 | 1392 | 580 | | 1392 |
| 09/20/2019 | PREPARATION OF CORRESPONDENCE | to Curtis re: joint pretrial stipulation | jpf | 0.6 | 348 | 580 | | 348 |
| 09/23/2019 | ANALYSIS OF | Curtis revisions to joint pretrial stipulation | jpf | 0.2 | 116 | 580 | | 116 |
| 09/23/2019 | ANALYSIS OF | Curtis' witness list; preparation of email to Curtis re: same | jpf | 0.1 | 58 | 580 | | 58 |
| 09/23/2019 | PREPARATION OF | joint pretrial stipulation | jpf | 0.4 | 232 | 580 | | 232 |

| 09/23/2019 | PREPARATION OF CORRESPONDENCE | to Curtis and Barriage re: joint pretrial stipulation | jpf | 0.1 | 58 | 580 | | 58 |
| 09/24/2019 | ANALYSIS OF | Curtis' witness list | jpf | 0.1 | 58 | 580 | | 58 |
| 09/24/2019 | PREPARATION OF | joint pretrial stipulation with Curtis and Barriage | jpf | 0.3 | 174 | 580 | | 174 |
| 09/24/2019 | PREPARATION OF CORRESPONDENCE | to Curtis and Barriage re: final version of joint pretrial stipulation for signatures | jpf | 0.1 | 58 | 580 | | 58 |
| 09/30/2019 | ANALYSIS OF | discovery production text messages from Curtis | jpf | 0.4 | 232 | 580 | | 232 |
| 10/01/2019 | PREPARATION FOR HEARING | on pretrial status conference | jpf | 0.4 | 232 | 580 | | 232 |
| 10/01/2019 | APPEARANCE AT HEARING | on pretrial status conference | jpf | 1.6 | 928 | 580 | | 928 |
| 10/02/2019 | PREPARATION OF | notice of continued hearing on pretrial conference | jpf | 0.2 | 116 | 580 | | 116 |
| 10/02/2019 | PREPARATION OF CORRESPONDENCE | to client re: update on Curtis litigation and pretrial stipulation and conference | jpf | 0.3 | 174 | 580 | | 174 |
| 10/11/2019 | ANALYSIS OF CORRESPONDENCE | from Curtis re: argument that MSJ is untimely filed and threatening Rule 9011 sanctions | jpf | 0.1 | 58 | 580 | | 58 |
| 10/11/2019 | PREPARATION OF CORRESPONDENCE | in response to letter from Curtis re: argument that MSJ is untimely filed and | jpf | 0.3 | 174 | 580 | | 174 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | threatening Rule 9011 sanctions | | | | | | |
| 10/11/2019 | PREPARATION OF | (further preparation) in response to letter from Curtis re: argument that MSJ is untimely filed and threatening Rule 9011 sanctions | jpf | 0.2 | 116 | 580 | | 116 |
| 10/16/2019 | ANALYSIS OF | Curtis opposition to motion for summary judgment | jpf | 1.8 | 1044 | 580 | | 1044 |
| 10/18/2019 | PREPARATION OF | reply to opposition of Curtis to Debtor's motion for summary judgment | jpf | 0.8 | 464 | 580 | | 464 |
| 10/21/2019 | PREPARATION OF | reply to Curtis and Ammec opposition to motion for summary | jpf | 3.1 | 1798 | 580 | | 1798 |
| 10/19/2019 | PREPARATION OF | reply to Curtis and Ammec opposition to motion for summary | jpf | 5.9 | 3422 | 580 | | 3422 |
| 10/20/2019 | PREPARATION OF | reply to Curtis and Ammec opposition to motion for summary | jpf | 5.1 | 2958 | 580 | | 2958 |
| 10/20/2019 | PREPARATION OF | reply to Curtis and Ammec opposition to motion for summary | jpf | 2.2 | 1276 | 580 | | 1276 |
| 10/21/2019 | PREPARATION OF | reply to Curtis and Ammec opposition to motion for summary | jpf | 1.8 | 1044 | 580 | | 1044 |
| 10/21/2019 | PREPARATION OF | evidentiary objections to Curtis | jpf | 1.2 | 696 | 580 | | 696 |

| | | declaration | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/21/2019 | PREPARATION OF | evidentiary objections to Lee declaration | jpf | 0.8 | 464 | 580 | | 464 |
| 10/21/2019 | PREPARATION OF | evidentiary objections to White declaration | jpf | 0.7 | 406 | 580 | | 406 |
| 10/22/2019 | PREPARATION OF | reply to Curtis and Ammec opposition to Debtor's motion for summary judgment | jpf | 3.1 | 1798 | 580 | | 1798 |
| 11/05/2019 | PREPARATION FOR HEARING | on motion for summary adjudication of claim disallowance and lien avoidance | jpf | 2.4 | 1392 | 580 | | 1392 |
| 11/05/2019 | ANALYSIS OF | court's tentative ruling on motion for summary adjudication of claim disallowance and lien avoidance | jpf | 0.1 | 58 | 580 | | 58 |
| 11/05/2019 | TELEPHONE CONFERENCE W/ CLIENT | re: court's tentative ruling on motion for summary adjudication of claim disallowance and lien avoidance | jpf | 0.1 | 58 | 580 | | 58 |
| 11/05/2019 | ANALYSIS OF | joint pretrial stipulation in preparation for hearing on motion for summary adjudication of claim disallowance and lien avoidance | jpf | 0.3 | 174 | 580 | | 174 |

| 11/05/2019 | APPEARANCE AT HEARING | on motion for summary adjudication of claim disallowance and lien avoidance | jpf | 3.7 | 2146 | 580 | | 2146 |
|---|---|---|---|---|---|---|---|---|
| 11/05/2019 | PREPARATION OF | proposed order on motion for summary adjudication of claim disallowance and lien avoidance | jpf | 0.6 | 348 | 580 | | 348 |
| 11/05/2019 | PREPARATION OF | amended separate statement of undisputed facts and conclusions of law on motion for summary adjudication of claim disallowance and lien avoidance | jpf | 0.3 | 174 | 580 | | 174 |
| 11/05/2019 | PREPARATION OF | notice of rescheduled hearing on pretrial conference in Curtis lien dispute | jpf | 0.1 | 58 | 580 | | 58 |
| **TOTAL** | | | | | | | | $147,629.25 |

Remainder of page left intentionally blank.  See next page.

**Exhibit 1 to Findings and Conclusions**

Part "B"- November 6, 2019, to April 19, 2021

| CHARGE DATE | WORK CODE DESCRIPTION | DESCRIPTION | LAWYER'S INITIALS | HOURS WORKED | AMOUNT CHARGED | LAWYER'S RATE | Court Ruling | AMOUNT ALLOWED |
|---|---|---|---|---|---|---|---|---|
| 11/14/2019 | ANALYSIS OF | signed order on Debtor's motion for summary adjudication | jpf | 0.2 | 116 | 580 | | 116 |
| 11/14/2019 | ANALYSIS OF | signed statement of undisputed material facts and conclusions of law on Debtor's motion for summary adjudication | jpf | 0.2 | 116 | 580 | | 116 |
| 11/15/2019 | PREPARATION OF | motion for attorneys' fees and costs against Curtis and Ammec | jpf | 1.1 | 638 | 580 | | 638 |
| 11/18/2019 | PREPARATION OF | joint pretrial stipulation with Curtis | jpf | 1 | 580 | 580 | | 580 |

| | | and Ammec | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 11/20/2019 | PREPARATION OF | motion for attorneys' fees and costs against Curtis and Ammec | jpf | 1.1 | 638 | 580 | | 638 |
| 11/21/2019 | PREPARATION OF CORRESPONDENCE | to Greta Curtis and John Barriage re: amended joint pretrial stipulation | jpf | 0.1 | 58 | 580 | | 58 |
| 11/21/2019 | PREPARATION OF | amended joint pretrial stipulation | jpf | 0.1 | 58 | 580 | | 58 |
| 11/25/2019 | PREPARATION OF | motion for attorneys' fees and costs against Curtis and Ammec | jpf | 0.8 | 464 | 580 | | 464 |
| 11/26/2019 | PREPARATION OF | motion for fees and costs against Curtis and Ammec | jpf | 2.4 | 1392 | 580 | | 1392 |
| 11/26/2019 | PREPARATION OF | supplement | jpf | 0.2 | 116 | 580 | | 116 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | and exhibit C to motion for fees and costs against Curtis and Ammec | | | | | | |
| 12/02/2019 | ANALYSIS OF | Curtis' revisions to joint pretrial stipulation | jpf | 0.2 | 116 | 580 | | 116 |
| 12/02/2019 | PREPARATION OF | joint pretrial stipulation with Curtis and Ammec | jpf | 0.7 | 406 | 580 | | 406 |
| 12/02/2019 | PREPARATION OF CORRESPONDENCE | to Curtis and Barriage re: joint pretrial stipulation revisions | jpf | 0.1 | 58 | 580 | | 58 |
| 12/02/2019 | PREPARATION OF | joint pretrial stipulation in adversary proceeding with Curtis and Ammec | jpf | 1.3 | 754 | 580 | | 754 |
| 12/03/2019 | PREPARATION OF | notice of joint pretrial stipulation | jpf | 0.9 | 522 | 580 | | 522 |

| | | dispute | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12/05/2019 | PREPARATION OF | reply on attorneys' fees objections | jpf | 4.4 | 2552 | 580 | | 2552 |
| 12/06/2019 | PREPARATION OF | reply on motion for attorneys' fees award against Curtis and Ammec | jpf | 4.7 | 2726 | 580 | | 2726 |
| 12/09/2019 | PREPARATION OF | reply brief to Curtis' opposition to attorneys fees motion | jpf | 3.9 | 2262 | 580 | | 2262 |
| 12/09/2019 | PREPARATION OF | evidentiary objections to Curtis declartaion | jpf | 1.9 | 1102 | 580 | | 1102 |
| 12/09/2019 | PREPARATION OF | declaration of Michelle McArn in support of reply for attorneys' fees award | jpf | 1.7 | 986 | 580 | | 986 |
| 12/09/2019 | PREPARATION OF | declaration | jpf | 1.8 | 1044 | 580 | | 1044 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | of JP Fritz in support of attorneys' fees award | | | | | | |
| 12/09/2019 | PREPARATION OF | reply brief to Curtis' opposition to attorneys fees motion | jpf | 2.1 | 1218 | 580 | | 1218 |
| 12/09/2019 | ANALYSIS OF | court's tentative ruling on joint pretrial status conference | jpf | 0.1 | 58 | 580 | | 58 |
| 12/09/2019 | PREPARATION FOR HEARING | joint pretrial status conference | jpf | 0.1 | 58 | 580 | | 58 |
| 12/07/2019 | ANALYSIS OF | Curtis' cited case law in opposition to motion for attorneys' fees | jpf | 1.9 | 1102 | 580 | | 1102 |
| 12/08/2019 | PREPARATION OF | reply to Curtis' opposition for attorneys' | jpf | 4.6 | 2668 | 580 | | 2668 |

| | | fees motion | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12/17/2019 | APPEARANCE AT HEARING | on joint pretrial conference | jpf | 1.2 | 696 | 580 | | 696 |
| 12/17/2019 | PREPARATION OF | joint pretrial stipulation for uploading | jpf | 0.8 | 464 | 580 | | 464 |
| 12/17/2019 | PREPARATION OF | notice of joint pretrial stipulation for uploading | jpf | 0.3 | 174 | 580 | | 174 |
| 12/17/2019 | PREPARATION OF | pretrial scheduling order | jpf | 0.2 | 116 | 580 | | 116 |
| 12/18/2019 | PREPARATION OF | joint pretrial stipulation in response to court's rejection of prior version based on incomplete sentence drafted by Defendants | jpf | 0.3 | 174 | 580 | | 174 |
| 01/27/2020 | PREPARATION OF | trial declaration for Eric | jpf | 1.6 | 952 | 595 | | 952 |

| | | Radley | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 02/07/2020 | PREPARATION OF | declaration of Barrington Radley for trial | jpf | 1.2 | 714 | 595 | | 714 |
| 02/07/2020 | PREPARATION OF | Eric Radley's declaration for trial | jpf | 3.6 | 2142 | 595 | | 2142 |
| 02/07/2020 | PREPARATION OF | Michelle McArn's declaration for trial | jpf | 1.3 | 773.5 | 595 | | 773.5 |
| 02/24/2020 | ANALYSIS OF | Curtis' evidentiary objections to declaration of Michelle McArn | jpf | 0.1 | 59.5 | 595 | | 59.5 |
| 02/24/2020 | ANALYSIS OF | Curtis' evidentiary objections to declaration of Eric Radley | jpf | 0.1 | 59.5 | 595 | | 59.5 |
| 02/24/2020 | ANALYSIS OF | Curtis' evidentiary objections to declaration of Barrington | jpf | 0.1 | 59.5 | 595 | | 59.5 |

| | | Radley | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 03/16/2020 | PREPARATION OF | motion to reschedule trial | jpf | 1.1 | 654.5 | 595 | | 654.5 |
| 03/16/2020 | PREPARATION OF | proposed order on motion to reschedule trial | jpf | 0.4 | 238 | 595 | | 238 |
| 03/17/2020 | TELEPHONE CONF. W/ COURT STAFF | re: filing of application for order shortening time on motion to reschedule trial | jpf | 0.1 | 59.5 | 595 | | 59.5 |
| 03/17/2020 | ANALYSIS OF | order re: application for order shortening time on motion to reschedule trial | jpf | 0.1 | 59.5 | 595 | | 59.5 |
| 03/17/2020 | PREPARATION OF | subpoenas for Habitat for Humanity witnesses for | jpf | 0.1 | 59.5 | 595 | | 59.5 |

| | | trial | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 06/16/2020 | PREPARATION FOR HEARING | on Curtis pretrial conference | jpf | 0.3 | 178.5 | 595 | | 178.5 |
| 07/07/2020 | PREPARATION OF | brief re: remote trial procedures | jpf | 0.6 | 357 | 595 | | 357 |
| 08/04/2020 | APPEARANCE AT | status conference re: setting trial | jpf | 0.5 | 297.5 | 595 | | 297.5 |
| 09/30/2020 | APPEARANCE AT HEARING | pretrial status conference against Curtis and Ammec | jpf | 1.2 | 714 | 595 | | 714 |
| 10/01/2020 | PREPARATION OF | pretrial scheduling order | jpf | 0.2 | 119 | 595 | | 119 |
| 12/03/2020 | PREPARATION OF | trial subpoenas for habitat for humanity employees | jpf | 0.2 | 119 | 595 | | 119 |
| 12/18/2020 | PREPARATION OF | trial subpoena and cover letter for | jpf | 0.8 | 476 | 595 | | 476 |

| | | Habitat for Humanity | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 01/10/2021 | PREPARATION OF | trial | jpf | 2.2 | 1331 | 605 | | 1331 |
| 01/11/2021 | EMAIL EXCHANGE WITH | client re: Curtis trial preparation | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 01/11/2021 | PREPARATION OF | evidentiary objections to declaration of Phillip White | jpf | 0.8 | 484 | 605 | | 484 |
| 01/11/2021 | PREPARATION OF | evidentiary objections and preparation for trial | jpf | 4.3 | 2601.5 | 605 | | 2601.5 |
| 01/17/2021 | PREPARATION FOR HEARING | pretrial status conference | jpf | 0.4 | 242 | 605 | | 242 |
| 01/18/2021 | PREPARATION FOR TRIAL | on disputed mechanic lien | jpf | 2.4 | 1452 | 605 | | 1452 |
| 01/19/2021 | PREPARATION FOR TRIAL | on Curtis disputed lien | jpf | 0.4 | 242 | 605 | | 242 |
| 01/19/2021 | APPEARANCE AT HEARING | pretrial status hearing to test | jpf | 0.4 | 242 | 605 | | 242 |

| | | courtroom technology | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 01/20/2021 | TELEPHONE CONF. W/ COURT STAFF | re: scheduling witnesses for trial | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 01/20/2021 | ANALYSIS OF | pretrial scheduling order to prepare for trial | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 01/22/2021 | TELEPHONE CONF. W/ COURT STAFF | re: trial exhibits and witness scheduling | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 01/23/2021 | PREPARATION FOR TRIAL | on Curtis and Ammec lien | jpf | 1.1 | 665.5 | 605 | | 665.5 |
| 01/24/2021 | PREPARATION FOR TRIAL | on disputed mechanic lien | jpf | 0.6 | 363 | 605 | | 363 |
| 01/25/2021 | PREPARATION FOR TRIAL | against Curtis and Ammec | jpf | 2.3 | 1391.5 | 605 | | 1391.5 |
| 01/26/2021 | PREPARATION FOR TRIAL | on Curtis mechanic lien | jpf | 1.3 | 786.5 | 605 | | 786.5 |
| 01/27/2021 | PREPARATION FOR TRIAL | against Curtis and Ammec | jpf | 1.3 | 786.5 | 605 | | 786.5 |
| 01/27/2021 | PREPARATION OF | motion in | jpf | 0.8 | 484 | 605 | | 484 |

38

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | limine to exclude impeachment exhibits by Curtis | | | | | | |
| 01/27/2021 | TELEPHONE CONFERENCE W/ CLIENT | prepare for trial | jpf | 1.2 | 726 | 605 | | 726 |
| 01/27/2021 | PREPARATION FOR TRIAL | on Curtis and Ammec dispute | jpf | 3.7 | 2238.5 | 605 | | 2238.5 |
| 01/28/2021 | PREPARATION FOR TRIAL | against Curtis and Ammec | jpf | 3.8 | 2299 | 605 | | 2299 |
| 01/28/2021 | APPEARANCE AT TRIAL | against Curtis and Ammec | jpf | 2.1 | 1270.5 | 605 | | 1270.5 |
| 02/04/2021 | ANALYSIS OF | Greta Curtis trial declaration | jpf | 0.4 | 242 | 605 | | 242 |
| 02/04/2021 | PREPARATION OF CORRESPONDENCE | to client re: Greta Curtis trial declaration | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 02/04/2021 | TELEPHONE CONFERENCE W/ CLIENT | preparation for trial and response to Greta Curtis declaration | jpf | 0.4 | 242 | 605 | | 242 |

| 02/08/2021 | PREPARATION OF | evidentiary objection to Greta Curtis declaration | jpf | 1.6 | 968 | 605 | | 968 |
| 02/09/2021 | PREPARATION OF | evidentiary objections to Curtis declaration | jpf | 2.9 | 1754.5 | 605 | | 1754.5 |
| 02/11/2021 | PREPARATION OF | evidentiary objection to Curtis trial declaration | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 02/15/2021 | PREPARATION FOR TRIAL | on Curtis mechanic lien | jpf | 0.8 | 484 | 605 | | 484 |
| 02/16/2021 | PREPARATION FOR TRIAL | slander of title | jpf | 0.8 | 484 | 605 | | 484 |
| 02/17/2021 | PREPARATION FOR TRIAL | on Mechanic's lien | jpf | 2.1 | 1270.5 | 605 | | 1270.5 |
| 02/18/2021 | PREPARATION FOR TRIAL | morning portion of trial day 1 against Curtis and Ammec | jpf | 3.1 | 1875.5 | 605 | | 1875.5 |
| 02/18/2021 | PREPARATION FOR TRIAL | afternoon portion of trial day 1 against Curtis | jpf | 3.6 | 2178 | 605 | | 2178 |

| | | and Ammec | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 02/19/2021 | PREPARATION FOR TRIAL | morning portion of trial day 2 against Curtis and Ammec | jpf | 3.6 | 2178 | 605 | | 2178 |
| 02/19/2021 | PREPARATION FOR TRIAL | afternoon portion of trial day 2 against Curtis and Ammec | jpf | 1.8 | 1089 | 605 | | 1089 |
| 02/22/2021 | PREPARATION OF | post-trial findings of facts and conclusions of law | jpf | 2.4 | 1452 | 605 | | 1452 |
| 02/27/2021 | PREPARATION OF | findings of facts and conclusions of law after trial | jpf | 1.8 | 1089 | 605 | | 1089 |
| 03/06/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 1.1 | 665.5 | 605 | | 665.5 |
| 03/08/2021 | PREPARATION OF | post-trial findings of | jpf | 0.8 | 484 | 605 | | 484 |

| | | fact and conclusions of law | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 03/12/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 0.3 | 181.5 | 605 | | 181.5 |
| 03/19/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 0.6 | 363 | 605 | | 363 |
| 03/19/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 4.2 | 2541 | 605 | | 2541 |
| 03/22/2021 | PREPARATION OF | proposed findings of fact and conclusions of law after trial | jpf | 2.4 | 1452 | 605 | | 1452 |
| 03/22/2021 | PREPARATION OF | proposed findings of fact and conclusions of law after | jpf | 1.4 | 847 | 605 | | 847 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | trial | | | | | | |
| 03/23/2021 | PREPARATION OF | proposed findings of fact and conclusions of law after trial | jpf | 1.6 | 968 | 605 | | 968 |
| 03/29/2021 | ANALYSIS OF | court scheduling order on closing arguments, findings and conclusions, and attorneys' fees damages | jpf | 0.2 | 121 | 605 | | 121 |
| 03/29/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 1.8 | 1089 | 605 | | 1089 |
| 04/04/2021 | PREPARATION OF | findings of facts and conclusions of law after trial | jpf | 0.8 | 484 | 605 | | 484 |
| 04/06/2021 | PREPARATION OF | findings and conclusions | jpf | 1.3 | 786.5 | 605 | | 786.5 |

| | | after trial | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 04/07/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 1.5 | 907.5 | 605 | | 907.5 |
| 04/08/2021 | PREPARATION OF | findings and conclusions after trial | jpf | 1.8 | 1089 | 605 | | 1089 |
| 04/10/2021 | PREPARATION OF | findings of facts and conclusions of law after trial | jpf | 1.4 | 847 | 605 | | 847 |
| 04/10/2021 | PREPARATION OF | findings of facts and conclusions of law after trial | jpf | 2.2 | 1331 | 605 | | 1331 |
| 04/11/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 1.2 | 726 | 605 | | 726 |
| 04/12/2021 | PREPARATION OF | findings of fact and conclusions of law after | jpf | 2.1 | 1270.5 | 605 | | 1270.5 |

| | | trial | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 04/12/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 1.5 | 907.5 | 605 | | 907.5 |
| 04/12/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 0.6 | 363 | 605 | | 363 |
| 04/15/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 2.4 | 1452 | 605 | | 1452 |
| 04/15/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 1.7 | 1028.5 | 605 | | 1028.5 |
| 04/18/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 0.9 | 544.5 | 605 | | 544.5 |
| 04/18/2021 | PREPARATION OF | findings of fact and | jpf | 2.3 | 1391.5 | 605 | | 1391.5 |

| | | conclusions of law after trial | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 04/18/2021 | PREPARATION OF | request for judicial notice in support of findings of fact and conclusions of law after trial | jpf | 0.3 | 181.5 | 605 | | 181.5 |
| 04/18/2021 | PREPARATION OF | notice of trial hearing transcripts in support of findings of fact and conclusions of law after trial | jpf | 0.2 | 121 | 605 | | 121 |
| 04/19/2021 | PREPARATION OF | findings of fact and conclusions of law after trial | jpf | 0.7 | 423.5 | 605 | | 423.5 |
| TOTAL | | | | | | | | $87,365.50 |

Remainder of page left intentionally blank.  See next page.

**Exhibit 1 to Findings and Conclusions**

Part "C" - April 21 2021 to January 12 2022

| CHARGE DATE | WORK CODE DESCRIPTION | DESCRIPTION | LAWYER'S INITIALS | HOURS WORKED | AMOUNT CHARGED | LAWYER'S RATE | Court Ruling | AMOUNT ALLOWED |
|---|---|---|---|---|---|---|---|---|
| 04/21/2021 | PREPARATION OF | motion for attorneys' fees award | jpf | 0.5 | 302.5 | 605 | | 302.5 |
| 04/21/2021 | PREPARATION OF | motion for award of attorneys' fees | jpf | 1.2 | 726 | 605 | | 726 |
| 04/21/2021 | PREPARATION OF | motion for attorneys' fees and costs | jpf | 1.7 | 1028.5 | 605 | | 1028.5 |
| 04/22/2021 | PREPARATION OF | motion for award of attorneys' fees | jpf | 1.4 | 847 | 605 | | 847 |
| 04/22/2021 | PREPARATION OF | motion for award of attorneys' fees | jpf | 0.5 | 302.5 | 605 | | 302.5 |
| 04/27/2021 | PREPARATION OF | motion on attorneys' fees after trial | jpf | 2 | 1210 | 605 | | 1210 |

| 04/28/2021 | PREPARATION OF | motion for attorneys' fees and costs | jpf | 1.9 | 1149.5 | 605 | | 1149.5 |
|---|---|---|---|---|---|---|---|---|
| 04/28/2021 | PREPARATION OF | motion for attorneys' fees and costs | jpf | 1.8 | 1089 | 605 | | 1089 |
| 04/28/2021 | PREPARATION OF | McArn declaration in support of motion for attorneys' fees | jpf | 0.3 | 181.5 | 605 | | 181.5 |
| 04/28/2021 | PREPARATION OF | motion for attorneys' fees with exhibits | jpf | 0.7 | 423.5 | 605 | | 423.5 |
| 04/30/2021 | ANALYSIS OF CORRESPONDENCE | from Curtis re: extending deadline to respond to attorneys' fees motion | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 04/30/2021 | ANALYSIS OF | Curtis' ex parte motion for extending deadline on attorneys' | jpf | 0.2 | 121 | 605 | | 121 |

| | | fees motion | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 04/30/2021 | PREPARATION OF CORRESPONDENCE | to Curtis re: extending deadline to respond to attorneys' fees motion | jpf | 0.2 | 121 | 605 | | 121 |
| 05/14/2021 | EMAIL EXCHANGE WITH | client re: Curtis request for extension of time related to deaths in family | jpf | 0.4 | 242 | 605 | | 242 |
| 05/14/2021 | ANALYSIS OF CORRESPONDENCE | from Greta Curtis re: request for briefing continuance | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 05/14/2021 | PREPARATION OF CORRESPONDENCE | to Greta Curtis re: request for briefing continuance | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 05/14/2021 | ANALYSIS OF CORRESPONDENCE | Curtis' email re: continued hearing dates | jpf | 0.3 | 181.5 | 605 | | 181.5 |
| 05/14/2021 | PREPARATION OF CORRESPONDENCE | to Curtis re: | jpf | 0.7 | 423.5 | 605 | | 423.5 |

| | | problems and issues and suggested fixes on Curtis' request for continued briefing and hearing dates | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 05/18/2021 | ANALYSIS OF | Curtis' application for a continued hearing and extended briefing schedule | jpf | 0.2 | 121 | 605 | | 121 |
| 05/18/2021 | PREPARATION OF | response to Curtis' application for a continued hearing and extended briefing schedule | jpf | 0.2 | 121 | 605 | | 121 |
| 06/08/2021 | PREPARATION OF | Greta Curtis re: attorneys' | jpf | 0.4 | 242 | 605 | | 242 |

50

| | | fees motion | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 06/21/2021 | ANALYSIS OF CORRESPONDENCE | from Greta Curtis re: third request to continue briefing and hearing deadlines | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 06/24/2021 | PREPARATION OF | response to Curtis' third ex parte motion for continuance trial | jpf | 1.7 | 1028.5 | 605 | | 1028.5 |
| 06/25/2021 | ANALYSIS OF | Court's order on Curtis' ex parte application to extend briefing schedule and continue hearings | jpf | 0.2 | 121 | 605 | | 121 |
| 06/25/2021 | PREPARATION OF CORRESPONDENCE | to client re: Court's order on Curtis' ex parte application to extend | jpf | 0.5 | 302.5 | 605 | | 302.5 |

| | | briefing schedule and continue hearings | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 07/07/2021 | ANALYSIS OF | tentative ruling for ex parte hearing on continued hearing dates | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 07/07/2021 | APPEARANCE AT HEARING | on Curtis' ex parte application for continued hearing dates | jpf | 0.5 | 302.5 | 605 | | 302.5 |
| 07/08/2021 | ANALYSIS OF | court order rescheduling deadlines and hearing dates on Curtis' ex parte application | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 08/02/2021 | ANALYSIS OF | tentative ruling to status conference | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 08/03/2021 | APPEARANCE AT HEARING | status conference for | jpf | 0.3 | 181.5 | 605 | | 181.5 |

| | | scheduling | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 08/04/2021 | ANALYSIS OF | scheduling order continuing hearing dates and deadlines for Curtis' medical condition | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 08/04/2021 | PREPARATION OF CORRESPONDENCE | to client re: results from hearing and court's scheduling order continuing hearing dates and deadlines for Curtis' medical condition | jpf | 0.1 | 60.5 | 605 | | 60.5 |
| 09/14/2021 | APPEARANCE AT HEARING | on scheduling conference for Curtis lien and slander of title | jpf | 0.7 | 423.5 | 605 | | 423.5 |

| | | matter | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/20/2021 | APPEARANCE AT | status conference on Curtis litigation | jpf | 0.4 | 242 | 605 | | 242 |
| 10/27/2021 | APPEARANCE AT HEARING | on trial status conference | jpf | 0.5 | 302.5 | 605 | | 302.5 |
| 11/17/2021 | PREPARATION FOR HEARING | on Ammec's ex parte application to extend deadlines again | jpf | 0.7 | 423.5 | 605 | | 423.5 |
| 11/17/2021 | APPEARANCE AT HEARING | on Ammec's ex parte application to extend deadlines again | jpf | 0.5 | 302.5 | 605 | | 302.5 |
| 12/29/2021 | PREPARATION OF | reply to Curtis' proposed findings | jpf | 0.4 | 242 | 605 | | 242 |
| 12/29/2021 | PREPARATION OF | reply to Curtis' proposed findings | jpf | 2 | 1210 | 605 | | 1210 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12/30/2021 | PREPARATION OF | reply to Curtis' findings and conclusions | jpf | 1.7 | 1028.5 | 605 | | 1028.5 |
| 12/30/2021 | ANALYSIS OF | case law re: litigation privilege and mechanics liens | jpf | 0.8 | 484 | 605 | | 484 |
| 12/30/2021 | ANALYSIS OF | case law re: application of litigation privilege on mechanics lien | jpf | 1.1 | 665.5 | 605 | | 665.5 |
| 12/31/2021 | ANALYSIS OF | plaintiff's findings and conclusions in preparation of reply to defendants' findings and conclusions | jpf | 1.4 | 847 | 605 | | 847 |
| 01/01/2022 | PREPARATION OF | reply to defendants' proposed findings and conclusions | jpf | 1.4 | 868 | 620 | | 868 |

| 01/02/2022 | PREPARATION OF | reply on findings and conclusions | jpf | 1.2 | 744 | 620 | | 744 |
|---|---|---|---|---|---|---|---|---|
| 01/05/2022 | ANALYSIS OF | 56-page Curtis opposition to attorneys' fees motion | jpf | 2.6 | 1612 | 620 | | 1612 |
| 01/05/2022 | PREPARATION OF | reply on findings and conclusions | jpf | 0.3 | 186 | 620 | | 186 |
| 01/06/2022 | PREPARATION OF | reply to attorneys' fees opposition by Curtis and Ammec | jpf | 0.8 | 496 | 620 | | 496 |
| 01/06/2022 | PREPARATION OF | reply on attorneys' fees motion | jpf | 2.6 | 1612 | 620 | | 1612 |
| 01/07/2022 | PREPARATION OF | reply on attorneys' fees | jpf | 4.6 | 2852 | 620 | | 2852 |
| 01/08/2022 | PREPARATION OF | reply on attorneys' fees to Curtis' opposition | jpf | 0.2 | 124 | 620 | | 124 |

| 01/08/2022 | PREPARATION OF | reply on findings and conclusions | jpf | 1.4 | 868 | 620 | | 868 |
|---|---|---|---|---|---|---|---|---|
| 01/08/2022 | PREPARATION OF | reply on findings and conclusions | jpf | 1.9 | 1178 | 620 | | 1178 |
| 01/09/2022 | PREPARATION OF | reply on Defendants' findings and conclusions | jpf | 2.4 | 1488 | 620 | | 1488 |
| 01/10/2022 | PREPARATION OF | reply to Defendants' opposition to findings and conclusions | jpf | 2.6 | 1612 | 620 | | 1612 |
| 01/10/2022 | PREPARATION OF | reply to Defendants' opposition to findings and conclusions | jpf | 1.9 | 1178 | 620 | | 1178 |
| 01/11/2022 | PREPARATION OF | reply on attorneys' fees motion | jpf | 1.9 | 1178 | 620 | | 1178 |
| 01/11/2022 | PREPARATION OF | reply on findings and conclusions | jpf | 0.4 | 248 | 620 | | 248 |
| 01/11/2022 | PREPARATION OF | reply on findings and | jpf | 1.5 | 930 | 620 | | 930 |

| | | conclusions | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 01/12/2022 | PREPARATION OF | reply on attorneys' fees motion | jpf | 1.4 | 868 | 620 | | 868 |
| 01/12/2022 | PREPARATION OF | reply on findings and conclusions after trial | jpf | 0.3 | 186 | 620 | | 186 |
| **TOTAL** | | | | | | | | $35,712.50 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Part A** | | | | | | | $147,629.25 |
| **Part B** | | | | | | | $87,365.50 |
| **Part C** | | | | | | | $35,712.50 |
| **TOTAL** | | | | | | | $270,707.25 |